UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO:  1:24-cv-20060-KMW


ARTHUR LEHMANN,

          Plaintiff,

v.

CARNIVAL CORP.,

          Defendant.
_____/


Remote Audio-Video Communication

Monday, November 18, 2024

10:00 a.m. - 2:13 p.m.




DEPOSITION OF RANDALL JACQUES


     Taken before Paula Pace, RPR, Notary Public
in and for the State of Florida at Large, pursuant
to Notice of Taking Deposition filed in the above
case.

APPEARANCES:


ON BEHALF OF THE PLAINTIFF:
LIPCON, MARGULIES & WINKLEMAN, P.A.
2800 Ponce de Leon Blvd.
Suite 1480
Miami, Florida 33134
BY:  Alex Perez, Esquire
     Aperez@lipcon.com

     Nicolas Lipcon, Esquire
     Nlipcon@lipcon.com

ON BEHALF OF THE DEFENDANT:
FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
BY:  Victor J. Pelaez, Esquire
     Vpelaez@fowler-white.com




                    - - - - - -

                  I N D E X

                    - - - - - -
                                              PAGE
**Randall Jacques**
   By Mr. Pelaez                              003
                                              133
   By Mr. Perez                               102


                E X H I B I T S

                                              PAGE
DEFENDANT'S
No. 1 - Report                                025
No. 2 - Zoomed in photo                       071
No. 3 - Photograph of the tender boat         095

Thereupon,

RANDALL WESLEY JAQUES,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PELAEZ:

Q.    Morning, sir.  Can you please state your name for the record.

A.    Randall Wesley Jaques, spelled J-A-Q-U-E-S.

Q.    Where are you testifying from today?

A.    1601 -- 1601 Jennings Avenue, Apartment number B as in boy, Villas -- V-I-L-L-A-S -- New Jersey 08251.

Q.    Is that your home address?

A.    For right now, yes, until we come home next year.

Q.    Okay.  Do you have a separate business address?

A.    That's complicated.  Yes, I do.  It's our primary residence in Cooper City, but I would prefer not to have anything mailed there because it will just wind up in the garbage can.

Q.    Okay.  How long have you been living in New Jersey for now?

**A.**     Approximately 14 months.

**Q.**     Okay.  And this is not your first deposition, correct?

**A.**     That's correct.

**Q.**     Can you tell us how many depositions you've done in the past?  Do you have an idea, a ballpark?

**A.**     In the past how many years?

**Q.**     In your entire experience, can you tell me how many depositions you've done?  Do you know?

**A.**     Well, I will be 66 in two weeks.  I'm just going to guesstimate.  Over a hundred.

**Q.**     Okay.  And you're here today as an expert witness on behalf of Plaintiff Arthur Lehmann in a lawsuit that he filed against my client Carnival Corporation; is that correct?

**A.**     Yes.

**Q.**     And you were retained by Mr. Lehmann's attorneys as an expert witness in this matter; is that correct?

**A.**     Yes.

**Q.**     And you have authored a Rule 26, a tender operation expert report in this matter; is that correct?

A.    Yes.

Q.    Okay.  Can you tell me what qualifications you have to provide expert opinions in this matter regarding a transfer of a passenger from a cruise ship onto a tender boat in Cabo San Lucas?

A.    I worked for four major cruise lines back in the '90s and up until 2007.  I have done tender operations and been responsible for them on a weekly basis, depending on what port we're going to, one of which was Cabo San Lucas; Grand Cayman -- that was another one; Belize.  These ports are very challenging in that we use third-party tenders, and I have done that for seven and a half years.

Q.    When did you first begin working with the cruise lines?

A.    Just after the first Gulf War.  I think it was 1991.

Q.    What cruise line did you work -- or start working with in 1991?

A.    Carnival Cruise Line.

Q.    Was that Carnival Cruise Line?

A.    Yes, it is.

Q.    Okay.  And in what capacity were you

employed by Carnival Cruise Line in 1991?

A.    I was the chief security officer.  I was responsible for the passengers and crew and their safety and welfare, working with DEA, customs authorities.  Of course, I worked underneath the auspices of the captain and the staff captain.  I was an SSO, which is shipboard security officer, along with the staff captain who was a shipboard security officer, which requires two on board the ship.  Tender operations were -- oh, gangway operations, really, are tender operations.  It's just, it's -- the mathematic situation changes and the logistics changes.

And in tender operations, I was responsible for overseeing the lowering the platform, ensuring that the platform was lowered properly, that the tender was coming alongside, that the ordinary seamen were able to do their job by tying off the tender, and that we could begin offloading passengers for their tours.  And then after that, the passengers going ashore.

Q.    How long did you work for Carnival Cruise Lines for?

A.    I believe it was for just over two years.

Q.   And the entire time you were with Carnival Cruise Line was your -- your title was chief security officer?

A.   Yes.  With other cruise line, it's called -- like with Norwegian Cruise Line, which I went to next, was called security officer, then security manager.  We were three-stripe officers, mid-management.  We had security guards that worked for us.

Q.   I'm just focusing on Carnival right now.  So you said you were with Carnival for about two years and that entire time you held the position of chief security officer?

A.   That's correct.

Q.   Okay.  Do you remember what ships you worked on during your time with Carnival?

A.   Yes.  The TROPICALE, which I am quite sure is scrapped now, the ECSTASY, which is scrapped now, and the MARDI GRAS, which is definitely gone now.

Q.   During your time with Carnival Cruise Line, specifically from 1991, for those about two years thereafter, did any of those ships that you worked on make port in Cabo San Lucas at that time?

A.   No.  When I went to Holland America,

they did, and they're owned by Carnival Corporation.

Q.   When you were employed by Carnival Cruise Line as a chief security officer, your involvement in tender operations at that time -- and specifically, when I say "tender operations," I'm talking about not, you know, lifeboat drills or lifeboat tenders, but specifically tendering cruise ship passengers from the ship to shore in ports of call.

Do you understand that?

A.   Yes, I do.

Q.   Okay.  So just so we're all on the same page to make sure.  But while you were with Carnival from 1991 for those two years, your involvement in tender boat operations at that time, as a chief security officer, was your responsibility more so to ensure the security of the ship itself and the passengers getting on and off?

A.   Well, yes, with explanation, that -- coupled with that is that I had to monitor, constantly, the interaction between the tender operator and our own qualified seamen aboard the ship so we had a safe and proper entrance and exit

from the tender itself.  Because it's very complicated when you go down to the platform. First of all, the ship is moving; second of all, the platform is moving; and then third of all, the tender is moving.  So it's not an easy task, and we have to monitor that hands-on.

Q.   After those two years you spent with Carnival in the early nineties, where did you work at next?

A.   I went back to the military for a while.  I wasn't ready to go back to police work. I just wanted to take a break, and I worked on active duty for a while at US Southern Command in Miami.  Then I went to Norwegian Cruise Line as security manager.

Q.   Why did you stop working with Carnival Cruise Line on or around 1993?

A.   Because I took a grant position with the City of South Miami Police Department.  They wanted -- I had a friend there, and they wanted me to clean up about 30 hit-and-run accidents that they had, that they thought would take over a year to do, and I completed that within nine months and I basically said, okay, I've done my job.  I'm going to move on, go back to the military or go see

what else is out there.  I kind of wanted to see the world.

Q.    And you mentioned that at some point thereafter you began working for Norwegian Cruise Lines; is that correct?

A.    That's correct.

Q.    Okay.  Can you tell me when you first started working with Norwegian Cruise Line?

A.    I believe it was 2000.

Q.    When you began working with Norwegian Cruise Line, what was your title?

A.    Security manager.

Q.    Okay.  Security manager.  And that is a position on board Norwegian cruise ships, correct?

A.    That's correct.  I was shipboard.  I wasn't home office.

Q.    And as security manager on Norwegian Cruise Line cruise vessels, were you the highest officer in terms of the security department on board Norwegian ships?

A.    No.  The staff captain was my boss, because there's -- again, there's two SSOs, shipboard security officers, the staff captain being my boss, and, of course, the master being my

boss, and I was third from there.

Q.    How long did you work specifically with Norwegian Cruise Lines for?

A.    Excuse me.  I believe approximately -- just over two years, and then I was released.

Q.    Why were you released from Norwegian Cruise Lines?

A.    I was responsible for the crew cleaning out the safety locker, and I told them to do something and they thought I said incinerate something, and I said no, store something.  So they incinerated two boxes worth of safety reports and I was responsible.  I was in charge.  So Norwegian Cruise Line broke my contract and said, we're going to release you and thank you very much.

Q.    During your time with Norwegian Cruise Line, did you have any involvement with tender boat operations there at ports of call as well?

A.    Oh, gosh, yes.  I mean, because I was on the SS NORWAY, which -- I don't know if any of you had the opportunity to sail upon from Miami with your parents, but we had LITTLE NORWAY 1, and LITTLE NORWAY 2, and these were our tenders that actually sat on the vessel, and we used those because the NORWAY was so big that we couldn't come

alongside in port.  So it was a constant logistical nightmare, but it worked because we knew what to do.

Q.    So during your time with Norwegian Cruise Line your experience with tender boat operations involved using the actual lifeboats from the ship itself; is that correct?

A.    No, they weren't lifeboats.  You would have to Google LITTLE NORWAY 1 and LITTLE NORWAY 2 and see their pictures.  They had a capacity of, I believe, about -- close to 200 passengers, and they were two decked, something kind of like that they use in Grand Cayman.

Q.    Okay.

A.    And these tenders, these were actually on the vessel.  It's something to see.

Q.    When you were working with Norwegian Cruise Line, did you have any experience with them handling tender operations in Cabo San Lucas specifically?

A.    I'm thinking.  No, because we were global.  It wasn't until I went with Holland America that -- it wasn't until I went with Holland America Line that we had Cabo San Lucas.

Q.    Okay.  Then after you stopped working

with Norwegian Cruise Line, did you work at any other cruise lines thereafter?

A.    Yes.  I worked for Disney Cruise Line. I did one contract.  And then I went to -- I had applied previously with Holland America Line, and they called me while I was with Disney, asking if I would quit that day in a foreign port and just board their vessel, and I said, no.  I said, when I get home, I'll call you.

But I stayed with Holland America Line for probably -- I'm going to say just over a year -- or excuse me, with Disney.  I apologize.  With Disney.

Q.    So just over a year with Disney Cruise Line; is that correct?

A.    No.  Back up.  I'm sorry.

I did one contract for five months.  I apologize.

Q.    And what was your title during that one contract with Disney Cruise Line?

A.    I was security officer.  Same thing as chief security officer and same thing as security manager.  Same responsibilities.  It really doesn't change within the industry.

Q.    Your report indicates that you worked

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

with Disney in 2004; is that correct?

A.    Yes.  Spot on, because I just came back then from Afghanistan the first time.  Yes, that's correct.

Q.    And then after Disney Cruise Line, you testified that is when you began working with Holland America, correct?

A.    Yes, I returned home and then I called Holland America and I said, I can't work with Disney anymore.  Basically what it was, is that the benefits were great, however, if you were an American -- and my wife was pregnant -- they would not cover the birth of a child in America unless you had been with them for over nine months.  And so Holland America Line said, we'll give you Blue Cross Blue Shield and have a preexisting condition for your wife.

Q.    Let me back up just again.  I think you made it clear.  You didn't actually oversee any type of tender boat operations in your cruise line experience until you started with Holland America; is that correct?

MR. PEREZ:  Object to the form.

THE WITNESS:  No.  I thought we just went through all that.

BY MR. PELAEZ:

Q.   Did I say that right?  Maybe I -- I think it came out wrong.

What I'm trying to say is, is it correct that you didn't oversee any type of tender boat operations in Cabo San Lucas specifically until you started with Holland America?

A.   I would agree with that.

Q.   Okay.  That's what I meant to say.

And then how long did you work with Holland America for?

A.   I believe it was two years.

Q.   What was your title with Holland America?

A.   Security officer.

Q.   Okay.  And did you have generally the same responsibilities as you did when you worked with Carnival and with Norwegian and with Disney?

A.   Exactly the same with the only changes I was allowed, they allowed me to apply for safety officer.  So the captain signed off on my seaman's book that I was qualified to be a safety officer as well as security officer.  We did a lot more things with Holland America Line.  We got in the water, we trained crew members how to swim.  We actually

inspected the hull of the vessel while underwater with tanks, being PADI-certified.  So it was a little bit different in that respect, but the rest of the responsibilities, especially with the elderly, elderly passengers was -- and we traveled the world -- was paramount that we had to have the best of the best of service for when -- and responsibility in logistics when they boarded these tenders and when they offloaded these tenders.

Q.   Can you tell me more about that specifically?  What were your duties or obligations or responsibilities while you were with Holland America with respect to tender boat operations at ports of call?

A.   You kind of lost me there, Victor.  So you want me to tell you now or are you going to ask me later?

Q.   I'm asking you, during your time with Holland America back in 2005 through 2006, what were your specific responsibilities and duties with respect to tender boat operations at ports of call?

A.   They were more than they were with any other cruise line because we were -- I boarded in Brazil, and we couldn't come alongside any port because we had to either anchor or maneuver and, of

course, that involves tender operations.  And we traveled the world.  We went to Tahiti, the Panama Canal, Hawaii.  I mean, it was -- these were people that take 20-, 30-day cruises.  These ports cannot hold a vessel alongside the pier because they don't have the depth for the haul.  So we would do tender operations --

Q.   My question is more specifically -- sorry to cut you off there.  But just as a security officer and safety officer, specifically what was your role with respect to tender operations of Holland America?

A.   Correct.  I was trying to set up -- it is complicated.  But at any rate, my responsibility was that I would have to be there early in the morning hours, greet immigration or customs when they came on board the vessel.  We would be maneuvering or anchored because they would come out by their own pilot boat or tender, and then I would have to make sure the platform was set up -- you see, the platform goes out from the ship.  The platform is actually encased into the ship.  The platform comes out.  And then once the platform is out, then we can lower our tenders to come alongside the ship.  But then we would be

responsible for reporting to the bridge, well, is it safe to start debarking passengers because the ship is clear.

And that was my responsibility, to ensure whether or not we had minimal swells, that the seas were halfway calm, and that it was logistically and safely possible for these passengers to debark the vessel, down a gangway, to go to the platform to get into the tender.

And it was time consuming and I had to do that all day long.  Yes, I would take breaks and I had a assistant chief security officer that was responsible with me.  And the safety officer would also help.  So the three of us would do this throughout the day.

And then it was time for the last tender to come back, all passengers are on board, very good, and we would bring up the tenders and the platform would be retracted.

Q.    When you were with Holland America, were there ever times when they using third-party tender boat operators or -- because you mentioned now lowering the lifeboats?

A.    It was kind of 50/50.  It would depend on where you were.  Like, if you were in Belize,

that's third party.  If in you're in Cabo San Lucas, third party.  If you're in -- it's a myriad of different places, but it's contracted through shore excursions and that particular country.

Q.    Your report indicates that you worked with Holland America through July of 2006; is that correct?

A.    Yes.

Q.    And why did you stop working with Holland America in July of 2006?

A.    It was time to come back to land.  My daughter had been born and we decided to move back to South Florida, and I was going back to police work.

Q.    Since July of 2006, have you ever worked with a cruise line since then?

A.    I contracted on a emergency basis for Star Cruise Line, and, I believe, Viking.  They called me once and I did go for two weeks; however, I was pretty done.  It was over.

Q.    Okay.  So basically, after you stopped working with Holland America in July of 2006, you may have served one two-week contract with Star and Viking; is that correct?

A.    I believe so, yes.

Q.   Do you recall what year that was at all, that you served that two-week contract?

A.   It was 2007.  I really don't remember.

Q.   Okay.  And since then, you haven't worked on board cruise ships at all after that; is that correct?

A.   Correct.

Q.   Okay.  So what did you start working as after you stopped with the cruise lines around 2007?

A.   I went back to Afghanistan with the Department of Defense for one last contract, and then when I came home, I believe I went with the school district police department, and then I started my LLC, which was Randall W. Jaques, LLC.

Q.   When did you start Randall Jaques, LLC?

A.   I believe it was 2007.

Q.   What was the purpose of starting Randall Jaques, LLC?  What kind of business were you doing?

A.   Well, I wanted to do expert testimony and consulting and accident reconstruction -- any criminal work, maritime accidents, anything that happened on the water.  I offered my services and I

still do to both plaintiff and defense.

Q.   Currently, besides your work with Randall Jaques, LLC, are you employed in any other sort of fashion?

A.   No.  I'm disabled and retired now with the U.S. Army.

Q.   But you still actively maintain Randall Jaques, LLC, correct?

A.   Yes, I do.

Q.   Okay.  And besides Randall Jaques, LLC, not including any type of disability or pension or whatever other payments you may receive, your only kind of active employment at this time is through Randall Jaques, LLC; is that fair?

A.   That's fair.  Yes.

Q.   What percentage of your work with Randall Jaques, LLC, involves testimony on behalf of plaintiffs in personal injury lawsuits?

A.   It goes year by year.  It varies.  I mean, ever since, post-COVID, it's mostly -- well, I would still say it's probably 90 percent -- 80 to 90 percent plaintiff, 20 to 10 percent defense.  It all depends how the year goes.

Q.   Have you ever served as a expert

witness on behalf of a cruise line in a lawsuit?

A. With outside firms, yes. Not with inhouse.

Q. When was the last time you served as an expert witness on behalf of a cruise line in any lawsuit?

A. Two years ago with Maltzman and Partners -- M-A-L-T-Z-M-A-N -- and Partners, Coral Gables, Florida. And that was a case with Princess Cruise Line.

Q. So after that case with Maltzman and Partners you haven't been retained on behalf of the cruise lines in any personal injury lawsuits; is that fair?

A. For defense, that's correct. They call sometimes, but they usually settle the case and they don't need me.

Q. Do you hold any type of educational degrees or certificates that qualify you to testify as an expert in this matter regarding tender boat operations?

A. Well, I have been a certified SSO which is shipboard security officer with the Netherlands and the United States Coast Guard for two decades now, and -- or more than that, and I

also am a qualified seaman with the United States Coast Guard which means the United States Coast Guard put on the training for those of us that were shipboard in management positions to become qualified seamen, being responsible for tender operations, passenger debarkation in case of emergency, and a whole spectrum of different things that, emergency-wise, happen on ships, crowd and crisis control management under STCW-95 which has to do with emergencies at sea, passenger debarkation, controlling passengers properly so that there's not -- you know, mayhem that breaks out and stampedes.

Q.    Do you still maintain that shipboard security officer licenses, the ones that you mentioned with the Netherlands and with the U.S. Coast Guard?

A.    Yes.  It doesn't expire.  I was just thinking of what else that has to do directly with what you were asking.  Bear with me.

I think for training purposes, that just about covers it, but then I actually did the training myself because I had to teach the new personnel coming on board the vessel what their responsibilities were, especially within the deck

department, to assist passengers -- and we can get to that later.

Q.   And besides your work directly with the cruise lines that we've now gone over, do you have any other actual experience, overseeing or being involved with tender boat operations, or is it just through the cruise lines?

A.   It's mostly through the cruise lines. It's just I was a marine patrol officer for four years with the City of Coral Gables Police Department, and not that we were embarking passengers by the thousands or, you know, debarking them.  However, we did have to assist passengers coming on board our vessel, and then returning them back to their vessel, if need be, in case of emergency.

Q.   But in terms of overseeing, as you said, thousands of passengers getting on and off of tender boats, that kind of experience is -- in terms of what you have, is only through working with the cruise lines, right?

A.   That's correct.

Q.   Okay.  In terms of this specific case involving passenger Arthur Lehmann, can you tell me specifically what your assignment was as an expert

witness in this case?

A.    Well, yes.  I mean, briefly, to break it down, is that I was not able to actually go to the vessel; however, I was able to speak with Mr. Lehmann and determine exactly what his impression was of what happened.  I was able to review the CCTV camera footage, I was able to read depositions and discovery, late discovery that arrived, policies and procedures from Carnival Corporation, and then come to a consensus and offer opinions as to what I felt either broke down in the system, or the machine, as we call it, or what contributed to it.

Q.    You told us earlier you did offer a report in this matter, correct?

A.    That's correct.

Q.    Okay.

MR. PELAEZ:  Let's go ahead and mark that as Exhibit 1 to your deposition today.

(Thereupon, Defense Exhibit No. 1 was marked for identification.)

BY MR. PELAEZ:

Q.    And I will share it with you now.

A.    Okay.  Thank you.  Because I don't have the best computer.

Q.   Okay.  Are you able to see the document that I've now shared with you, that we've now marked as Exhibit 1 to your deposition today.  Sir?

A.   Excellent.  Thank you.  I'm going to back this up a little bit so I can -- okay, thank you.

Q.   So it's a seven-page document.  It's titled Tender Operation Expert Report and it's got your name at the top of it, right?

A.   That's correct.

Q.   And we could scroll through it.

Bottom of page 7, electronic signature, Randall Jaques, September 5th, 2024.

Do you see that?

A.   Yes, I do.

Q.   Okay.  So you agree this is the report that you authored in this matter?

A.   Yes, I agree.

Q.   Okay.  All right.

So you mentioned that you reviewed certain discovery, you saw the CCTV video and you conducted an interview with Mr. Lehmann, correct?

A.   That's correct.

Q.   Okay.  When exactly did you conduct

that interview with Mr. Lehmann?

A.    I don't really recall.  I'll have to scroll town and see if I...  bear with me.

Q.    Do you have a copy of the report in front of you, your own report?  You can refer to that.

A.    I do on my iPhone.

Q.    Okay.

A.    I don't recall the exact date I spoke with Mr. Lehmann.

Q.    Okay.  I wanted to ask you a specific question here, and this is on page 3 of the report.

A.    Okay.

Q.    You know, you discuss your training and experience working on board cruise ships, and you indicated that during that time over a seven-year period, you were responsible for overseeing at least 50 transfer operations of cruise passengers from cruise ship to a tender, similar to what plaintiff in this case experienced leading up to his injury.

Do you see that?

A.    Yes.

Q.    Okay.  So my question is, when you say that you oversaw 50 transfer operations during that

seven-year period, is that your estimate of the number of times that you were involved in tender boat operations during the entire seven years that you worked with cruise lines?

A.   No.  I was talking about Cabo San Lucas.

Q.   Okay.  So that's a different -- okay.

A.   Sorry if I didn't communicate well.

Q.   Okay.  No, no, that's why I'm asking. Because it says similar to what plaintiff was involved in, and I didn't know whether this was your entire time.  Okay.  So this 50 transfer operations that you mention here is specific as to Cabo San Lucas; is that correct?

A.   That's correct.

Q.   Okay.  And those 50 transfer operations that you discussed there on page 3 that you referenced, that was all during your time with Holland America Cruise Line, correct?

A.   Very good.  Correct.

Q.   Okay.  And when you say 50 transfer operations, is that just 50 different days when the ships that you were working on would have been in port in Cabo San Lucas?

A.   Well, no, not days.  That was the

amount of tenders that we were operating that were going ashore and coming back to the ship.  I don't want to mislead you.

Q.    No, no, I'm trying to understand exactly what you mean by the 50 transfer operations.  Okay.

A.    Right.

Q.    So what do you mean exactly when you say 50 transfer operations then?

A.    Well, I was just trying to not be, you know -- make it sound like there was thousands of operations in Cabo.  There wasn't.  But in Cabo, I would be responsible for maybe five a day, and then the next week or that same week, depending on how many times we went back, I would be responsible for maybe 10, 12.  So I'd say 50 is probably fair, because then we moved on.  We were a worldwide vessel so we didn't stick in Mexico forever.

Q.    Okay.  As you sit here today, do you recall about how many times the Holland America ships that you were working on came to port in Cabo San Lucas during your time with them?

A.    I really couldn't say.  It was -- it would be too difficult.  I'm sorry, no.

Q.    And when you say the 50 transfer

operations, that is -- my understand, then, is those are the operation of getting passengers from the cruise ship onto the tender boat, each instance of that, each tender boat that you oversaw that for, that would be one operation?

A.   Well, if the tender is coming alongside, that's one operation.  If the tender is returning and they're debarking, that's two operations.

Q.   Okay.  And when you were with Holland America, those 50 transfer operations that you were involved with directly in Cabo San Lucas, can you tell me whether they -- those operations specifically involved third-party tender operator like what happened in this case?

A.   To my recall, it was third party, yes.

Q.   Okay.  And when we say third party, we mean it's a local lead of tender boats, right?

A.   Correct, locally contracted.

Q.   Okay.  And based on your experience, was there anything unique or different about tender operations in Cabo San Lucas versus, let's say, Grand Cayman -- or you mentioned Belize?

A.   Well, with explanation, you never know.  It's because the water, the day, the

weather, the currents, I mean, it would be very hard for me to give a proper answer to that because every day is different in every port.

Q.   Okay.  And would you agree that anytime there is a tender boat operation where the cruise ship is, transferring passengers from the cruise ship onto tender boats to go to shore, whether it's Grand Cayman or Cabo San Lucas, things like the weather, the sea conditions, currents, wind, all that can affect the operation, regardless of the port of call; is that fair?

A.   I would agree with that.

Q.   During your time with Holland America, did you experience anything in terms of tender operations specifically at Cabo San Lucas that stood out to you personally in terms of differentiating it from tender operations at other ports of call like Grand Cayman or Belize?

A.   The water was extremely warm.  That's the only thing that stands out.  I would -- the swells, the maneuvering of the vessel, whether they anchored or maneuvered, that was all up to the navigation team.  But that's the only thing that stands out.

Q.   So the only thing that stands out to

you, really, about Cabo San Lucas is the water on your experience was the water temperate was warmer?

A.    Correct.

Q.    You indicate in the last paragraph here before Section 3 that in view of your work experience and training, you are intimately familiar with the cruise-ship-to-tender transfer operations and industry standards for same and how such operations are to be safely conducted on cruise ships by crew members, vis-à-vis, cruise ship passengers.

Do you see that?

A.    Correct.

Q.    Okay.  Now, my question to you is, in terms of where you say that you're familiar with the industry standards for same, for cruise ship tender boat operations, after you stopped working with Holland America in 2007, did you have any further involvement that would support you being familiar with industry standards as they may have developed from 2007 through the present?

A.    Well, I did take some emergency contracts with -- I took two of them, and we did tender operations with those two independent cruise lines that were owned by Royal Caribbean.  The

operation is exactly the same.  I mean, I could get into it, but I don't know when you want to do that. However, it is exactly the same.  That's why I include industry standards.

Q.   Okay.  So let me ask you this:  You mentioned specifically now those emergency contracts that you handled for those other two cruise lines -- I believe it was Star and Viking -- that was back in 2007 that you did that, right?

A.   It was after -- correct.  It was after Holland America.

Q.   Okay.  And it sounds like what you're telling me is basically that the procedure as it was back when you worked on board cruise ships in Holland America was similar to the -- really, the way it is now in terms of transferring passengers onto tender boats?

A.   Correct.  And I've been sailing on cruise ships since I became a passenger again and I left the cruise line as an employee.  I'm Platinum with Carnival.  I sailed on Royal Caribbean for another, probably, 30 cruises; sailed on Disney for another, maybe, 15 cruises; and I mean, I watch.  I pay attention.  It's within my nature.  However, it the logistics and how you operate and what you do

with the passenger, and it's still the same methodology.

Q. So you just mentioned you're a Platinum cruiser with Carnival; is that correct?

A. Well, yes, not that that matters anymore, because I got blacklisted. Go figure.

Q. I was going to ask you: When is the last time you went on a Carnival cruise as a passenger?

A. Excuse me for saying "uh." That would be 2013 -- no, 2015.

Q. Have you been on any other cruises with any other cruise lines since 2015?

A. Disney.

Q. Is that exclusively Disney since 2015?

A. Yes. Oh, and Royal Caribbean. I'm sorry.

Q. How many times have you sailed with Royal Caribbean as a passenger or a guest since 2015?

A. Well, my wife worked for Royal so I would bring the girls and we would go for maybe 30 cruises throughout her tenure with Royal.

Q. What years was that?

A. 2018 through -- no, 2013 through 2022.

And by the way, I'm blacklisted from them, now, too.  I hope everybody is happy.

Q.  Did you ever visit Cabo San Lucas as a cruise ship passenger and use tender boats there?

A.  Yes, but I don't remember what year. I think we were with Carnival because I remember the girls were with me.

Q.  How many times do you think that happened?  Just once?

A.  I would say once.

Q.  And here at the bottom of page 3, you indicated that in lieu of a ship or site inspection, you reviewed the CCTV which captures Mr. Lehmann's incident.  You also personally interviewed Arthur Lehmann further to your understanding of the specific facts of his case; is that correct?

A.  Correct.

Q.  Okay.  So you did not perform a vessel inspection in this matter, correct?

A.  Correct.

Q.  Okay.  You have not gone out to the Carnival PANORAMA, the subject cruise ship, to inspect the tender boat platform that was used in this case when the plaintiff was transferring onto

the tender boat; is that correct?

A.    That's correct.

Q.    Okay.  And you did not go to Cabo San Lucas and inspect the tender boat itself that was involved in Mr. Lehmann's incident, either, correct?

MR. PEREZ:  Object to form.

THE WITNESS:  That's correct with explanation, too, is that for the jury, in this particular case, for me to do an accident analysis, not a reconstruction, you would have to duplicate many factors, and as far as the listing of the ship and the listing of the tender goes, and the listing of the platform, that cannot be duplicated.  So I mean, if we were to do -- which I have done many times -- deck department operations of how they board passengers on tenders, that could have been done.  However, that's not what I'm disputing.

BY MR. PELAEZ:

Q.    My specific question was simply whether you conducted a personal inspection of the subject tender boat in person that was involved in

this matter.

A.   That's correct.  I did not.  However, I wanted for the jury to understand why.

Q.   Okay.  You didn't take any -- well, strike that.

Given that you didn't perform any type of physical site inspection, either as to the cruise ship, the subject tender platform from the cruise ship, or the actual tender boat involved itself, is it fair to say that you didn't take any physical measurements of any aspect of anything that was involved in this case?

A.   That's correct.

Q.   You didn't perform any type of actual testing in this matter; is that correct?

A.   Well, with explanation, that is correct.  However, the CCTV camera footage that was presented to me, I was able to do some video analysis of exactly how he walked off the gangway of the ship and approached the tender.  So that, of course, offered me the information to give an opinion on what had happened.

Q.   Okay.  So if I understand, you're agreeing that you didn't perform any actual testing in this matter, but you are explaining that you did

review the CCTV footage, the video of the incident and performed an analysis of that footage to arrive at your opinions?

A.   Yes, along with the interview of the plaintiff and reading the discovery that was presented to me, especially from the corporation itself, others -- several documents that were -- one was animated, showing and depicting how procedures are supposed to go.

Q.   You didn't perform any type of calculations to arrive at your opinions in this matter, correct?

A.   That's correct.

Q.   Tell me about the video analysis that you just referenced you performed.  What exactly did that entail?

A.   Basically observing the plaintiff walk off the gangway from the break door of the ship, and it appears that, number one, he's holding his cane, I believe in his right hand and there is nobody assisting him while he's using his cane going down the gangway.  And then it appears to me, and it's my opinion that a crew member on board the tender itself has requested that he hand them his cane, which he does so while boarding the tender,

and then immediately following that, within seconds, he falls down and is injured.

Q.   So from your review of the video, you were basically able to see that plaintiff is holding his cane as he is descending the set of stairs from the ship down to the tender platform; is that correct?

A.   Well, it appears that he is using his cane.  Because holding the cane is one thing.

Q.   Okay.  So he's using his cane to walk down the steps, right?

A.   Exactly, correct.

Q.   Okay.  And that's something that you observed from watching the video, right?

A.   That's my interpretation, yes.

Q.   Okay.  It's also your interpretation that nobody assisted the plaintiff as he was going down the step of steps to the tender boat; is that correct?

A.   That's correct.  I didn't see any assistance whatsoever, and that's what strikes me. An explanation to the jury is we don't operate like that.  I mean, within the industry, you just don't release the passengers to the hounds.  You have to -- especially if you see a disabled passenger,

somebody with a cane, and they have to go down the gangway to a platform to a tender, and you're at sea, that you escort them down that gangway and then you hand them off -- we call it spoon-feeding -- to the third-party company, and there's just not somebody standing alongside the tender.  There's somebody down below in the tender to receive the passenger as they're coming into the tender.

Q.    You stated earlier that -- well, let me ask you this:  You stated earlier that the crew on the tender requested Plaintiff's cane and he handed over his cane as he was boarding the tender; is that correct?

A.    That's my interpretation.

Q.    Okay.  And what informs that interpretation?  How did you arrive at that interpretation?

A.    Because as somebody who walks with a cane, unfortunately, once a month, why would I hand my cane to somebody unless they asked for it.  And then again, secondly, why would you ask for somebody's cane, especially on a moving tender.

Q.    My question more specifically is, though, what facts did you rely on to arrive at the

conclusion that somebody on the tender boat requested that plaintiff hand over his cane?

**A.** My experience with using a cane, and I would say that if somebody was to hand over a cane, again, typically it would be because somebody asked for it. In other words, here, I'm the crew member on board the tender. And I'm going, oh, Senor, or Mister, give me your cane. And because they feel compelled to do something because they've been instructed to do something, the first thing that human nature is, is to hand them the cane. But now he's kind of defenseless and he boards the tender, which is pitching and listing, you know, who knows what the stability is of that tender at that point in time. Only he does. But obviously, we know the outcome. He went down. They dropped him.

**Q.** Now, the CCTV video, the footage that you reviewed of the incident, there's no audio to it, correct?

**A.** Correct.

**Q.** Okay. So we can't hear anybody saying anything on that video that you reviewed, right?

**A.** That's correct. Again, this is my interpretation. Having done this for, I mean, a lot of ports, to include Cabo San Lucas, and that

you just can't drop the ball.  You drop the ball, you drop the passenger.

Q.   I think you understood where I was getting at, which is that from the video itself, we can't hear whether anybody in the area specifically instructed the plaintiff, Mr. Lehmann, to hand over his cane; is that correct?

A.   That's correct.  Again, it's my interpretation.

Q.   Okay.  Have you reviewed any testimony or any statements from any of the people who were working on the tender boat itself or the from Carnival crew member who was on the platform indicating or confirming that plaintiff was instructed to hand over his cane as he was boarding the tender boat?

A.   No.

Q.   From reviewing and analyzing the CCTV video itself, is it your opinion that you can see plaintiff actually hand over his cane as he boards the tender boat?  Can you see that in the video?

A.   After interviewing Mr. Lehmann -- and I have no reason to not believe him -- and he stated to me he handed over his cane because they asked for it, I can't conclusively say that the

video does depict him handing over the cane; however, it does appear that he is walking without the cane onto the tender.  I mean, irrespective of that, sir, I would say definitely that he was without his cane as he boarded the tender.

Q.   Okay.  So it's your opinion that Plaintiff Mr. Lehmann was without his cane as he boarded the tender?

A.   Yes, sir, it is.

Q.   Okay.  But you agree that from the CCTV video footage itself, you do not see -- or you cannot see whether Mr. Lehmann actually handed over his cane to anybody; is that correct?

A.   No, that's not correct with explanation.  It's like you can and cannot.  I think it's up for interpretation for the jury.  I interpret it as that he boarded without his cane.  However, other people may interpret it in a different way.  But based upon his testimony -- excuse me, based on my interview with him, I have no reason to disregard what he said and what happened and transpired.

Q.   So if I understood that, it sounds like you're saying that from the video, he may have handed over his cane as he boarded the tender, but

he may not have handed over his cane as he boarded the tender?

Is that what you're saying?

MR. PEREZ:  Object to the form.

THE WITNESS:  I think that's kind of taking what I'm saying out of context because I am saying that it's up for interpretation.  My interpretation is that in the video, he is handing his cane over -- or definitely not walking with his cane onto the tender.  Other people may have a different opinion.  However, again, I have no reason to doubt my interview with him, and I have no reason to -- or he has no reason to state to me that he didn't hand over his cane, he used it the whole time.

BY MR. PELAEZ:

Q.   Okay.  But would you agree, at least, that from reviewing the CCTV footage of the incident, it is inconclusive from the footage itself whether Mr. Lehmann actually handed over his cane as he boarded the tender boat?

A.   No, because that's not what I testified to.

Q.   But you just testified that it's up for interpretation from the video, whether he handed over his cane or not.  Isn't that what you said?

A.   Correct.  And that's why we're here today and that's my interpretation.

Q.   Okay.  But if something is up for interpretation, then that means that you could see it one way or you could see it the other way; is that fair?

A.   Well, I think that's perfectly fair.

Q.   Okay.  So if you could see it one way or the other way, then, from the video, it's inconclusive.  There's no conclusive video showing whether he handed over his cane; is that fair?

A.   Again, no, I don't agree with that.  I think that I have testified that I believe that, you know, he did hand over his cane, based upon, of course, his own statement to me, and that when he did so, that's when everything went wrong.

Q.   Well, let me ask you this:  Your conclusion that Mr. Lehmann did, in fact, hand over his cane to the crew on the tender boat, is that interpretation of yours more so based on Mr. Lehmann's interview responses to you and

telling you that that's what happened?

A. No, I been doing this a long time. I was a detective for ten years. I'm pretty good at understanding what people are trying to tell me in a legitimate and proper way and they're not lying to me -- there's no reason for him to make up a story in this case because, first of all, he needs the cane. I see no reason why he would manifest a story as to handing over -- or not handing over a cane and boarding a tender.

And irrespective of that, again, it's -- this is not about Mr. Lehmann. This is about the crew. The crew did not follow the policy and procedure of the corporation and their training and the industry standard to get him on board that tender safely. I mean, forget about the cane. You know, I mean, it's very simple. It's so easy. And there's a seat right there next to the operator of the tender that says disability passenger seat that he could have sat at. That I myself have had to sit at before in Dubai because I broke my left kneecap.

But again, irrespective of that, it's just I have the experience in this not only as a passenger and as somebody injured doing this, but

as running these operations for decades.

Q.    So you went over a lot there.

You indicated that as part of your review and part of the manner in which you came to the conclusion that Mr. Lehmann did hand over his cane was based on your interview with him and your experience as an investigator and as a police officer and basically believing Mr. Lehmann's version of the incident and judging his credibility; is that fair?

A.    I would say that is fair.

THE WITNESS:  Let me know, gentlemen, when you want to take five minutes.

MR. PELAEZ:  This is fine.  We can take five right now.

THE WITNESS:  Thank you very much.

MR. PELAEZ:  Yeah, no problem.

THE COURT REPORTER:  Okay.  Going off the record at 11:42 a.m.

(Thereupon, a short recess was taken.)

THE COURT REPORTER:  Going back on the record at 11:52 a.m.

BY MR. PELAEZ:

Q.    Okay.  I'm going to bring up Exhibit 1 again.

A.     Thank you.

Q.     Okay.  So specifically, Mr. Jaques, with respect to your methodology, for purposes of this assignment, you indicated that you considered other reasonable alternatives and/or causes.

Do you see that?

A.     Yes, sir.

Q.     Okay.  So tell me, specifically, what other potential alternative causes did you consider with respect to Mr. Lehmann's incident where he fell while boarding this tender boat in Cabo San Lucas?

A.     Well, I don't want to be longwinded, but as a trained investigator, I look at everything with a 360 view.  And first of all, I want to make sure that I'm the right fit for the case, which, in this case I was.  Second of all, I want to make sure that do the facts surrounding the case quantify what it is I'm about to give an opinion to, and do I believe what actually happened.  And then thirdly, is there anything else that could have happened in this case that could have caused something like this to have happened.  And that's why I say I consider everything on the defense side and on the plaintiff's side.

Q.    Okay.  And as part of that methodology that you employed in this case, are there any specific alternative potential causes of this incident that you considered or ruled out?

A.    Well, I -- excuse me for -- I considered a couple of things, is that -- well, number one, I wasn't there that day.  None of us were.  So we really don't know the sea conditions, how bad they were.  However if the tender was pitching and listing enough to where it, kind of like, this gentleman fell down a flight of stairs, that would indicate to me that maybe the bridge should have considered moving the operation to the other side of the vessel, which we do all the time. Or you can suspend operations for 15, 20 minutes, or the bridge can navigate the vessel in a different position so that the wind pushing the waves is not causing a safety hazard for the tender operations.

So these are things that I would consider, however, again, I wasn't there that day, and I don't know how bad it was.  But apparently it was bad enough.

Q.    When you say "apparently it was bad enough," what exactly are you saying?  Do you have

an opinion as to whether the sea or weather conditions that day caused or contributed to this incident?

A.   Well, you asked me the question and I'll -- I will tell you from my experience that in -- if somebody goes down like that and loses their balance on a tender, especially, you know, from a platform while you're at sea, it's been my experience, having done this a lot throughout the world that it's because the tender is listing and pitching, and that's because of the waves itself. I mean, you just can't control a three-foot wave that turns into five feet, and you -- so an answer to your question is that I think that yes, there are -- it would have been probably pretty choppy out there.  "Choppy" is a good word.

Q.   And the basis for you stating that it would have been pretty choppy and that the sea conditions may have caused or contributed to this incident sounds like it's just based on the fact that the incident occurred and Mr. Lehmann actually fell down a set of steps; is that fair?

MR. PEREZ:  Object to the form.

THE WITNESS:  Well, yes, with explanation to the jury.  I agree with you,

however, it's just not that simple.  I mean, if you walk on a tender and you're not receiving any assistance, allegedly, and then you go down a flight of stairs, typically that's because the tender is moving and rocking and pitching, and the wave conditions are such that it's not really that safe to do something like that without assistance.

BY MR. PELAEZ:

Q.    So it sounds like to me you believe that the weather conditions or the sea conditions may have caused or contributed to the incident; is that fair?

A.    I don't want that opinion to be argued.  I think that it's best that it's -- it's my experience and knowledge and background that has to do with tender operations, that it would fit into what happened; however, I don't have any information of what the conditions were that day, nor was I there.

Q.    Okay.  So you don't have any facts or evidence that you rely on -- that you can rely onto support an opinion that the weather or sea conditions contributed to the incident?  Is that

fair?

A.    Well, that's fair with explanation, however.  Me having done that for hundreds of times, it's my experience that typically it is the weather.

Q.    I understand that.  But my question is, in this specific case, did you review any facts or evidence that would support an opinion, here specifically, that in this instance, the weather or the sea conditions or the wind conditions caused or contributed to the incident?

A.    Yes.  He went down.

Q.    So the only evidence you reviewed that would support that is the fact that the incident itself occurred; is that fair?

A.    I think that simplifies it; however, with explanation, I think that -- and I have to say this:  If you don't control the situation, and even if we don't know what the circumstances were that day -- and none of us do except for Mr. Lehmann -- that when the machine breaks down, things go bad.  And if he wasn't given any assistance whatsoever, that, yeah, he is going to go down.

Q.    Did you review the deck logs for the day in question for the subject vessel, the cruise

ship, the PANORAMA?

A.   I don't recall the deck logs, no.

Q.   Okay.  You're familiar with deck logs, though?

A.   Oh, of course.

Q.   Okay.  Are you familiar with deck logs normally containing weather observations?

A.   Yes, of course.

Q.   Okay.  And you didn't review the deck logs in this case and review any of the weather information for the time of the incident; is that fair?

A.   That's fair.

Q.   You reviewed the CCTV video of the incident, correct?

A.   Correct.

Q.   Could you tell what the weather conditions were from the CCTV video in any capacity?

A.   No, I could not.

Q.   In considering other reasonable alternatives or causes, did you consider whether plaintiff may have simply misjudged the set of steps leading down from the tender platform to the seating area onboard?

A.   No, because you shouldn't have to misjudge them because that's part of the logistical operation of getting them on board the tender.

Q.   You agree there is a set of steps leading down to the seating area on this specific tender boat, right?

A.   That's correct.

Q.   You've seen the photos of the tender boat that are produced in discovery, right?

A.   Correct.

Q.   Okay.  Those steps had yellow markings on them, right?

A.   Correct.

Q.   You didn't do anything to rule out the possibility that plaintiff may have misjudged the steps or just didn't see them?

A.   Well, I will state this, is that within the Southern District of Florida, and it's been testified to and accepted in the court, that passengers on cruise ships do not look down. They're looking straight ahead and forward, and that's because they're looking at what unknown area or they're looking for family members or they're looking for where supposed to be sitting in the buffet.  Or on a tender they're looking for

somebody that is going to take their hand or guide them, but passengers don't look down, and again, that's been testified to many times. And I wouldn't expect to -- I wouldn't expect for him to look down. Not when -- it's kind of, like, a scary thing. And he's approaching this tender, he's unfamiliar with it, and he's looking, most probably, straight ahead.

Q. Did you review all the discovery and documents that have been produced by Carnival in this case as part of your assignment?

A. Yes.

Q. Okay. In your review of that, did you note any documentation or evidence indicating that Mr. Lehmann made any statements indicating that he misjudged the steps or may have not have even realized there were steps there?

A. No.

Q. In your methodology, you indicated that you tested opinions or ruled out other reasonable alternatives.

Do you see that?

A. Yes.

Q. You confirmed earlier you didn't perform any actual testing in this case, though,

right?

A.   That's correct.  But I was just trying to state that I had ruled out anything other than I thought what had happened because I had done a 360 on the overview of the accident itself.

Q.   So if I understand you, then, are you basically just saying that you ruled out other possible alternatives as to causation based on just your review of the documentation and the file materials and everything that was provided to you?

A.   And the CCTV camera footage and my interview with the plaintiff.  And again, my experience and background and knowledge of how passengers get on and off tenders safely.

Q.   Do you hold yourself out as an expert in human factors?

A.   Yes.

Q.   What specific qualifications, training, or experience do you have to offer regarding human factors?

A.   I was a traffic homicide investigator and I am an accident reconstructionist with Northwestern University.

Q.   Is that a degree or certificate, accident reconstructionist?

A.   It's a certificate and an association with the university itself.

Q.   What exactly did you have to do to become certified as an accident reconstructionist?

A.   I had to go to the -- or attend the Institute of Police Technology and Management in Jacksonville, Florida, which is also covered by Miami-Dade College.  And I had to attend advanced accident reconstruction, and then -- well, prior to that, advanced accident investigation, accident reconstruction, traffic homicide, and it took me approximately one year to get to this point and then I received certificates through Miami-Dade College and the Institute of Criminal Justice from Miami-Dade College.

Q.   Okay.  And how long was that course for the entire process of obtaining that certificate?

A.   It took -- it took about a year and a half and a total of inhouse weeks were nine.

Q.   Okay.  When did you obtain that certificate?

A.   1985.

Q.   You mentioned it involved traffic homicide courses.  Did that advance accident

reconstruction certificate, was it -- trying to think.  Was it dealing more so with vehicle -- motor vehicle accidents or just accidents in general?

A.   Well, it has to do with a combination of things because the human factors is a portion of the, like, a bicycle accident and how far the bicyclist was thrown when he was struck by the vehicle; the pedestrian when they step off of the curb, and if they're struck by a vehicle, how far do they travel based upon the movement of the vehicle.  It's also people being ejected from cars.  It's kind of the same thing with anything that happens on a cruise ship that I've dealt with, scooter accidents, people being struck by forklift operators.  It's all human factors.

Q.   It sounds, based on what you just explained, that most of that coursework and for obtaining that certificate in advanced accident reconstruction did, in fact, deal with incidents involving motor vehicles; is that fair?

A.   No, not just motor vehicles because, you know, we have bicycle accidents, moped accident, scooter accidents, and especially with the cruise line, onshore scooter accidents.  It's

anything that moves mechanically and you get ejected from it, there has to be a causation and the injuries sustained are determined by speed, direction of travel, where people are coming from as far as what they're driving.  It's not just about cars, no.  And then as far as tender operations are concerned, if somebody's gait is off or they're walking in a certain way, but they're using something to stabilize them, like in this case, without that stability, what's the causation of the accident?

So it's all human factors.

Q.   In terms of the certification that you obtained in 1985 in accident reconstruction, did any part of your training involve vessels at sea?

A.   No, not until -- well, really, when I was with the marine patrol in 1983, that's when we took our marine patrol basic seaman's course and became basic boat operators because we did accidents throughout the channels of Coral Gables up into where we had the 13-mile limit.  We were working all the way out to Stiltsville.

Q.   Okay.  But my question was only with respect to the certification that you obtained in advanced accident reconstruction, that specific

certification course had nothing to do with accident reconstruction involving accidents at sea or involving vessels in the ocean; is that fair?

A.   Well, no, it's really not fair because we're talking about, you know, the human body, and what somebody -- say, for instance, a woman is sitting in the theater, watching a show -- and I've had this happen -- and another person comes along with a scooter at high speed, and they strike the back of her chair, and cause a serious neck injury.

That -- again, it all involves the human body and how the body reacts or chain reacts during some kind of force.

Q.   I'm just going to ask it this way and I'd like a yes or no response:  Did the course and certification that you obtained in 1985 in advanced accident reconstruction involve any type of formal training or education with respect to analyzing accidents at sea or on vessels?

A.   No.  With explanation, however, the human body and human factors are human factors in the human body.  So I can't differentiate between what I'm doing now and what I did then as far as somebody being injured.

Q.   Do you agree that the tender boat

involving Mr. Lehmann's accident had handrails available on it?

A.   Yes.

Q.   And again, you didn't inspect the tender boat itself with the handrails on the tender boat, correct?

MR. PEREZ:  Object to the form.

THE WITNESS:  Correct.

MR. PELAEZ:  What was that?

MR. PEREZ:  Object to form.  Asked and answered.

BY MR. PELAEZ:

Q.   And what was the answer?

A.   Correct.

MR. PEREZ:  He already testified about inspecting.

BY MR. PELAEZ:

Q.   Okay.  Would it be fair to say that because you didn't inspect the vessel or the handrails themselves, or the steps themselves, you have no opinion specifically as to the adequacy of the handrails or the steps onboard the subject tender boat?

A.   I have no knowledge.

Q.   You have no opinion about it, either,

correct?

A.   That's correct.

Q.   On page 4 here, you indicate that upon Mr. Lehmann's transfer from the cruise vessel gangway to the tender, Mr. Lehmann fell and fractured his ankle.

Do you see that?

A.   Yes.

Q.   Okay.  You're not here giving any medical opinions in this matter, are you?

A.   Correct.

Q.   You indicate here on page 4 as well that the tender crew did not advise Mr. Lehmann of the railings on the tender he could have used to stabilize himself while on board the tender.

Do you see that?

A.   Yes.

Q.   Okay.  What -- again, we went over this before, but there's no audio available on the CCTV video footage, correct?

A.   Correct.

Q.   So how do you know whether the tender crew advised Mr. Lehmann that there was any railings that he could use?

A.   Because that's the first thing we do.

Let me describe spoon-feeding to you and the jury. So spoon-feeding goes like this:  You grab the back of their elbow, and then you grab them like this with your other arm and clasp their hand.  You bring them onto the tender, holding their elbow because you can stabilize them.  Then you have another crew member behind you, and you're going to spoon-food the passenger to the crew member behind you.  What that crew member does is then, when you release, takes the hand, and puts it onto the railing, so now the passenger can stabilize themselves.  In this case, because he is disabled that -- I think we could all agree he was disabled -- that the crew member, then, would have taken the passenger and taken them over to the disability chair or all the way downstairs so that they could have sat down.

Q.   My question was simply, what facts -- what specific facts or evidence do you have to indicate that the tender crew, the crew members on board the tender boat, didn't advise Mr. Lehmann of the fact that there were railings available to him?

A.   Because they dropped him.

Q.   Anything else to support that specific conclusion?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A.    I think I just did.  I won't get longwinded.

Q.    Okay.  Do you agree that the railings that were available on the tender boat itself were plainly visible, correct?  Based on review of the photos of the tender?

A.    I'm sure they were visible.  However, I did not see them and inspect them.

Q.    Okay.  So getting into your formal expert opinions in this matter which are set forth in pages 5 through 7 of your report, your first formal opinion is that cruise-ship-to-tender transfer operations are dangerous for cruise ship passengers.  This is well known to cruise lines but not an obvious danger to cruise passengers, right?

A.    Correct.

Q.    Okay.  Do you know what Plaintiff Mr. Lehmann's experience was in terms of his history, being on cruise ships and cruise vacations?

A.    He had had many sailings.

Q.    Many sailings before this incident in Cabo San Lucas, correct?

A.    I don't recall how many.

Q.    You don't recall how many, exactly,

cruises Mr. Lehmann had been on before this incident?

A.    Correct.

Q.    Do you know whether Mr. Lehmann personally was experienced with respect to the use of tender boats to get to different ports of call from cruise ships?

MR. PEREZ:  Object to the form.

THE WITNESS:  I'm sorry.

BY MR. PELAEZ:

Q.    You can answer?

A.    I don't recall how many times he has taken a tender from sea to port.

Q.    Okay.  Do you know if he had experience, though, being an experienced cruiser and using tender boats before?

A.    I don't recall.

Q.    You didn't ask him that during your interview?

A.    I don't think I did.

Q.    Why not?  Wouldn't that have been important, based on the circumstances?

A.    He -- to be honest with you, Counselor, I try to keep it short and less specific because I don't want to convolute or get involved

in future testimony, especially by clients.

Q.   So if I understand your first opinion, you're basically testifying that transferring cruise ship passengers from a cruise ship onto a tender boat is a dangerous operation.

Is that your opinion?

A.   Yes.

Q.   Okay.  And you're opining that it's a danger which cruise lines are aware of but maybe not necessarily passengers?

A.   That's definitely true.

Q.   Okay.  So you don't know whether this specific passenger, Mr. Lehmann would have been familiar with that type of danger since you don't know what his personal experience was using tender boats?

A.   Well, my response to you is that nobody is, because each day changes.  You can't -- you can't arrive in Cabo San Lucas and say, oh, I was here two years ago and this is an easy port to get on the tender because, oh, no, it's not.  It depends on the swells, the wind -- you know, it's extremely dangerous.

Q.   Extremely dangerous boarding a tender boat from a cruise ship?  Is that what you're

saying?

A. Well, I've done it -- excuse me, yes, in response. I have done enough of these accidents. I've seen them personally. People think they know something about these tenders, they get on the tender, and the next thing you know, they're being airlifted off the ship.

Q. How often has that happened in your experience?

A. More times than I would like to know. I mean, I have done it as an expert witness, I've seen it firsthand. Passengers just -- you know, they're on vacation. They want to have fun. They don't want to listen to people telling them what to do. So if you start telling them, hold the railing, hold the railing, everybody hold onto the railing, maybe ten percent will do that because they're having fun, again, and they are experiencing a lifetime vacation and they just don't want to hear that.

Q. Do you agree that even a lay person would understand that there is some danger involved in terms of moving from a cruise ship onto another vessel, a tender boat, in open water?

MR. PEREZ: Object to the form.

THE WITNESS: Absolutely not, Counselor. And this is what I bring to the table, my usefulness and my experience, and the cases that I have done, especially at sea and in the civil realm are mystifying. Passengers have no understanding whatsoever of what it is like to board a tender in Belize and travel 30 minutes to go ashore. They think you can stand up and walk around. They don't want to sit down. There is no understanding whatsoever on the part of the passenger, because they're, again, there to have fun, and I get that part, but that's where we come in, and in this case we dropped the ball.

BY MR. PELAEZ:

Q. Based your review of the materials provided to you, do you know whether there was any warnings or information that Carnival provided to passengers about using tender boats at ports of call like Cabo San Lucas?

A. Well, not specific to Cabo San Lucas, but there is a policy that is animated and sent as discovery later, that pretty much projects how it is that you're supposed to board a passenger.

Q.   I believe what you're referring to is the safety video that's shown in cabin to passengers.  It's available to them.  Is that what you're referring to?

A.   Yes.

Q.   Okay.  And you reviewed that safety video that was produced in discovery by Carnival in this matter?

A.   I reviewed the still photo.

Q.   Oh, you didn't review the video itself?

A.   No.

Q.   Okay.

A.   I've seen it before.

Q.   Okay.  Do you know whether that safety video provides any instruction or guidelines for passengers in terms of using tender boats?

A.   There is some instruction, yes.

Q.   Your second opinion in this matter is referenced on page 5 of your report is that cruise ship crew and their tender agents are responsible for assisting passengers' transfer from the cruise ship to the tender must exercise caution for the safety of cruise ship passengers.

Is that right?

A.    Correct.

Q.    Do you agree that in this case Carnival had a crew member on the platform just before passengers would enter or transfer onto the tender boat?

A.    Yes.   The third-party crew member, the contracted crew member.

Q.    Okay.   Is it your opinion, then, that there was no Carnival crew member there on the tender platform?

A.    It's my interpretation, having done this many, many times, that there will be a contracted crew member from the third party that will be there at the bottom of the gangway. However, in this case, it's my interpretation that the Carnival cruise ship employees released the passenger to walk down the gangway to the platform to the tender.

Q.    Based on your review of the video in this case, there was an individual present to assist passengers from the platform onto the tender, right?

A.    Yes.

Q.    Okay.   And then there was at least two more individuals onboard the tender itself who were

helping passengers get on the tender, right?

A.   I don't know what their positions were.  I don't know where they were located.

Q.   Okay.  Do you know how many people were on board the tender boat itself assisting passengers in boarding?

A.   No.

Q.   Let's go through the video.

MR. PELAEZ:  I'm going to bring up the video.  I will mark it as Exhibit 2 to your deposition today.

THE WITNESS:  Of course.

BY MR. PELAEZ:

Q.   And it's the CCTV footage of the subject incident.

Okay.  And this is a zoomed-in version of it.  I've got it squared here.  I can zoom around a little bit.  Let's go to the beginning. Okay.  Play.

(Thereupon, Defense Exhibit No. 2 was marked for identification.)

BY MR. PELAEZ:

Q.   Okay.  Do you see the video that I've started playing now.  It's been marked as Exhibit 2 to your deposition, sir.

A.    Yes, I do.

Q.    Okay.  Do you recognize this video?

A.    Yes.

Q.    It's a video of Mr. Lehmann's incident?  Correct?

A.    Correct.

Q.    This is the video that you reviewed in preparation of your report and opinions, correct?

A.    Correct.

Q.    Okay.  So go ahead and play it, and you can see some passengers getting on board here in the beginning of it?

Do you see that there's an individual standing in, looks like, a blue jacket and khaki pants on the gangway platform itself before the tender boat?

A.    Yes, I do.

Q.    Okay.  Do you know whether that is a Carnival employee or a tender boat operator employee?  Do you know?

A.    I can't tell.

Q.    Okay.  But there's certainly somebody on the platform itself where the guests are transferring onto the tender boat, correct?

A.    Correct.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q.   Go ahead and play it some more.

You can see from the beginning of this video that as passengers go boarding on they turn to their right and go down a set of steps, down to the seating area on the tender boat, right?

A.   Yes.

Q.   Okay.  Okay.  Go ahead and play it again.

Okay.  Stop it right here.  And we can see the individual a little more clearly here on the platform before the passengers get on the tender boat.  And there's at least, it looks to me like two people on board the tender boat dressed in white where the passengers get on.

Do you see them?

A.   Yes.  I would say that they are not Carnival cruise ship crew members.

Q.   Who are you speaking about specifically?

A.   All of them.

Q.   All of them.  Okay.  And what is your basis for that statement?

A.   They -- how do I say this kindly? They just aren't wearing the professional uniform mandated by Carnival Corporation.

Q.   Okay.  And that's your opinion as to the individual in blue as well, standing in the platform?

A.   I have to go with my gut opinion that he is not deck department.

Q.   Okay.  I will keep playing this here.

A.   Okay.  Now stop right there.

Q.   Okay.

A.   You see what I'm saying?  That is what we call spoon-feeding.  That's what you're supposed to do.  And they started doing that with this lady, and you can also see that the tender is definitely -- because you zoomed in, which I appreciate -- is definitely listing and pitching.  So they're on notice right there, those three individuals, that it's, kind of, like, a rough journey.

Q.   Okay.  So you agree that there's three people assisting a passenger transfer from the platform onto the tender boat here, at least at this moment at 23 seconds into the video, right?

A.   Correct.

Q.   Okay.  I'll keep playing it.  Oh, crashed.  Give me one second.

A.   That's okay.

Q.   They only give us the best IT here.

Do you see the screen I'm sharing again now?

A.   Yes, I do.

Q.   Back to where that one passenger is being helped on.  We went over that.

Okay.  You said that from the video it looks like the tender boat does list occasionally from side to side; is that fair?

A.   Oh, it's listing, yes.  And notice, also, that either the man or the woman in the white hat is assisting the female passenger hold onto the railing to go downstairs.

Q.   Okay.  And this is at 30 seconds into the vehicle.  You can actually see the female passenger holding onto the railing with her right hand, right?

A.   Yes.

MR. PEREZ:  Object to the form.

THE WITNESS:  But most importantly, I see the crew member holding on to the passenger, which, again, is part of spoon-feeding.

BY MR. PELAEZ:

Q.   Okay.  I'll keep playing this.

**A.** Oh, but you see that's dangerous. She releases her.

**Q.** Well, that other passenger didn't fall down, right?

**A.** Sure, luckily.

**Q.** Okay. And we see a few more passengers getting on board here.

**A.** Oh, that tender is listing big time. You've got big swells there.

**Q.** We see about five or six more passengers get on board without issue here, right?

**A.** Yes, because they don't want help. Okay. Go ahead.

**Q.** Okay. And then at about minute 7, we see Mr. Lehmann step into the screen and he's holding his cane in his right hand, right?

**A.** Correct.

**Q.** You can see the cane in his hand, right?

**A.** Yes, and he's using his cane plus his hand to go down the railing and the steps.

**Q.** Stop it here. We see Mr. Lehmann go down the set of stairs down to the tender platform, correct?

**A.** Correct.

Q.   Okay.  You can see he was using his cane while using the steps, right?

A.   Correct.

Q.   Okay.  Hit play here.

Okay.  I'm slowing it down.  I'm going frame by frame here --

A.   Okay.

Q.   -- slower.  We can't see Mr. Lehmann as he's all the way at the bottom here.  He's blocked, kind of, by other passengers; is that fair?

A.   I understand, yes.

Q.   Okay.  And you see the crew member here in blue kind of extend his right hand out?

A.   Yes.

Q.   Or extend a hand out?  You see that, right?

A.   Yes.

Q.   Okay.  It's slowed way down.  It's going frame by frame, though.  Can you see Mr. Lehmann at all in this point in the video, at one minute 25 seconds?

A.   No, however, I do see the -- what I believe to be the tender crew member in blue, reaching out to grab something.

**Q.** To grab what?

**A.** Well, let's finish the video.

**Q.** Okay. Do you see Mr. Lehmann come back into view; is that fair?

Do you see it up here in gray with the hat on?

**A.** Yes.

**Q.** Okay. At 1:26, we can see Mr. Lehmann. Do you know whether he is on the tender boat at this point?

**A.** Yes, it appears he is.

**Q.** Okay. It looks like at 1:27, Mr. Lehmann has already fallen. Do you agree?

**A.** Oh, yes.

**Q.** Do you see Mr. Lehmann here with his right arm and elbow reaching out as he's falling down at 1:28?

Can you see Mr. Lehmann in this frame, sir?

**A.** Vaguely, yes.

**Q.** Okay. Do you agree it looks like he is reaching out with his right arm as he's falling down?

**A.** I can't agree with that.

**Q.** You can't agree with that. Okay.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Would you agree that it appears that Mr. Lehmann has his cane in his hands, in his right hand as he's falling down at that moment, at the 1 minute 28 second mark in the video?

MR. PEREZ:  Object to the form.

THE WITNESS:  Where do you see the cane?

BY MR. PELAEZ:

Q.   You don't see the black object extending diagonally from the left in his hand as he's falling down?

A.   Why would he hold his cane up in the air if he was trying to support himself unless the crew member in the blue had just handed the cane back to him?

Q.   My question was just whether you agree that it appears that he is holding his cane at this moment in the video, 1:28 as he's falling down.

MR. PEREZ:  Object to the form.

THE WITNESS:  Well, I'll agree that possibly somebody is holding the cane. Maybe he is.  However, the cane is not being used the way it's supposed to be used --

BY MR. PELAEZ:

Q.   So --

A.   -- supporting him.  Well, let me finish.

Definitely, this person in the blue is not a Carnival employee.  And the treatment that they gave the female passenger going down the stairs prior to him coming down the gangway, is totally different.

Q.   Okay.  So it sounds like you said that it looks like somebody is holding the cane at that point, either the person in blue or Mr. Lehmann?

A.   Correct.  And I think the jury would have a hard time discerning that, too.

Q.   Okay.  And Mr. Lehmann falls down the steps sideways, it looks like, right?

A.   Apparently so.

Q.   Okay.  From viewing the video, do you agree it's possible Mr. Lehmann could have just missed the step and fallen down sideways?

MR. PEREZ:  Object to the form.

THE WITNESS:  Counselor, I can tell you right now that it was pitching so bad that they put him in harm's way.  They didn't do the same thing they did for the

lady prior to him.  All they had to do was spoon-feed him down those stairs.  They dropped the ball.

Look at that.  The three of them are behind him.  How can you be behind him?  Somebody has to be in front of him, and the person in the blue, I don't know if they're still holding onto his cane or not, but he's going down and -- I'm sorry, but...

BY MR. PELAEZ:

Q.    Well, when you said you didn't know who holding onto the cane, whether it was the person in blue or Mr. Lehmann; is that correct?

A.    At this point after you've enhanced this video, I am just not sure.  But if the cane is being -- if the cane is being held up in the air, that's because he's already started falling.  But look at the boat pitching.

Q.    Okay.

A.    I mean, it's incredible.

Q.    You can see the boat pitch right at the moment when Mr. Lehmann fall; is that fair?

A.    Yes.

Q.    Okay.

A.    Oh, Lord.

Q.   So do you think that the pitching of the tender boat had something to do with Mr. Lehmann's fall?

A.   Well, yes, that coupled with the fact that the three crew members, that just all of a sudden lost sight of the fact that they've got a man with a cane and he needs help downstairs, too, or better yet, just put him next -- see, they're reaching out for him there.  Just put him next to the captain and let him sit down in the disabled seat.  Why take him downstairs in conditions like that?

Look at how much it's pitching and listing.  They should have suspended operations.

Q.   Is that a new opinion that you're giving now, that they should have suspended operations because the vessel was pitching?

A.   Definitely.  This is a no-brainer.

Q.   But do you know if anybody else had any other issues or any other falls getting on or off of tender boats in Cabo San Lucas that day besides Mr. Lehmann?

A.   No, I don't, but as an expert in doing this for many years, if you've got a tender boat pitching and listing in that capacity, number one,

you notify the bridge.  You suspend operations. Then you move the operations to the other side of the vessel so that the wind is not blowing to that capacity, to that side of the -- to the side of the vessel where you're at now, that this never would have happened.

Q.    Let's me ask you this:  I didn't see it anywhere in your report.  Did you state in your report anywhere that the operation should have been stopped or suspended, the tender boat operations, in Cabo San Lucas that day?

A.    Well, no, not until I saw this.

Q.    Okay.  But you had this video available to you before today, before your deposition, right?

A.    Yes, but I couldn't enhance it like this.

Q.    Okay.  But just to be fair, then, nowhere in your expert report did you give any formal opinion that it was too dangerous to be performing tender boat operations in Cabo San Lucas on this specific day, correct?

A.    Correct.  Again, because I really didn't understand how bad it was.

Q.    Okay.  And as you sit here today, now

you think that perhaps something should have been done differently with respect to either suspending the tender boat operations altogether or changing the manner in which it was being carried out?  Is that fair?

A.   Correct.  It's very simple.  It only takes ten minutes.

Q.   So reviewing the video now today, do you think Mr. Lehmann's fall had more to do with the weather conditions on the day in question than anything else?

A.   No, I disagree.  I think that it was a combination of a calamity of errors.  I mean, the crew on board the tender obviously are ill skilled. They're not trained, which I've dealt with for many, many years, and that he was basically fed to crew members that didn't know, really, what to do with him, because they're dealing with this.  And him coming on -- and he is a big guy.  And him coming on board the vessel with the cane being handed, with the cane being turned over, him holding the cane up in the air, they're standing, three of them, behind him instead of one of them in front of them like they did with the lady previous to this.  And all they had to do was just put him

in the seat right there next to the console.  How hard would that have been?

Q.    You mentioned that the crew on the tender were possibly inadequately trained?  Did you just say that?

A.    Yes, if you're going to ask me how do I know that?

Q.    Yes.

A.    Because you can see they don't know what they're doing.  They're trying to help, and I've experienced this many, many times, is that they hire people that are ill skilled, that they try to train, as third-party people, and Carnival people -- there's not one Carnival person, Counselor, down there at that gangway.

Q.    You're certain of that?

A.    I'm certain of that.  That person in the blue, with the hat either backwards or the hair to the back, in the blue, is not a professional Carnival employee, no, absolutely not.

Q.    You didn't review any specific training of the tender boat crew members who were there in this case, did you?

A.    In this case, no.

Q.    You're saying, based on your review,

you believe they're inadequately trained just from what you observed them doing in the CCTV video you saw at that moment; is that right?

A.   Yes.  You just saw it yourself.  I mean, how do you -- how do you take what happens to be a middle-aged woman, well, elderly -- how do you take an elderly woman and walk her down a flight of stairs one way, and then you get a man with a cane coming down the gangway to you, but the three of you are now behind him.  Where is he supposed to go with the pitching and listing, nowhere but down the stairs.

Q.   You agree that Carnival has policies and procedures in place regarding assisting passengers from cruise ships onto tender boats?

A.   Yes.

Q.   You didn't give any opinions in your report in this matter regarding the adequacy of Carnival's policies and procedures for transferring passengers from cruise ships onto tender boats, did you?

A.   I would have to see my opinions again, but really, until I saw this enhanced video, I -- it's pretty conclusive.

Q.   Okay.  Well, I'm just asking you

whether you're giving any opinions as to the adequacy of Carnival's policies and procedures in effect for transferring passengers, guests from cruise ships onto tender boats like this?

A.   Well --

Q.   The adequacy of the procedures themselves and the policies?

A.   I don't have the specific SQM number, 3.5, 3.6, however, the space in between the gangway and the break door of the ship going down to the tender, there are no Carnival employees.  So that is not how I was trained, and that's not how we operated, and that's not how I trained people.

Q.   So that's based on your conclusion that the individual in blue standing at the bottom of the platform is not a Carnival employee, correct?

A.   Correct.  He is not.  There is no way.

Q.   Okay.  But just to be clear, in your report itself, you didn't give any opinions regarding the adequacy of Carnival's specific policies and procedures, did you?

Oh, sorry about that.  Give me one second.

(A discussion was held off the

record.)

BY MR. PELAEZ:

Q.   Anyways, sorry about that.

Your report, again, which was Exhibit 1 -- and we were going through your opinions.  And I just want to confirm that in the report that you authored in this matter, there is no opinions offered, criticizing the adequacy of Carnival's actual policies and procedures regarding tender boat operations; is that fair?

A.   Well, I don't really agree because basically the opinions that I offered are all coordinated towards Carnival's failure to provide safety and security for Mr. Lehmann getting on board the tender.  So that all has to do with their policy and procedure.  However, I did not, you know, quote a specific policy.

Q.   Okay.  You didn't quote any specific -- Carnival policy or procedure in your report; is that correct?

A.   Can you -- Victor, can you blow it up a little bit?

Q.   Zoom in, you mean, or --

A.   Thank you.  Excuse me.  I'll leave it at that.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q.    Okay.  So you don't cite to any specific Carnival policies or procedures in your report, do you?

A.    Well, other than my experience, background, and knowledge and what Carnival has produced as discovery because if you can scroll down, please.

Q.    More?

A.    Could you go back to the animation.  Thank you.

So here we have a policy that's from an animation, that shows their procedure.  I mean, I think that that's...

Q.    Okay.  You agreed with me before, though, that animation is from a safety video that is made for passenger purposes, correct?

A.    Well, correct, but you're providing it to the passengers, so why would it not be policy in the SQM?

Q.    Okay.

A.    Excuse me, SMS.  I just don't have the number.

Q.    Your third opinion, Carnival crew and tender agents did not act reasonably under the circumstances because they failed to reasonably

assist Mr. Lehmann board the tender vessel, correct?

A.   Correct.

Q.   Okay.  And you indicate within the cruise industry, it is standard practice for tender agents to assist passengers board a tender when they are from coming from a cruise vessel, correct?

A.   Correct.

Q.   Okay.  And you agreed with me before that there was a -- there was somebody present on the tender platform at -- in this manner -- in this matter who was assisting passengers getting onto tender boats from the cruise ship, correct?

A.   Well, I don't want to go back to the video and do this all over again, but when Mr. Lehmann got onto the tender, all three of those crew members were on the tender.  He had removed himself -- the one in blue had gotten off the little platform there and stepped back onto the tender.

Q.   Right.  So now you're saying that the individual -- you agree that this individual in blue -- I switched back to Exhibit 2, the video now.

So you agree that the individual in

blue with the khaki pants is on the tender platform at this point, right, at 1 minute 25 seconds into the video?

A.    Okay.  Yes, he is.  And then...

Q.    He's on the platform, right?

A.    Okay.  Let's play it again.

Okay.  Now he steps up.  So now they're all on the vessel right now.

Q.    This is at 1 minute 28 seconds, and we can see that Mr. Lehmann is falling down the steps. The individual in blue is kind of reaching out to him and I think it looks like he is still standing on the platform, but is it your interpretation that the individual in blue is now on the vessel itself, the tender?

A.    Well, you can't be on both because the -- it's listing and pitching so much.  And my other question is, too, is what is in his right hand?

Q.    What is in whose right hand?

A.    The crew member in the blue with the hair or the -- whatever he is wearing.  So he's grabbing something.  Okay.  I'm quite sure he has the cane.

Q.    Okay.  So now your interpretation is that who has the cane?  The individual in the blue?

A.     The individual in blue.

Q.     Okay.

A.     Geez.  They never should have boarded this guy.

Q.     But what we were saying before -- and I went back to the 20-second mark here.  The individual in blue that was on the tender platform as Mr. Lehmann fell, based on the video.  You agree with that?

A.     Well, I'll agree with explanation for the jury is that you can't stand on a platform and on the tender's platform threshold that comes out and not fall between the vessel and the platform and get crushed.  So it's got to be one or the other.  It's a very dangerous situation.  I have done people being crushed before.  I wasn't there, so...

Q.     Okay.  I've gone back to Exhibit 1 now, the actual report.  At least with respect to this first part, your opinion 3 subpart A where you indicate that it's standard practice for tender agents to assist passengers board a tender when they are coming from a cruise vessel.  Would you agree that in this case that there were tender agents available to assist Mr. Lehmann when he was

coming from the cruise ship onto the tender --
available to assist?

A.    Well, yes, however, they didn't.

Q.    Okay.  So your criticism is that they didn't provide the right type of assistance to Mr. Lehmann as he was boarding the vessel; is that fair?

A.    Apparently not.  They didn't provide any assistance whatsoever.

Q.    Okay.  So there were individuals there available to provide assistance, but your opinion is that they didn't provide any assistance whatsoever to Mr. Lehmann?

A.    Correct.

Q.    Okay.  And because of that and your interpretation, you opine that Carnival's crew and tender agents did not act reasonably under the circumstances of Mr. Lehmann's incident, correct?

A.    Correct.

Q.    And specifically, you go on to state that it was unreasonable for Carnival's crew and tender agents, as you say here, to instruct Mr. Lehmann to give him his cane, correct?

A.    Correct.

Q.    Okay.  You go on to say that this was

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

not reasonable under the circumstances because it should have been obvious to the tender crew that Mr. Lehmann needed his cane for stability, and therefore the tender crew should not have ordered Mr. Lehmann to give up his crane, especially at a time when he needed it, right?

A.   Correct.

Q.   And your next criticism is that the tender crew did not assist Mr. Lehmann to sit down on the tender and the tender crew should have, right?

A.   Correct.

Q.   Okay.  So it's your opinion that the tender crew acted unreasonably by not offering any assistance to Mr. Lehmann, as you stated before, right?

A.   Correct.

Q.   Okay.  And then subpart 3, you indicate that the tender crew did not advise Mr. Lehmann of the nearby railings, correct?

A.   Correct.

Q.   Okay.  We went over the railings earlier, though, and you agree the railings were visible, right?

A.   Well, I agree they were visible, but

you have to actually take their hand and put it onto the railing because when the tender is pitching and listing, they are in panic mode because they don't know what to do.  So you have to calm them down and take their hand and say it's okay, I got you, and put their hand onto the railing so they can grab it.

Q.    Okay.

MR. PELAEZ:  I'm going to mark as Exhibit 3 to your deposition today a photograph of the tender boat that was produced in discovery.  It's part of your file as well, CCL 000162.

(Thereupon, Defense Exhibit No. 3 was marked for identification.)

BY MR. PELAEZ:

Q.    Sir, do you see the document I've just marked as Exhibit 3 to your deposition today, the photograph?

A.    Yes, I do.

Q.    Okay.  You've see this photo before, right?

A.    Yes.

Q.    Okay.  This is a photo that was taken after the incident, the same day of the subject

tender boat. You can see the railing going down the set of steps here that was available on the tender boat for use, correct?

A. Correct, but he uses his cane with his right hand.

Q. Okay. And you can see that there's another railing on the left-hand side of that staircase going down as well, correct?

A. Correct.

Q. Okay. And here, we see the platform to the right where the individual in the blue -- I don't know if it's the same individual at this point, but there's somebody in a blue shirt and khaki pants on the platform there, next to the tender boat in this case, right?

A. Correct.

Q. And your opinion was that the tender crew were required to advise Mr. Lehmann of the availability of these railings to go down the steps?

A. Well, not advise, but actually direct because you have to grab them in a nice way -- that's why we call it spoon-feeding. You have to take their hand, as I explained, and say, I'm going to assist you, and place their hand on the railing,

but somebody with a cane, you would want to go in front of them, and maybe even have them hold the back of your shoulder while you're going down the stairs, while they're holding the railing with one hand here on the left and using the cane with the right.

Q.   Okay.  But my question was simply as to the subpart 3, of 3 B in your opinions.  It says, "the tender crew did not advise Mr. Lehmann of the nearby railings.  Similarly to the point above, Carnival's crew and agents should have done this, but they did not.  So you're criticizing that they didn't advise Mr. Lehmann of the nearby railings; is that correct?

A.   Correct.  Apparently they didn't. Look what they did for the lady in front of him.

Q.   Okay.  And then your fourth opinion is that the conduct of Carnival's crew and agents directly caused Mr. Lehmann to become injured, right?

A.   Correct.

Q.   When you say "become injured," you're not giving an opinion, a medical opinion, as to the fall causing a specific injury like his fractured ankle.  Are you -- is your opinion geared

towards -- are you opining that the conduct of Carnival's crew and agent directly caused Mr. Lehmann to suffer his fall?

A.    I have -- my opinion is contributing factors.

Q.    Okay.  Are you giving an opinion as to actual causation of the injury itself, a fractured ankle, medical opinion?

A.    No, sir.

Q.    No.  Okay.

And again, your opinion there is based on -- you indicate the CCTV footage of the incident, right?

A.    Yes.

Q.    And you indicate that according to the CCTV, it showed that Carnival's tender crew and agents did not reasonably assist Mr. Lehmann, once he got aboard the tender vessel, right?

A.    Yes.

Q.    Have we gone over all the opinions you intend to offer in this matter?

A.    Unless there's anything else comes in and I am offered the availability to offer other opinions, yes.

Q.    Okay.  But as you sit here today, have

we now reviewed all of the opinions that you intend to offer in this matter?

A.    Yes, sir.

Q.    Okay.  Sorry.  I'm going through my notes here.

Mr. Jaques, would you agree that your ultimate opinion is that Carnival's crew and the tender boat's crew, in this case, failed to act reasonably under the circumstances?

A.    Yes.

Q.    And to arrive at that opinion, you basically just reviewed the evidence in this case, the documents produced by Carnival, the CCTV video footage of the incident, the Carnival safety video showing the procedure for guests transferring off the tender boats, and your interview with the plaintiff; is that correct?

MR. PEREZ:  Object to the form.

THE WITNESS:  Correct.  Oh -- and excuse me, your enhanced video you just showed me.

BY MR. PELAEZ:

Q.    But to be fair, it's the same video, it's just the video player that allows you to zoom in and pause and slow down.  There's been no

enhancement to that video itself.

A.   Excuse me, that was bad terminology, so...

But your video that I was unable to do something like that to.

Q.   Okay.  You've been paid by Plaintiff's counsel for your time and work on this matter, correct?

A.   Yes.

Q.   Okay.  As you sit here today, can you tell me how much you've charged for your services as an expert witnesses, specifically on this matter?

A.   $1,500.

Q.   Okay.  Do you have any other bills or invoices that are pending in addition to the $1,500 that you've charged to Plaintiff's counsel for rendering your opinions in this matter?

A.   No, I do not.

Q.   Can tell me how much time -- how many hours you've spent investigating, reviewing the materials, and preparing your report in this matter that would be included in that $1,500 that you billed to Plaintiff's counsel?

A.   I believe about 7.5 hours.

Q.   So that's the total amount of time that you spent in this matter on behalf of Plaintiff so far, 7.5 hours?

A.   Yes.

Q.   And obviously, your time here today is separate.  That's being paid by my office for taking your deposition, right?

A.   Correct.  And you paid me.  Thank you.

Q.   Okay.  Did you do anything to prepare for your deposition today?

A.   Go over all of the materials again, read my report.  Excuse me.  That was it.

Q.   Okay.  Do you have any other cases that you are currently working on as an expert witness on behalf of Plaintiff's counsel's office?

A.   Give me a second.  No, actually, this was it.  I have nothing else for 2024.

Q.   You have had your opinions previously stricken by Federal courts or limited under the Daubert standard; is that correct?

A.   Correct.  In two decades, of course.

Q.   Now specifically, have you ever had any opinions that you've offered in lawsuits on behalf of plaintiffs for accidents happening with tender boats?  Have any of those opinion previously

been stricken?

A.    No.

MR. PELAEZ:  I don't have anything further for you, Mr. Jaques.  Thank you for your time.

THE WITNESS:  Thank you, sir.

CROSS-EXAMINATION

BY MR. PEREZ:

Q.    I have a few questions.  Mr. Jaques, My name is Alex Perez.  I represent Mr. Arthur Lehmann in this case, and I want to learn a little bit more about your opinions in this case, but first, just briefly describe for us your qualifications to give opinions in this case.

A.    I'll try not to be longwinded; however, I did accept a position with Carnival Corporation in, I believe, 1991.  They had just started a new program called chief security officer.  There were so many problems going on out there that they had to hire retired and active police officers, detectives.

At any rate, I was sent immediately to Puerto Rico and I was responsible for passengers and crew and investigating all accidents that occurred shipboard, which culminated about to 25 to

30 accident reports a week.  I was also responsible for tender operations, gangway operations, drug interdiction.  It was a lot.

Q.   When I asked you about your qualifications, you told me you worked for Carnival Cruise Line.  How many years did you work for Carnival?

A.   I worked for Carnival for approximately two years, and then I took a -- as I explained earlier, a grant position with the City of South Miami Police Department.

Q.   Okay.  I will kind of walk you through what I'm asking.  What positions in those two years for Carnival did you hold for Carnival?

A.   Chief security officer.

Q.   Okay.  And as chief security officer working for Carnival, did you have any experience working with tender operations involving passengers?

MR. PELAEZ:  Objection.  Form.

THE WITNESS:  Yes, that was part of my daily duties because every port that we went into, if we came alongside, meaning that we actually got to dock at a port, I was responsible for notifying the bridge

that we are safe and secure alongside, the break door is clear, gangway is out. We were ready to debark passengers. And then I had to check the gangway and make sure that the gangway was secure, make sure that if it was raining, if it was inclement weather of some kind, that we were protecting the passengers. If we were at sea and we were maneuvering or anchored, that's a different story. So then I am responsible for the platform, the passengers. The safety officer assists me and the staff captain will assist me and the assistant chief security will assist me.

And it's very difficult because the ship is moving, in some cases there's third-party tenders, which aren't our crew, so it is -- it is very exhausting.

BY MR. PEREZ:

Q.    Let me just take a break here and ask you, for members of the jury who may not have heard what a tender operation means, can you just define that term for us?

A.    A tender operation -- a tender member,

not a member, but for the jury to explain to them and be of use for them, is that a tender is designed to tender passengers to the shore and back to the ship.  That's called tendering.  And for that, we have tender boats that come in all various sizes, and they can hold up to -- I've seen up to 300 passengers and in Belize, Cabo San Lucas, Grand Cayman, various different ports throughout the world, we will use tenders, Ireland, and in Greece, and these tenders are operational, based upon weather because the ship can only stay there and accept passengers as long as the weather is good.  So it is extremely logistically difficult.

Q.    So just to summarize, a tender is a smaller boat that takes cruise ship passengers from a large cruise ship onto a small boat to land and back?  Is that fair?

A.    Well, fair, and yet, it could be a smaller cruise ship tender lowered into the water, taking a 175 passengers, or it could be a third-party vessel, like in this case, taking -- I'm just going to guesstimate up to 150 to 75 passengers.  I've seen them up to 300 passengers.  So that is a tender, coming out to the ship.

Q.    And while working for Carnival for

your two years, what if any experience did you have with tender operations?

A.    I ran the operations from the morning until we closed because I was the security officer. And I worked with a safety officer, however, they were there to assist me so I could take a break for lunch and then come back.  Because you have to constantly monitor the operation itself.

Q.    And when you say, "run the operations," did that include any training of Carnival crew members for tender operations?

MR. PELAEZ:  Objection, form.

THE WITNESS:  Yes, it did, because our deck hands, which the deck department -- we have various departments on the ship -- they needed to be trained on how to load passengers onto a tender, especially one that is moving and listing and pitching, as in this case.

BY MR. PEREZ:

Q.    And did Carnival give you training on how to perform tender operations?

A.    Oh, yes, definitely.  I attended the United States Coast Guard course for qualified seamen, and I was trained shipboard by the previous

security officer.  And I was also trained by my own people that -- on what to do with these passengers. Housekeeping is a big help, however, in this case, I didn't see anybody helping.

Q.    Okay.  And we'll get to that.

Can you just describe generally for the members of the jury the training Carnival gave you on how to perform tender operations as it relates to passengers making the transfer to a smaller boat?

A.    Yes.  While -- it started with the day that I arrived on the ship because we had a port every day.  So there was no sea days.  And say, for instance, in Grenada, the island of Grenada, we would have to go over to the island, set up port operations, and then call in the tenders.  And I would go over with the first tender and I had to be trained by the previous security officer of how to radio the bridge, radio the cruise director, ensure all passengers were on board the tender for the first tour going to shore and make sure that they arrived safely.  And then we had to get them physically out of the tender and don't release their hand until they're on solid ground.

It's a hands-on situation.  People

don't like to be touched. We know that. However, in this case, you have to touch them. You have to grab their hand, grab their elbow, grab their arm, and then escort them up the steps from the tender to the port -- or to the pier, and then release them.

Q. Okay. And that was my question, but I'll make it more specific. What if any training did you get from Carnival as to how to transfer a passenger from the larger cruise ship to the smaller tender boat?

A. It was from ship to ship. It wasn't from Carnival Corporation. It was only from the ship's commands.

Q. Okay. Can you describe that training? How is it supposed to work under Carnival's policies in transferring the passengers from the cruise ship to the smaller tender vessel to get them to port?

A. Well, the training is done by -- there is a training manager on board the ship. The training manager will instruct the deck department on how to train the new deck hands to assist passengers to get on the tender. The supervisor in charge, which would be the security officer --

chief security officer of the ship -- will then also instruct the deck hand on how to do it properly.  And only then, when they're confident with their understanding of how to do this, release them and let them do it on their own.  The bosun in charge of the vessel, he will do write ups periodically on -- if they're engaging, how they're doing, if they need to be moved to a different location, as far as the deck hands are concerned.  But it's a very complex situation so you would have to have the same people doing the same job every day.

Q.   Let me try to give you a little bit of a narrow question.  Based on the training you got while working for Carnival, how is it supposed to look like, transferring a passenger from the cruise ship to the that smaller tender vessel?

A.   Well, again, first thing you want to do is -- what I didn't appreciate in this video that I saw again, is that the separation of cruise ship to tender is this.  And it shouldn't be, it should be this, because you need -- we've trained people, when I was with Carnival, that you have a crew member up top, scanning the cards, swiping the cards to release the passengers off the ship

through security, to walk down the gangway. However, at the bottom of the gangway, is a Carnival security employee, plus a deck hand from the ship. Then on the tender, which in this case, is third party, out of Cabo San Lucas -- no big deal. I've done it before with them -- is that the passengers going up the steps, or crossing over from the platform, to the break of the tender, which they're constantly moving is done by spoon-feeding. And again, you take them by the back of their elbow, also with their hand, and you're escorting them onto the tender. You're not going. You're handing them off to the tender crew member that's on the tender. Because the tender is rocking and pitching and listing. So you can't just release them or this is what is going to happen, as in this case. You have to physically hands them off. And then if you have somebody that is disabled, especially in conditions such as this, you have to put them in a disability seat or you have to physically walk them downstairs and put them into a seat and then walk them back off the tender when they get into Cabo San Lucas. It's a well-oiled machine, but if you don't use it properly, the machine breaks down.

Q.   Did you watch the CCTV video of Mr. Lehmann's fall in this case?

A.   Several times.

Q.   Did you see any of the tender agents in that video perform the spoon-feeding technique that you just described to us as it relates to Mr. Lehmann's incident?

A.   Yes, with the female passenger that appeared to be in her years, before Mr. Lehmann, they did what answered to be an adequate job, and they provided for her safety.  However, when Mr. Lehmann came on the tender, all three of them were standing to his back.  And no, they didn't provide any kind of assistance.

Q.   Okay.  Let me get back to your qualifications.  After working for Carnival Cruise Line, did you work far any other cruise lines?

A.   Yes, I went to Norwegian Cruise Line.

Q.   And how long were you with Norwegian Cruise Line?

A.   Two years.

Q.   And what positions do you hold at Norwegian Cruise Lines?

A.   Security manager.

Q.   As security manager for Norwegian, did

you have any job responsibilities relating to tender operations?

A.    Same exact thing.

Q.    Okay.  After working for Norwegian, did you work for any other cruise lines?

A.    Yes, for Disney, I did one contract, and then I went to Holland America and then I did emergency fill-ins for Royal Caribbean.

Q.    How many -- how long did you work for Disney Cruise Line?

A.    One 15-month contract.

Q.    And what position did you hold for Disney Cruise Line?

A.    Security officer.  Same thing.

Q.    Working as a security officer for Disney Cruise Line, did you have any job responsibilities relating to tender operations?

A.    Yes, definitely.

Q.    And explain to us what those were for Disney.

A.    I'm going to call it for the jury's sake industry standards so I can teach them a bit about this.  Within the industry, we call it industry standards, and tender operations fall within industry standards.  So basically the five

major cruise lines are doing everything just about the same because the industry requires them to do such.  So it was exactly the same process.

Q.   Okay.  After working for Disney Cruise Line, did you work for any other cruise lines?

A.   Yes, Holland America.

Q.   And how long did you work for Holland America?

A.   Two years.

Q.   And what position did you hold for Holland America?

A.   Security officer.

Q.   And that security officer for Holland America, did you have any responsibilities relating to tender operations?

A.   Yes, exactly the same.

Q.   In your years working for the four different cruise lines, did you ever have an opportunity to perform tender operations at Cabo San Lucas specifically?

A.   Yes, with Holland America Line.

Q.   Okay.  And was there anything peculiar about Cabo San Lucas tender operations as opposed to anywhere else in the world?

A.   No.  It just depends on the day.

That's why we have prearrival meetings to see what the weather is going to be that day.  But, no, it's the same.

Q.   Talking about industry standards for tender operations, are there any particular dangers that the cruise lines are aware of that they try to remedy when making the transfer operations of their passengers?

MR. PELAEZ:  Objection, form.

THE WITNESS:  Well, yes.  I mean, manpower.  Manpower and weather.  If you're not prepared and you don't have the people, and, as seen in this video, you're going to lose.

BY MR. PEREZ:

Q.   Can you describe to us any dangers as it relates to what the passengers may face when performing tender operations with cruise ships?

MR. PELAEZ:  Objection, form.

THE WITNESS:  Oh, they're falling and tripping and collapsing everywhere.  You can't even let them go for a second.  It doesn't matter if they're 22, 6, or my age, 66.  You have to maintain control of the passengers.  You have to physically grab

their hand, put their hand on railing, make sure that they're stable, make sure they can get downstairs, but if you see somebody with a cane, number one, you don't take their cane; and number two, if they have a cane, you've got to escort them onto the tender; and number three, you have to put them not downstairs.  You put them next to who's maneuvering the vessel with a disabled seat there, which I have had to do myself.  It's just if you make mistakes in the logistics of the operation, people are going to get hurt.

BY MR. PEREZ:

Q.    I asked you about dangers, and it may be an obvious answer, but why are those dangers that the passengers face while making these tender transfers?

MR. PELAEZ:  Objection, form.

THE WITNESS:  Well, the dangers are you can't leave them alone.  When the tender is listing and pitching and the weather is not so good and you've got swells -- because we get big swells out there.  It doesn't matter if it's Cabo or

if you're in Hawaii.  You're going to get swells anytime you're offshore.  And these swells can be, for the jury's sake, they can be from three to six feet, sometimes more, and a tender is only so big.

A ship won't move that much, however, a tender will rock and roll and you'll have people splashing all over the place.  So the dangers are you have to maintain a constant vigilance of the passenger that's boarding the vessel, and you have to ensure that you hold onto that passenger and make sure that that passenger gets seated.  End of story.

BY MR. PEREZ:

Q.   Can define for us, what is a swell?

A.   Swells are caused by the wind.  So the wind is moving your waves, and the wind is moving the swells.  Waves, you will see coming ashore for the jury that doesn't know this, but that's when you see whitecaps and people surfing on them.  However, a swell, typically there's no whitecaps.  They're just huge, monstrous waves that are pushing against the ship.  And when they're pushing against the ship, they cause the ship to list and to pitch.

So pitching, going forward to aft; listing, going from port to starboard, left to right.

Q.    And in layman's terms, can you define for us listing and pitching?

A.    In layman's terms.  Okay.  Pitching and listing would be -- if you're going to pitch, your bow is coming up, which is the front of the ship, and the bow is coming down.  The aft or the rear of the ship is coming up and the rear of the ship is coming down because of the waves.  And then you've got the listing which means that the port side, left -- port -- is going to left and the starboard side is going to the right.  So you're listing.  Now, you take that and you move it onto a tender which is very small in size, compared to the ship at a 140,000 tons, and it's very dangerous.  You have -- that's why you have to make sure that you constantly be vigilant with those passengers.

Q.    Well, while working for these cruise lines, did you yourself assist passengers transfer from cruise ship to tender?

A.    Oh, yes.  And in countless countries.  You can't let go of them.  You have to take one off, come back out, get another one.  Spoon-feed this one on, come back out, get another one.  If

somebody's disabled, they have a cane, wheelchair, they're blind, hearing impaired, elderly, they have a prosthetic, you're there.  You don't go anywhere. You have to -- and I have had to escort them all the way to their seat with their family, sit them down, go back up the stairs on my own, without cracking my head open, and get back out there and get another one.

Q.   Let me move on from your qualifications and talk about any methodology.  Did you employ any methodology in arriving at your opinions in this case?

A.   Yes.  My experience, my background, my knowledge, the CCTV camera footage, my interview with the plaintiff, my review of the discovery, I was not able to inspect the vessel, however, in this case, I don't see any reason necessary.

Q.   So you said you reviewed some documents and you drew from your experience.  My question is, how did you take the documents you reviewed and coupled that with your experience to arrive at your opinions in this case?

A.   Well, because the documents spelled out policy on the part of Carnival that they were supposed to employ, was -- they show a picture --

it's an animation picture from their video of one person standing on the tender, assisting a passenger going on board. Well, that's ridiculous. That's not how it's done. And the rest of it was all reviewing other documentation that came in. But most importantly was my interview with the client and my review of the CCTV camera footage.

Q. Okay. And how did your review of the documents and your experience help you arrive at your opinions in this case?

A. Because with my experience, background, and knowledge, and having trained crew members how to do proper boarding of tenders, that's -- it was within my lane. I knew that this case was viable, that as far as I'm concerned, Mr. Lehmann didn't contribute to any portion of this accident, that Carnival failed to follow their own procedures and policy. Carnival failed to act responsibly and ensure the safety of this particular passenger.

Q. I do want to talk to you about your opinions in this case, and I will bring up your report.

I'll mark it as Plaintiff's Exhibit 1. If you need to refer to it, just let me know.

(Thereupon, Plaintiff's Exhibit No. 1 was marked for identification.)

MR. PELAEZ:  Just for the purposes of -- to the extent that this is being offered as a direct examination for purposes of trial preservation, we object to the report as hearsay.

MR. PEREZ:  Okay.

BY MR. PEREZ:

Q.   Let me know when you're ready, Mr. Jaques.

A.   Yes.  Excuse my sinuses.

Q.   You ready?

A.   Yes.

Q.   Do you have opinions in this case?

A.   Yes.

Q.   Okay.  Let me ask you, what is your first opinion?

A.   Can you put my report up.

Q.   Do you need something to refresh your recollection?

A.   Well, yeah, I can't remember everything.

Q.   Okay.  Would reading your expert report in this matter help refresh your

recollection as to your first opinion?

A.   Yes.  I can pull it up on my iPhone.

Q.   Well, I'm asking you.

A.   Yes, it would.

Q.   Okay.  Then let me introduce Plaintiff's Exhibit 1.

MR. PELAEZ:  Same objection, hearsay.

MR. PEREZ:  Understood.

BY MR. PEREZ:

Q.   I will introduce Mr. Jaques, as Plaintiff's Exhibit 1, your expert report in this matter.  I will scroll down to page 5 of that report.

Does this document refresh your recollection as to what your first opinion is in this case?

A.   Yes, of course it does.

Q.   Okay.  I will ask you:  What is your first opinion in this case?

A.   "Cruise ship to tender transfer operations are dangerous for cruise ship to passengers.  This is well known to the cruise lines but not an obvious danger to cruise passengers."

Q.   And I brought this up just to refresh your recollection.  I don't necessarily want you to

read to the jury, but this just helps in the event you need to recall specific facts.  But just summarize for us, what -- what is that opinion all about?

**A.**    And again, for the jury, that cruise ship passengers -- it doesn't matter how many times they've cruised throughout their lives, they don't expect the unexpected.  So if they're boarding a tender out at sea, they're not paying attention to the pitching and the listing as we just talked about.  They're not paying attention to what railing there is, what they can grab ahold of if they need to.  They are looking straight ahead and that's been testified to, as I said.  They're not looking down.  That's why there's so many of us there to help them.  Watch your step.  Watch your step.  Please hold the railing.  Watch your step.  You have to keep constant vigilance on these passengers, and they're just -- they don't know their surroundings.  So any time that they're -- in this case, boarding a tender, you have to, again, be watching for them.  If you see somebody, especially with a cane, you have to watch them twice and make sure that you get them to a seat of safety.

*Jeannie Reporting*
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q.   Okay.   And I'll just ask you a simple question, and maybe the answer is simple.   Why are cruise ship to tender transfer operations dangerous for cruise ship passengers?

MR. PEREZ:   Objection, form.

THE WITNESS:   Because everything is moving; the ship is moving, the platform is moving and the tender is moving.

BY MR. PEREZ:

Q.   And you say here that cruise ship operators like Carnival are aware of that danger. How is that?

A.   Well, because every cruise line knows that tender operations, especially when you're maneuvering, are inherently dangerous because of those circumstances.   Weather will cause injury if you're not prepared and we could do things such as move the ship or move the operation to the other side of the vessel.   But in this case, they didn't feel it was necessary.   I don't know why.

BY MR. PEREZ:

Q.   Okay.   Let me ask you:   Do cruise ship operators typically monitor the sea and weather conditions at the port of calls that they're going to be disembarking passengers?

A.    Oh, yes, definitely.

Q.    Do cruise ship passengers typically have the same amount of information as it relates to the weather and sea as do the cruise ship operators?

MR. PELAEZ:  Objection, form.

THE WITNESS:  No, not really.  I mean, they could Google on their phone, but they're not going to have sea conditions.

BY MR. PEREZ:

Q.    No, like the cruise ship operators themselves; is that correct?

A.    Correct.

MR. PELAEZ:  Objection, form.

THE WITNESS:  They're not going to know what sea conditions there are, the wind, what the swell condition are, wave heights, none of that.

BY MR. PEREZ:

Q.    What's your second opinion in this case?

A.    "Cruise ship crew and their tender agents responsible for assisting passengers transfer from the cruise ship to the tender must exercise caution for the safety of cruise ship

passengers."

Q.     And why do you have that opinion in this case?

A.     Well, because if you don't provide the safety for the cruise ship passenger and you're not assisting them in some way or form, then you're going to have an accident, as in this case.

Q.     Explain that to me.  Why is that the case?

A.     Because it's in the video, explains that if you -- for example, the lady that went on board before the plaintiff, she was offered assistance.  Her hand was seen being put on the railing.  She was assisted by three crew members. She was even being held by one.  The plaintiff comes on board the tender, and three crew members of the tender are standing behind him, whether he had his cane or not.  I don't believe he did have his cane because it appeared he handed it over.

So where is the safety in that?  You do the same thing for every passenger that boards the tender, and you don't break that.

Q.     And again, simple question:  Why are you giving this opinion that the cruise ship crew need exercise caution for the safety of the cruise

ship passengers when doing these tender transfers?

MR. PELAEZ:  Object to form.

THE WITNESS:  Because if they don't do the spoon-feeding, as I explained, if they don't actually physically touch the passenger and hold their hand or their elbow, the passenger is going to go down. And I've done hundreds of these accidents, both on board the cruise ships as an employee, in the civil world.  It's always been because nobody assisted the passenger. They were left on their own.

BY MR. PEREZ:

Q.    And why do you say the passenger is likely to go down if they're not spoon-fed?

MR. PELAEZ:  Object to the form.

THE WITNESS:  Because the tender is moving and the water is unpredictable.  You can't negotiate with the sea.  You can't understand what those swells do, and if the ship is moving and the platform is moving and the tender is moving, it's horrific.

BY MR. PEREZ:

Q.    You have a third opinion in this case.

A.    "In this particular case, Carnival's

crew and tender agents did not act responsibly under the circumstances, because they failed to reasonably assist Mr. Lehmann board the tender vessel."

Q.   And what facts is that opinion based on?

A.   Well, I hate to use the word "obvious," but they dropped him.  When I say "dropped him," they didn't hold him and drop him. We call it dropping them because they didn't pay adequate attention to him.  There was no safety of him being processed on board the tender appropriately.  And for him to be sent downstairs -- well, first of all, for him to come on the tender without escort was bad enough.  Now he's on board the tender which is listing far more than the platform or his cruise ship.

So he's in an environment right now, totally unexpected, and they didn't help him.  They didn't do anything for him, and he went down.  Not only did he go down, he went down a flight of stairs.  It's -- sorry, but it's just -- I can't believe it.

Q.   Do you have any opinion as to any action or inaction on the part of Carnival's tender

agents which contributed to Mr. Lehmann falling?

A.   Well, yes, definitely.  They -- the three -- what appeared to be gentleman or three crew members on board the tender acted confused.  They helped the lady in front of Mr. Lehmann; however, Mr. Lehmann comes on board, he has a cane, we all know that.  But they don't do anything for him.  I mean, all they had to do was put him into the seat next to whoever was going to maneuver the tender because there were two disabled seats there.

And again, I know because I've sat in one before, and they didn't do that.  So the next thing you know, it's listing and pitching so much that you can see it in the video, and he goes to his, what appears to be I believe his right, down the stairs.  And he's not a small guy.  So of course, he's injured.  I'm sure he is injured badly.

BY MR. PEREZ:

Q.   How did the conduct on the part of Carnival's tender agents lead to Mr. Lehmann falling?

MR. PELAEZ:  Objection, form.

THE WITNESS:  What was the last sentence?  What was that?

BY MR. PEREZ:

Q. I will ask again. Based on your experience doing tender operations, how did the conduct on the part of Carnival's tender operators lead to Mr. Lehmann falling?

MR. PELAEZ: Objection, form.

THE WITNESS: They failed. They didn't pay attention. They -- for whatever reason, they just dropped the ball. I can't explain it.

BY MR. PEREZ:

Q. My question is connect the dots for me and the members of the jury: How did is that conduct on the part of Carnival's agents, in your opinion, lead to Mr. Lehmann falling?

MR. PELAEZ: Objection, form.

THE WITNESS: There was no conduct. There was no training. It appears to be there was some kind of like -- we're going to do it this way mentality. I don't understand it. Because you didn't have a Carnival cruise ship employee at the gangway -- this is my opinion -- to monitor the situation and to instruct the tender crew members on what to do properly, and

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

then again, the operation should have been suspended.  So I -- you've got a separation in responsibility.  So you're talking about Carnival employees standing up by the gangway and then third-party employees alone down by the tender, and that shouldn't happen.  Carnival should always be monitoring those that are dealing with their passengers.  If they don't, this is what is going to happen.

BY MR. PEREZ:

Q.   And what is that opinion -- what facts is that opinion based on?

A.   According to the -- or in monitoring the CCTV camera video and Mr. Lehmann's discussion with me, I felt that, definitely, he was holding his cane at the time and then handed it over to the employees of the tender.  But they didn't do anything to assist him because they knew that the tender was listing and pitching, and they were fine with it, because they're used to it.  However he definitely wasn't, and he's disabled.  So they didn't do anything to assist him and again, all they had to do was keep him up on the upper deck. Why would you take a disabled passenger with a

cane, which means that they have a walking disability, to a below deck? Again, it's -- it doesn't make sense, it's irresponsible.

Q. Given your experience in tender operations and given the circumstances of this case and Mr. Lehmann holding a cane while trying to transfer onto the tender, what is it supposed to look like, given industry standards that you talked about?

MR. PELAEZ: Objection, form.

THE WITNESS: Well, it's very simple. I mean, Mr. Lehmann would have started to board the gangway, come down the gangway with a Carnival employee because he had a cane. You know, from housekeeping or the security department, walk him down the gangway to the tender and then release him to the tender operator so that they could walk him down the stairs just to the deck, not down the stairs to below decks, and then place him into a disability seat.

It's that simple. It's not rocket science.

BY MR. PEREZ:

Q. Did this tender vessel have a disability seat by the captain's operation area?

A.   As far as I'm concerned, yes.

Q.   Do you have a fourth opinion in this case?

A.   Yes.

Q.   What is it?

A.   "The conduct of Carnival's crew and agent directly caused Mr. Lehmann to become injured."

Q.   So do you have an opinion in this case as to whether Carnival's tender agents acted reasonably under the circumstances as it relates to Mr. Lehmann?

A.   They did not.

Q.   That's your opinion?

A.   Yes.

Q.   And what is that opinion based on?

A.   It's based upon their actions or the lack of their actions.  You can see in the video that the three of them are standing behind Mr. Lehmann.  That's not how it works.

One of them should have been in front of Mr. Lehmann, as in the lady prior to Mr. Lehmann, and the other two or other one should have been assisting Mr. Lehmann grab onto -- if they weren't going to put him into a disability

seat, which I don't understand why not, and they were going to take him downstairs, then it takes two of them to do that, down and back up, because that tender is always moving.

Q.   At the start of my questioning, I asked you about your methodology and you described it to me.  Did you use that same methodology to arrive at all four of your opinions?

A.   Yes, I did.

Q.   Are all the opinions you described to us today made within a reasonable degree of professional certainty?

MR. PELAEZ:  Objection, form.

THE WITNESS:  Yes, they are.

MR. PEREZ:  Okay.  I don't have any further questions at this time.

MR. PELAEZ:  Brief follow up.

REDIRECT EXAMINATION

BY MR. PELAEZ:

Q.   Mr. Jaques, you told us earlier that the last time you were involved personally in terms of being involved with or overseeing any type of tender operations is back in 2007 when you worked for Holland America and then when you did those two contracts on an emergency basis, right?

A.   As a shipboard employee, yes.  But remember, I've sailed on many ships as a passenger since then.

Q.   But in terms of having any oversight or responsibility over tender boat passenger operations, you've had none of that since at least 2007; is that correct?

A.   That's correct.

Q.   Okay.  That's over 25 years ago, right?

A.   Correct.

Q.   Okay.  And you talked about your time working with Carnival as a security officer, right?

A.   Correct.

Q.   But you didn't -- strike that.

You worked with Carnival as a security officer in the early '90s, believe, right?

A.   Correct.

Q.   Okay.  So in terms of specifically Carnival -- take out Holland America -- you haven't had any involvement in terms of overseeing tender boat operations for Carnival Cruise Line in over 30 years; is that fair?

A.   Correct.  It's still the same.

Q.   Do you know if cruise members are

allowed to force passenger to accept assistance, physical assistance while transferring from the cruise ship onto a tender boat?

A.    Sorry.

Q.    Do you know if crew members on cruise ships are allowed to force a passenger to accept assistance in transferring from a cruise ship onto a tender boats?

A.    Well, we don't force assistance but we highly recommend it.  We -- well, let me finish.  And then we convince them in a human way how this is moving, that is moving, you need to hold onto me, and nobody argues the case.

Q.    So you would agree with me that crew members can't force a passenger to accept assistance, transferring onto a tender boat, right?

A.    No, I will agree with you.

Q.    Okay.  Crew members can offer assistance to passengers transferring from the cruise ship onto the tender boat, right?

A.    Yes.  However we do it in a very respectful way, and it's done -- how should I say -- with urgency.

Q.    When you say "we do it," you're talking about back in your time over 25 years ago

working on the cruise lines, right?

A.   Well, then and now too.  You can't change the rules just because it was 25 years ago.

Q.   But you haven't worked on a cruise -- on a cruise ship in over 25 years.  You said that, right?

A.   Correct.  But it doesn't matter.  I've sailed on ships, plus 30 vessels.  It's all done the same way.  The crew members will stick their hand out, they will grab your arm, and they will respectfully offer you assistance getting onto the tender.  And nobody in their right mind is not going to take that assistance because the tender is up here and now the gangway is doing this.

Q.   In your opinion, nobody in their right mind would refuse assistance boarding a tender boat?  Is that what you're saying?

A.   Well --

MR. PEREZ:  Form.

THE WITNESS:  Okay.

BY MR. PELAEZ:

Q.   That's what you have just said, right?

A.   Okay.  Right mind.  Somebody who is, you know, trying to do this without injuring themselves.  If somebody gets upset, you calm them

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

down and tell them to wait for a second.  You know, maybe the swells will calm.  But you're not going to injure somebody just because they say, don't touch me, you know.  If somebody says, don't touch me, they're not going on that tender because, especially if the swells are like what you showed me today, they're not going on my tender.

Q.    And you only experience being on cruise ships in the last 25 years is as a passenger, as a guest, right?

A.    Correct.

Q.    Okay.  Now, nowhere in your report, none of the opinions you offered today or that you provided on examination by Mr. Perez, none of them had anything to do with the weather or the swells or the sea conditions causing or contributing to this incident; isn't that true?

A.    Correct, until you showed them to me.

Q.    Okay.  Well, you had that video available to you previously, right?

A.    Well, yes, however I didn't see it like you were able to show it.

Q.    Okay.  My question was simply in terms of your expert disclosure, you didn't include anything indicating that the weather, the sea

conditions or the swells caused or contributed to this incident, right?

A. No, I didn't.

Q. And nowhere in your report that you authored in this matter did you disclose any opinion criticizing, I guess, the decision not to have plaintiff sit in a different area, as you mentioned, by the captain in a disabled seat; is that true?

MR. PEREZ: Object to the form.

THE WITNESS: I don't believe so, but that's something that they know.

BY MR. PELAEZ:

Q. Okay. So if I understand, you didn't -- you did not criticize or -- strike that.

Nowhere in your report do you state that Mr. Lehmann should have been offered a different seat on the tender boat, right?

MR. PEREZ: Object to the form.

THE WITNESS: Well, in opinion No. 4, I tried to explain to the jury what it is that could be done or should have been done, and that was part of it, that they should have put him in a disability seat next to whoever was piloting.

BY MR. PELAEZ:

Q.   I'd be happy to show you your opinion No. 4.  Maybe you could point me out to where you said that specifically, because I don't see it anywhere in there?

A.   Well, no, I didn't.  That's just what I'm saying.

Q.   Oh, you didn't?  You didn't say that anywhere in your opinion, in your report?

A.   No, but it was inferred that this is something that they could have done, and I was going to expound upon that during my testimony.

Q.   Okay.  But you agree that in your report, you didn't specifically say anywhere that Mr. Lehmann should have been offered a different seat on the tender boat, right?

A.   No, I did not.  Correct.

Q.   Okay.

You responded to a question by Plaintiff's counsel by stating that it was obvious that there was a failure on the part of Carnival's crew member and the tender boat's crew members in this case, simply because of the fact that Mr. Lehmann fell; is that correct?

MR. PEREZ:  Object to the form.

THE WITNESS:  Well, I -- ask me the question and then I will answer you.

BY MR. PELAEZ:

Q.    Let me say this:  You said on examination by Plaintiff's counsel that it was obvious that there was a failure in this case involving Mr. Lehmann, based on how the incident itself occurred and as seen on the actual video footage, right?

A.    Yes.

MR. PELAEZ:  I have nothing further for you, sir.

THE WITNESS:  Thank you.

MR. PEREZ:  Mr. Jaques, you have the opportunity to read your transcript or you can waive that opportunity.  It's your decision.

THE WITNESS:  Thank you.

I'll read.

MR. PEREZ:  Okay.

THE COURT REPORTER:  Do you have an email that you can provide me for the read?

THE WITNESS:  Yes.  It's JAQUESRANDY@hotmail.com.

THE COURT REPORTER:  Okay, perfect.

Thank you, everyone.

(Thereupon, the deposition was concluded at 2:13 p.m.)

*Jeannie Reporting*

Your Wish Is Our Job!

www.jeanniereporting.com

305-577-1705

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

                    I, the undersigned authority, certify that RANDALL JACQUES remotely appeared before me and was duly sworn.

                    WITNESS my hand and official seal this 4th day of December, 2024.




                    *Paula Pace*
                    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                    PAULA PACE, RPR

                    Notary Public State of Florida

                    My commission Expires:  12-14-26

CERTIFICATE OF SHORTHAND REPORTER


STATE OF FLORIDA     )
                     )  SS.
COUNTY OF PALM BEACH)

            I, Paula Pace, RPR, do hereby certify that I was authorized to and did stenographically report deposition of RANDALL JACQUES, that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 141 is a true record of my stenographic notes.

            I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.


            DATED, this 4th day of December, 2024.




_____
PAULA PACE, RPR

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

<u>JURAT PAGE</u>

STATE OF FLORIDA      )
                      )SS.
COUNTY OF PALM BEACH)


            I, hereby certify that I have read the foregoing transcript pages 1 to 141 and find the same to be true and accurate.

            Any corrections made by me are set forth on the errata page attached hereto.


                    _____
                    RANDALL JACQUES


Sworn to and subscribed before me on this, _____ day of _____, 2024.


_____
Notary Public in and for the
State of Florida at Large.
My Commission expires:



TO:  Randall Jacques
     JAQUESRANDY@hotmail.com

December 4, 2024

IN RE:  Lehmann v. Carnival

CASE NO:  1:24-cv-20060-KMW

Dear Mr. Jacques,

With reference to the examination of YOURSELF,
deponent in the above-styled cause, taken on
November 18, 2024 under oath, please be advised
that the transcript of the Deposition has been
transcribed and is awaiting your signature.

Please arrange to conclude this matter at your
earliest convenience.  We would suggest that you
telephone this office and arrange an appointment
suitable for all concerned.

However, if this has not been taken care of by
January 18, 2025, we shall conclude the reading and
signing of said deposition has been waived, and
shall then proceed to file the original of the said
transcript with the party who took the deposition,
without further notice to any parties.

                    Sincerely,




                    Paula Pace, RPR

cc:  All Counsel of Record.

ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES IN PART:
    (e)"...Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."


 PAGE/LINE              CHANGE/CORRECTION           REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


I, _____, do hereby certify that I

have read the foregoing transcript of my

deposition, given on November 18, 2024, and that

together with any additions or corrections made

herein, it is true and correct.


                         _____
                         RANDALL JACQUES

Jeannie Reporting
Your Wish Is Our Job!    www.jeanniereporting.com
                         305-577-1705

| **$** | **1:28** [2] - 78:17, 79:18 | **4** | 59:14, 59:25, 60:2, 60:17, 61:1, 103:1, 119:17, 125:7 | **ago** [5] - 22:7, 66:20, 134:9, 135:25, 136:3 |
|---|---|---|---|---|

**$1,500** [3] - 100:14, 100:16, 100:23

**2**

**'**

**'90s** [2] - 5:8, 134:17

**0**

**000162** [1] - 95:13
**003** [1] - 2:17
**025** [1] - 2:22
**071** [1] - 2:23
**08251** [1] - 3:14
**095** [1] - 2:23

**1**

**1** [18] - 2:22, 11:22, 12:9, 25:19, 25:20, 26:3, 47:24, 79:3, 88:5, 91:2, 91:9, 92:18, 119:24, 120:1, 121:6, 121:11, 142:6, 143:7
**1.310** [1] - 145:2
**10** [2] - 21:23, 29:16
**102** [1] - 2:18
**10:00** [1] - 1:13
**11:42** [1] - 47:19
**11:52** [1] - 47:22
**12** [1] - 29:16
**12-14-26** [1] - 142:22
**13-mile** [1] - 59:21
**133** [1] - 2:18
**1395** [1] - 2:10
**14** [1] - 4:1
**140,000** [1] - 117:16
**141** [2] - 142:6, 143:7
**1480** [1] - 2:4
**15** [2] - 33:23, 49:15
**15-month** [1] - 112:11
**150** [1] - 105:22
**1601** [2] - 3:12
**175** [1] - 105:20
**18** [4] - 1:12, 144:11, 144:16, 145:21
**1983** [1] - 59:17
**1985** [3] - 57:23, 59:14, 60:16
**1991** [6] - 5:19, 5:21, 6:1, 7:22, 8:15, 102:17
**1993** [1] - 9:17
**1:24-cv-20060-KMW** [2] - 1:3, 144:8
**1:26** [1] - 78:8
**1:27** [1] - 78:12

**2** [7] - 2:23, 11:23, 12:9, 71:10, 71:20, 71:24, 90:23
**20** [3] - 17:4, 21:23, 49:15
**20-second** [1] - 92:6
**200** [1] - 12:11
**2000** [1] - 10:9
**2004** [1] - 14:1
**2005** [1] - 16:19
**2006** [5] - 16:19, 19:6, 19:10, 19:15, 19:22
**2007** [9] - 5:8, 20:3, 20:10, 20:18, 32:18, 32:21, 33:9, 133:23, 134:7
**2013** [2] - 34:11, 34:25
**2015** [4] - 34:11, 34:13, 34:15, 34:20
**2018** [1] - 34:25
**2022** [1] - 34:25
**2024** [9] - 1:12, 26:14, 101:17, 142:12, 142:12, 143:17, 144:6, 144:11, 145:21
**2025** [1] - 144:16
**22** [1] - 114:23
**23** [1] - 74:21
**25** [8] - 77:22, 91:2, 102:25, 134:9, 135:25, 136:3, 136:5, 137:9
**26** [1] - 4:23
**28** [2] - 79:4, 91:9
**2800** [1] - 2:4
**2:13** [2] - 1:13, 141:3

**3**

**3** [12] - 2:23, 27:12, 28:17, 32:5, 35:11, 92:20, 94:18, 95:10, 95:14, 95:18, 97:8
**3.5** [1] - 87:9
**3.6** [1] - 87:9
**30** [8] - 9:21, 33:22, 34:22, 68:8, 75:14, 103:1, 134:23, 136:8
**30-day** [1] - 17:4
**300** [2] - 105:7, 105:23
**33131** [1] - 2:10
**33134** [1] - 2:5
**360** [2] - 48:15, 56:4

**4** [5] - 62:3, 62:12, 138:20, 139:3, 144:6
**4th** [2] - 142:12, 142:12

**5**

**5** [3] - 64:11, 69:20, 121:12
**50** [11] - 27:18, 27:25, 28:12, 28:16, 28:21, 28:22, 29:5, 29:9, 29:16, 29:25, 30:11
**50/50** [1] - 18:24
**5th** [1] - 26:14

**6**

**6** [1] - 114:23
**66** [2] - 4:12, 114:24

**7**

**7** [3] - 26:13, 64:11, 76:14
**7.5** [2] - 100:25, 101:3
**75** [1] - 105:22

**8**

**80** [1] - 21:22

**9**

**90** [2] - 21:22, 21:23

**A**

**a.m** [3] - 1:13, 47:19, 47:22
**able** [10] - 6:18, 25:3, 25:4, 25:6, 25:7, 26:1, 37:18, 39:4, 118:16, 137:22
**aboard** [2] - 8:24, 98:18
**above-styled** [1] - 144:11
**absolutely** [2] - 68:1, 85:20
**accept** [5] - 102:16, 105:12, 135:1, 135:6, 135:15
**accepted** [1] - 54:19
**accident** [22] - 20:23, 36:11, 56:5, 56:22, 56:25, 57:4, 57:9, 57:10, 57:25, 58:7, 58:19, 58:24, 59:11,

**accidents** [15] - 9:21, 20:24, 58:3, 58:15, 58:23, 58:24, 58:25, 59:20, 60:2, 60:19, 67:4, 101:24, 102:24, 126:8
**according** [2] - 98:15, 130:14
**accurate** [1] - 143:8
**act** [5] - 89:24, 93:17, 99:8, 119:18, 127:1
**acted** [3] - 94:14, 128:4, 132:10
**action** [3] - 127:25, 142:10, 142:10
**actions** [2] - 132:17, 132:18
**active** [3] - 9:13, 21:13, 102:20
**actively** [1] - 21:7
**actual** [10] - 12:6, 24:5, 37:9, 37:14, 37:24, 55:25, 88:9, 92:19, 98:7, 140:8
**addition** [1] - 100:16
**additions** [1] - 145:22
**address** [2] - 3:15, 3:19
**adequacy** [6] - 61:21, 86:18, 87:2, 87:6, 87:21, 88:8
**adequate** [2] - 111:10, 127:11
**advance** [1] - 57:25
**advanced** [5] - 57:8, 57:10, 58:19, 59:25, 60:16
**advise** [7] - 62:13, 63:21, 94:19, 96:18, 96:21, 97:9, 97:13
**advised** [2] - 62:23, 144:11
**affect** [1] - 31:10
**Afghanistan** [2] - 14:3, 20:11
**aft** [2] - 117:1, 117:8
**age** [1] - 114:23
**aged** [1] - 86:6
**agent** [2] - 98:2, 132:7
**agents** [17] - 69:21, 89:24, 90:6, 92:22, 92:25, 93:17, 93:22, 97:11, 97:18, 98:17, 111:4, 124:23, 127:1, 128:1, 128:21, 129:14, 132:10

**agree** [37] - 15:8, 26:17, 26:19, 31:4, 31:12, 43:10, 44:19, 45:16, 50:25, 54:4, 60:25, 63:13, 64:3, 67:21, 70:2, 74:18, 78:13, 78:21, 78:24, 78:25, 79:1, 79:16, 79:20, 80:19, 86:13, 88:11, 90:22, 90:25, 92:8, 92:10, 92:24, 94:23, 94:25, 99:6, 135:14, 135:17, 139:13
**agreed** [2] - 89:14, 90:9
**agreeing** [1] - 37:24
**ahead** [8] - 25:18, 54:21, 55:8, 72:10, 73:1, 73:7, 76:13, 122:13
**ahold** [1] - 122:12
**air** [3] - 79:13, 81:16, 84:22
**airlifted** [1] - 67:7
**Alex** [2] - 2:5, 102:10
**allegedly** [1] - 51:3
**allowed** [4] - 15:20, 135:1, 135:6
**allows** [1] - 99:24
**alone** [2] - 115:21, 130:6
**alongside** [9] - 6:17, 12:1, 16:24, 17:5, 17:25, 30:7, 40:6, 103:23, 104:1
**alternative** [2] - 48:9, 49:3
**alternatives** [4] - 48:5, 53:22, 55:21, 56:8
**altogether** [1] - 84:3
**America** [36] - 7:25, 12:23, 12:24, 13:5, 13:10, 14:7, 14:9, 14:13, 14:15, 14:21, 15:7, 15:11, 15:14, 15:24, 16:13, 16:19, 17:12, 18:20, 19:6, 19:10, 19:22, 28:19, 29:20, 30:11, 31:13, 32:18, 33:11, 33:15, 112:7, 113:6, 113:8, 113:11, 113:14, 113:21, 133:24, 134:20
**American** [1] - 14:12
**amount** [3] - 29:1, 101:1, 124:3

**analysis** [4] - 36:11, 37:19, 38:2, 38:14
**analyzing** [2] - 42:18, 60:18
**anchor** [1] - 16:25
**anchored** [3] - 17:18, 31:22, 104:9
**animated** [2] - 38:8, 68:23
**animation** [4] - 89:9, 89:12, 89:15, 119:1
**ankle** [3] - 62:6, 97:25, 98:8
**answer** [7] - 31:2, 50:13, 61:13, 65:11, 115:16, 123:2, 140:2
**answered** [2] - 61:11, 111:10
**anytime** [2] - 31:5, 116:2
**anyways** [1] - 88:3
**Apartment** [1] - 3:13
**Aperez@lipcon.com** [1] - 2:6
**apologize** [2] - 13:12, 13:18
**appear** [1] - 43:2
**APPEARANCES** [1] - 2:1
**appeared** [4] - 111:9, 125:19, 128:3, 142:9
**applied** [1] - 13:5
**apply** [1] - 15:20
**appointment** [1] - 144:14
**appreciate** [2] - 74:14, 109:19
**approached** [1] - 37:20
**approaching** [1] - 55:6
**appropriately** [1] - 127:13
**Arch** [1] - 2:9
**area** [7] - 42:5, 53:25, 54:5, 54:22, 73:5, 131:25, 138:7
**argued** [1] - 51:16
**argues** [1] - 135:13
**arm** [5] - 63:4, 78:16, 78:22, 108:3, 136:10
**Army** [1] - 21:6
**arrange** [2] - 144:13, 144:14
**arrive** [9] - 38:2, 38:11, 40:17, 40:25, 66:19, 99:11, 118:22, 119:9, 133:8
**arrived** [3] - 25:9, 107:12, 107:22

**arriving** [1] - 118:11
**Arthur** [4] - 4:15, 24:24, 35:15, 102:10
**ARTHUR** [1] - 1:5
**ashore** [4] - 6:21, 29:2, 68:8, 116:19
**aspect** [1] - 37:11
**assignment** [3] - 24:25, 48:4, 55:11
**assist** [19] - 24:1, 24:13, 70:21, 90:1, 90:6, 92:22, 92:25, 93:2, 94:9, 96:25, 98:17, 104:13, 104:14, 106:6, 108:23, 117:20, 127:3, 130:19, 130:23
**assistance** [20] - 39:21, 51:3, 51:9, 52:22, 93:5, 93:9, 93:11, 93:12, 94:15, 111:14, 125:13, 135:1, 135:2, 135:7, 135:9, 135:16, 135:19, 136:11, 136:13, 136:16
**assistant** [2] - 18:12, 104:14
**assisted** [3] - 39:17, 125:14, 126:11
**assisting** [11] - 38:21, 69:22, 71:5, 74:19, 75:12, 86:14, 90:12, 119:2, 124:23, 125:6, 132:24
**assists** [1] - 104:12
**association** [1] - 57:1
**attached** [1] - 143:10
**attend** [2] - 57:5, 57:8
**attended** [1] - 106:23
**attention** [5] - 33:24, 122:9, 122:11, 127:11, 129:8
**attorney** [2] - 142:8, 142:9
**attorneys** [1] - 4:20
**Audio** [1] - 1:11
**audio** [2] - 41:18, 62:19
**Audio-Video** [1] - 1:11
**auspices** [1] - 6:6
**authored** [4] - 4:23, 26:18, 88:7, 138:5
**authorities** [1] - 6:5
**authority** [1] - 142:8
**authorized** [1] - 142:5
**availability** [2] - 96:19, 98:23
**available** [11] - 61:2,

62:19, 63:22, 64:4, 69:3, 83:14, 92:25, 93:2, 93:11, 96:2, 137:20
**Avenue** [2] - 2:10, 3:12
**awaiting** [1] - 144:12
**aware** [3] - 66:9, 114:6, 123:11

## B

**background** [5] - 51:17, 56:13, 89:5, 118:13, 119:12
**backwards** [1] - 85:18
**bad** [9] - 49:9, 49:22, 49:23, 49:24, 52:21, 80:23, 83:24, 100:2, 127:15
**badly** [1] - 128:18
**balance** [1] - 50:7
**ball** [5] - 42:1, 68:15, 81:3, 129:9
**ballpark** [1] - 4:7
**based** [26] - 30:20, 43:19, 43:20, 45:18, 45:24, 47:6, 50:20, 56:8, 58:11, 58:17, 64:5, 65:22, 68:17, 70:19, 85:25, 87:14, 92:8, 98:11, 105:10, 109:14, 127:5, 129:2, 130:13, 132:16, 132:17, 140:7
**basic** [2] - 59:18, 59:19
**basis** [5] - 5:10, 19:17, 50:17, 73:22, 133:25
**BEACH** [3] - 142:5, 142:3, 143:3
**bear** [2] - 23:20, 27:3
**became** [2] - 33:19, 59:19
**become** [5] - 23:4, 57:4, 97:19, 97:22, 132:7
**began** [3] - 10:4, 10:10, 14:6
**begin** [2] - 5:16, 6:19
**beginning** [3] - 71:18, 72:12, 73:2
**BEHALF** [2] - 2:3, 2:8
**behalf** [8] - 4:15, 21:18, 22:1, 22:5, 22:12, 101:2, 101:15, 101:24
**behind** [8] - 63:7, 63:8, 81:5, 84:23,

86:10, 125:17, 132:19
**Belize** [6] - 5:12, 18:25, 30:23, 31:18, 68:8, 105:7
**below** [3] - 40:7, 131:2, 131:20
**benefits** [1] - 14:11
**best** [5] - 16:7, 25:25, 51:16, 75:1
**better** [1] - 82:8
**between** [4] - 8:23, 60:22, 87:9, 92:13
**bicycle** [2] - 58:7, 58:23
**bicyclist** [1] - 58:8
**big** [8] - 11:25, 76:8, 76:9, 84:19, 107:3, 110:5, 115:24, 116:5
**billed** [1] - 100:24
**bills** [1] - 100:15
**birth** [1] - 14:13
**bit** [7] - 16:3, 26:6, 71:18, 88:22, 102:12, 109:13, 112:22
**black** [1] - 79:9
**blacklisted** [2] - 34:6, 35:1
**blind** [1] - 118:2
**blocked** [1] - 77:10
**blow** [1] - 88:21
**blowing** [1] - 83:3
**blue** [23] - 72:14, 74:2, 77:14, 77:24, 79:14, 80:5, 80:12, 81:7, 81:13, 85:18, 85:19, 87:15, 90:18, 90:23, 91:1, 91:11, 91:14, 91:20, 91:25, 92:1, 92:7, 96:11, 96:13
**Blue** [2] - 14:15, 14:16
**Blvd** [1] - 2:4
**board** [43] - 6:9, 10:14, 10:21, 13:8, 17:17, 18:17, 20:5, 23:24, 24:14, 27:15, 33:14, 36:18, 38:23, 41:7, 46:15, 54:3, 62:15, 63:21, 68:7, 68:25, 71:5, 72:11, 73:13, 76:7, 76:11, 84:14, 84:20, 88:15, 90:1, 90:6, 92:22, 107:20, 108:21, 119:3, 125:12, 125:16, 126:9, 127:3, 127:12, 127:16, 128:4, 128:6, 131:13
**boarded** [9] - 16:8,

16:23, 43:5, 43:8, 43:17, 43:25, 44:1, 44:23, 92:3
**boarding** [14] - 38:25, 40:13, 42:15, 46:10, 48:11, 66:24, 71:6, 73:3, 93:6, 116:11, 119:13, 122:8, 122:21, 136:16
**boards** [3] - 41:12, 42:20, 125:21
**boat** [79] - 2:23, 5:5, 8:16, 11:17, 12:5, 14:20, 15:6, 16:13, 16:21, 17:19, 18:22, 22:20, 24:6, 28:3, 30:3, 30:4, 31:5, 32:17, 35:24, 36:1, 36:4, 36:25, 37:9, 39:18, 41:1, 42:12, 42:16, 42:21, 44:23, 45:23, 48:11, 54:6, 54:9, 59:19, 60:25, 61:5, 61:6, 61:23, 63:21, 64:4, 66:5, 66:25, 67:24, 70:5, 71:5, 72:16, 72:19, 72:24, 73:5, 73:12, 73:13, 74:20, 75:8, 78:10, 81:18, 81:21, 82:2, 82:24, 83:10, 83:21, 84:3, 85:22, 88:10, 95:11, 96:1, 96:3, 96:15, 105:15, 105:16, 107:10, 108:11, 134:5, 134:22, 135:3, 135:16, 135:20, 136:17, 138:18, 139:16
**boat's** [2] - 99:8, 139:22
**boats** [19] - 24:19, 30:18, 31:7, 33:17, 35:4, 65:6, 65:16, 66:16, 68:20, 69:17, 82:21, 86:15, 86:20, 87:4, 90:13, 99:16, 101:25, 105:5, 135:8
**body** [5] - 60:5, 60:12, 60:21, 60:22
**book** [1] - 15:22
**born** [1] - 19:12
**boss** [3] - 10:22, 10:25, 11:1
**bosun** [1] - 109:5
**bottom** [6] - 26:13, 35:11, 70:14, 77:9, 87:15, 110:2
**bow** [2] - 117:7, 117:8

*Jeannie Reporting*
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

**boxes** [1] - 11:12
**boy** [1] - 3:13
**brainer** [1] - 82:18
**Brazil** [1] - 16:24
**break** [9] - 9:12, 25:2, 38:18, 87:10, 104:2, 104:21, 106:6, 110:8, 125:22
**breaks** [4] - 18:11, 23:12, 52:21, 110:25
**Brickell** [2] - 2:9, 2:10
**bridge** [6] - 18:1, 49:12, 49:16, 83:1, 103:25, 107:19
**brief** [1] - 133:17
**briefly** [2] - 25:2, 102:13
**bring** [7] - 18:18, 34:22, 47:24, 63:5, 68:2, 71:9, 119:22
**broke** [3] - 11:14, 25:11, 46:21
**brought** [1] - 121:24
**buffet** [1] - 54:25
**BURNETT** [1] - 2:9
**business** [2] - 3:18, 20:20
**but..** [1] - 81:9
**BY** [46] - 2:5, 2:11, 3:6, 15:1, 25:22, 36:22, 44:18, 47:23, 51:10, 61:12, 61:17, 65:10, 68:16, 71:13, 71:22, 75:24, 79:8, 80:1, 81:10, 88:2, 95:16, 99:22, 102:8, 104:20, 106:20, 114:15, 115:14, 116:15, 120:9, 121:9, 123:9, 123:21, 124:10, 124:19, 126:13, 126:23, 128:19, 129:1, 129:11, 130:11, 131:23, 133:19, 136:21, 138:13, 139:1, 140:3

## C

**cabin** [1] - 69:2
**Cabo** [35] - 5:5, 5:11, 7:24, 12:19, 12:24, 15:6, 19:1, 28:5, 28:14, 28:24, 29:12, 29:21, 30:12, 30:22, 31:8, 31:15, 32:1, 35:3, 36:4, 41:25, 48:11, 64:23, 66:19, 68:21, 68:22, 82:21,

83:11, 83:21, 105:7, 110:5, 110:23, 113:20, 113:23, 115:25
**calamity** [1] - 84:13
**calculations** [1] - 38:11
**calm** [4] - 18:6, 95:5, 136:25, 137:2
**camera** [6] - 25:7, 37:17, 56:11, 118:14, 119:7, 130:15
**Canal** [1] - 17:3
**cane** [82] - 38:20, 38:21, 38:25, 39:5, 39:9, 39:10, 40:1, 40:12, 40:13, 40:20, 40:21, 40:23, 41:2, 41:3, 41:4, 41:8, 41:11, 42:7, 42:15, 42:20, 42:24, 43:1, 43:3, 43:5, 43:7, 43:13, 43:17, 43:25, 44:1, 44:9, 44:11, 44:16, 44:23, 45:3, 45:15, 45:18, 45:23, 46:8, 46:10, 46:16, 47:6, 76:16, 76:18, 76:20, 77:2, 79:2, 79:7, 79:12, 79:14, 79:17, 79:21, 79:22, 80:11, 81:8, 81:12, 81:15, 81:16, 82:7, 84:20, 84:21, 84:22, 86:8, 91:23, 91:25, 93:23, 94:3, 96:4, 97:1, 97:5, 115:4, 115:5, 115:6, 118:1, 122:23, 125:18, 125:19, 128:6, 130:17, 131:1, 131:6, 131:15
**cannot** [4] - 17:4, 36:15, 43:12, 43:15
**capacity** [5] - 5:25, 12:10, 53:19, 82:25, 83:4
**captain** [9] - 6:6, 6:8, 10:22, 10:24, 15:21, 82:10, 104:13, 138:8
**captain's** [1] - 131:25
**captures** [1] - 35:13
**cards** [2] - 109:24, 109:25
**care** [1] - 144:16
**Caribbean** [5] - 32:25, 33:21, 34:16, 34:19, 112:8
**CARNIVAL** [1] - 1:8

**Carnival** [75] - 4:17, 5:22, 5:23, 6:1, 6:22, 7:2, 7:10, 7:11, 7:16, 7:21, 8:1, 8:3, 8:15, 9:8, 9:16, 15:18, 25:9, 33:21, 34:4, 34:8, 35:6, 35:23, 42:13, 55:10, 68:19, 69:7, 70:3, 70:9, 70:16, 72:19, 73:17, 73:25, 80:6, 85:13, 85:14, 85:20, 86:13, 87:11, 87:16, 88:19, 89:2, 89:5, 89:23, 99:13, 99:14, 102:16, 103:5, 103:7, 103:8, 103:14, 103:17, 105:25, 106:11, 106:21, 107:7, 108:9, 108:13, 109:15, 109:23, 110:3, 111:16, 118:24, 119:17, 119:18, 123:11, 129:22, 130:4, 130:7, 131:14, 134:13, 134:16, 134:20, 134:22, 144:7
**Carnival's** [21] - 86:19, 87:2, 87:21, 88:9, 88:13, 93:16, 93:21, 97:11, 97:18, 98:2, 98:16, 99:7, 108:16, 126:25, 127:25, 128:21, 129:4, 129:14, 132:6, 132:10, 139:21
**carried** [1] - 84:4
**cars** [2] - 58:12, 59:6
**CASE** [2] - 1:3, 144:8
**case** [69] - 1:22, 22:9, 22:11, 22:16, 23:6, 24:15, 24:23, 25:1, 27:20, 30:15, 35:16, 35:25, 36:10, 37:12, 46:7, 48:16, 48:17, 48:18, 48:22, 49:2, 52:7, 53:10, 55:11, 55:25, 59:10, 63:12, 68:15, 70:2, 70:15, 70:20, 85:23, 85:24, 92:24, 96:15, 99:8, 99:12, 102:11, 102:12, 102:14, 105:21, 106:19, 107:3, 108:2, 110:4, 110:17, 111:2, 118:12, 118:17,

118:22, 119:10, 119:15, 119:22, 120:15, 121:16, 121:19, 122:21, 123:19, 124:21, 125:3, 125:7, 125:9, 126:24, 126:25, 131:5, 132:3, 132:9, 135:13, 139:23, 140:6
**cases** [3] - 68:4, 101:13, 104:17
**causation** [4] - 56:8, 59:2, 59:10, 98:7
**caused** [10] - 48:22, 50:2, 50:19, 51:13, 52:10, 97:19, 98:2, 116:17, 132:7, 138:1
**causes** [4] - 48:5, 48:9, 49:3, 53:22
**causing** [3] - 49:18, 97:24, 137:16
**caution** [3] - 69:23, 124:25, 125:25
**Cayman** [6] - 5:12, 12:13, 30:23, 31:8, 31:18, 105:8
**cc** [1] - 144:24
**CCL** [1] - 95:13
**CCTV** [22] - 25:7, 26:22, 35:13, 37:17, 38:1, 41:17, 42:18, 43:11, 44:20, 53:14, 53:18, 56:11, 62:20, 71:14, 86:2, 98:12, 98:16, 99:13, 111:1, 118:14, 119:7, 130:15
**certain** [4] - 26:22, 59:8, 85:16, 85:17
**certainly** [1] - 72:22
**certainty** [1] - 133:12
**certificate** [6] - 56:24, 57:1, 57:18, 57:22, 58:1, 58:19
**CERTIFICATE** [2] - 142:2, 142:1
**certificates** [2] - 22:19, 57:13
**certification** [4] - 59:13, 59:24, 60:1, 60:16
**certified** [3] - 16:2, 22:22, 57:4
**CERTIFY** [1] - 142:8
**certify** [4] - 142:8, 142:4, 143:6, 145:19
**chain** [1] - 60:12
**chair** [2] - 60:10, 63:16

**challenging** [1] - 5:13
**change** [2] - 13:24, 136:3
**CHANGE/ CORRECTION** [1] - 145:6
**changes** [5] - 6:12, 6:13, 15:19, 66:18, 145:2
**changing** [1] - 84:3
**channels** [1] - 59:20
**charge** [3] - 11:13, 108:25, 109:6
**charged** [2] - 100:11, 100:17
**check** [1] - 104:4
**chief** [12] - 6:2, 7:3, 7:13, 8:4, 8:17, 13:22, 18:12, 102:18, 103:15, 103:16, 104:14, 109:1
**child** [1] - 14:13
**choppy** [3] - 50:15, 50:16, 50:18
**circumstances** [10] - 52:19, 65:22, 89:25, 93:18, 94:1, 99:9, 123:16, 127:2, 131:5, 132:11
**cite** [1] - 89:1
**City** [4] - 3:21, 9:19, 24:10, 103:10
**civil** [2] - 68:5, 126:10
**clasp** [1] - 63:4
**clean** [1] - 9:21
**cleaning** [1] - 11:9
**clear** [4] - 14:19, 18:3, 87:19, 104:2
**clearly** [1] - 73:10
**client** [2] - 4:17, 119:7
**clients** [1] - 66:1
**close** [1] - 12:11
**closed** [1] - 106:4
**Coast** [5] - 22:24, 23:2, 23:17, 106:24
**collapsing** [1] - 114:21
**College** [3] - 57:8, 57:14, 57:15
**combination** [2] - 58:5, 84:13
**coming** [20] - 6:17, 23:24, 24:14, 29:2, 30:6, 40:8, 59:4, 80:8, 84:19, 84:20, 86:9, 90:7, 92:23, 93:1, 105:24, 116:19, 117:7, 117:8, 117:9, 117:10

**Command** [1] - 9:13
**commands** [1] - 108:14
**commission** [1] - 142:22
**Commission** [1] - 143:21
**communicate** [1] - 28:8
**Communication** [1] - 1:11
**company** [1] - 40:5
**compared** [1] - 117:15
**compelled** [1] - 41:9
**completed** [1] - 9:23
**complex** [1] - 109:10
**complicated** [3] - 3:20, 9:2, 17:14
**computer** [1] - 25:25
**concerned** [5] - 59:7, 109:9, 119:15, 132:1, 144:15
**conclude** [2] - 144:13, 144:16
**concluded** [1] - 141:3
**conclusion** [5] - 41:1, 45:22, 47:5, 63:25, 87:14
**conclusive** [2] - 45:14, 86:24
**conclusively** [1] - 42:25
**condition** [2] - 14:16, 124:17
**conditions** [20] - 31:9, 49:8, 50:2, 50:19, 51:7, 51:12, 51:20, 51:25, 52:10, 53:18, 82:11, 84:10, 110:19, 123:24, 124:9, 124:16, 137:16, 138:1
**conduct** [8] - 26:25, 97:18, 98:1, 128:20, 129:4, 129:14, 129:17, 132:6
**conducted** [3] - 26:23, 32:9, 36:24
**confident** [1] - 109:3
**confirm** [1] - 88:6
**confirmed** [1] - 55:24
**confirming** [1] - 42:14
**confused** [1] - 128:4
**connect** [1] - 129:12
**connected** [1] - 142:9
**consensus** [1] - 25:10
**consider** [4] - 48:9, 48:24, 49:21, 53:22
**considered** [4] - 48:4, 49:4, 49:6, 49:13

**considering** [1] - 53:21
**console** [1] - 85:1
**constant** [3] - 12:1, 116:10, 122:18
**constantly** [4] - 8:23, 106:8, 110:9, 117:18
**consulting** [1] - 20:23
**consuming** [1] - 18:10
**containing** [1] - 53:7
**context** [1] - 44:6
**contract** [9] - 11:14, 13:4, 13:17, 13:20, 19:23, 20:2, 20:12, 112:6, 112:11
**contracted** [5] - 19:3, 19:17, 30:19, 70:7, 70:13
**contracts** [3] - 32:23, 33:7, 133:25
**contribute** [1] - 119:16
**contributed** [8] - 25:13, 50:2, 50:19, 51:13, 51:25, 52:11, 128:1, 138:1
**contributing** [2] - 98:4, 137:16
**control** [4] - 23:9, 50:12, 52:18, 114:24
**controlling** [1] - 23:11
**convenience** [1] - 144:14
**convince** [1] - 135:11
**convolute** [1] - 65:25
**Cooper** [1] - 3:21
**coordinated** [1] - 88:13
**copy** [1] - 27:4
**Coral** [3] - 22:8, 24:10, 59:20
**CORP** [1] - 1:8
**corporation** [2] - 38:6, 46:14
**Corporation** [6] - 4:17, 8:2, 25:10, 73:25, 102:17, 108:13
**correct** [150] - 4:3, 4:4, 4:17, 4:21, 4:25, 7:14, 10:5, 10:6, 10:15, 10:16, 12:7, 13:15, 14:1, 14:4, 14:7, 14:22, 15:5, 17:13, 19:7, 19:24, 20:6, 20:7, 21:8, 22:15, 24:22, 25:15, 25:16, 26:11, 26:23, 26:24, 28:14, 28:15, 28:19, 28:20, 30:19,

32:3, 32:13, 33:10, 33:18, 34:4, 35:17, 35:18, 35:20, 35:21, 36:1, 36:2, 36:6, 36:8, 37:2, 37:13, 37:15, 37:17, 38:12, 38:13, 39:7, 39:12, 39:19, 39:20, 40:14, 41:19, 41:20, 41:23, 42:7, 42:8, 43:13, 43:14, 45:5, 53:15, 53:16, 54:7, 54:10, 54:13, 56:2, 61:6, 61:8, 61:14, 62:1, 62:2, 62:11, 62:20, 62:21, 64:5, 64:16, 64:23, 65:3, 70:1, 72:5, 72:6, 72:8, 72:9, 72:24, 72:25, 74:22, 76:17, 76:24, 76:25, 77:3, 80:13, 81:13, 83:22, 83:23, 84:6, 87:17, 87:18, 88:20, 89:16, 89:17, 90:2, 90:3, 90:7, 90:8, 90:13, 93:14, 93:18, 93:19, 93:23, 93:24, 94:7, 94:12, 94:17, 94:20, 94:21, 96:3, 96:4, 96:8, 96:9, 96:16, 97:14, 97:15, 97:21, 99:17, 99:19, 100:8, 101:8, 101:20, 101:21, 124:12, 124:13, 134:7, 134:8, 134:11, 134:14, 134:18, 134:24, 136:7, 137:11, 137:18, 139:17, 139:24, 145:23
**correction** [1] - 145:3
**corrections** [2] - 143:9, 145:22
**counsel** [7] - 100:7, 100:17, 100:24, 139:20, 140:5, 142:8, 142:9
**Counsel** [1] - 144:24
**counsel's** [1] - 101:15
**counselor** [1] - 80:22
**Counselor** [3] - 65:24, 68:2, 85:15
**countless** [1] - 117:22
**countries** [1] - 117:22
**country** [1] - 19:4
**COUNTY** [3] - 142:5, 142:3, 143:3
**couple** [1] - 49:6
**coupled** [3] - 8:22,

82:4, 118:21
**course** [16] - 6:5, 10:25, 17:1, 37:21, 45:19, 53:5, 53:8, 57:16, 59:18, 60:1, 60:15, 71:12, 101:21, 106:24, 121:17, 128:17
**courses** [1] - 57:25
**coursework** [1] - 58:18
**COURT** [5] - 1:1, 47:18, 47:21, 140:21, 140:25
**court** [1] - 54:19
**courts** [1] - 101:19
**cover** [1] - 14:13
**covered** [1] - 57:7
**covers** [1] - 23:22
**COVID** [1] - 21:21
**cracking** [1] - 118:7
**crane** [1] - 94:5
**crashed** [1] - 74:24
**credibility** [1] - 47:10
**crew** [74] - 6:3, 11:8, 15:25, 32:10, 38:23, 40:11, 41:6, 42:13, 45:23, 46:13, 62:13, 62:23, 63:7, 63:8, 63:9, 63:14, 63:20, 69:21, 70:3, 70:6, 70:7, 70:9, 70:13, 73:17, 75:21, 77:13, 77:24, 79:14, 82:5, 84:14, 84:17, 85:3, 85:22, 89:23, 90:17, 91:20, 93:16, 93:21, 94:2, 94:4, 94:9, 94:10, 94:14, 94:19, 96:18, 97:9, 97:11, 97:18, 98:2, 98:16, 99:7, 99:8, 102:24, 104:18, 106:11, 109:24, 110:13, 119:12, 124:22, 125:14, 125:16, 125:24, 127:1, 128:4, 129:25, 132:6, 135:5, 135:14, 135:18, 136:9, 139:22
**Criminal** [1] - 57:14
**criminal** [1] - 20:24
**crisis** [1] - 23:9
**criticism** [2] - 93:4, 94:8
**criticize** [1] - 138:15
**criticizing** [3] - 88:8, 97:12, 138:6
**Cross** [1] - 14:16

**CROSS** [1] - 102:7
**CROSS-EXAMINATION** [1] - 102:7
**crossing** [1] - 110:7
**crowd** [1] - 23:8
**cruise** [121] - 5:5, 5:7, 5:17, 5:20, 7:4, 8:8, 10:14, 10:19, 13:2, 14:20, 16:23, 19:16, 20:5, 20:9, 22:1, 22:5, 22:13, 24:4, 24:7, 24:8, 24:21, 27:15, 27:19, 28:4, 30:3, 31:6, 31:7, 32:7, 32:10, 32:16, 32:24, 33:8, 33:14, 33:19, 33:20, 34:8, 34:13, 35:4, 35:23, 37:8, 37:9, 52:25, 54:20, 58:14, 58:25, 62:4, 64:12, 64:13, 64:14, 64:15, 64:19, 65:7, 66:4, 66:9, 66:25, 67:23, 69:20, 69:22, 69:24, 70:16, 73:17, 86:15, 86:20, 87:4, 90:5, 90:7, 90:13, 92:23, 93:1, 105:15, 105:16, 105:19, 107:19, 108:10, 108:18, 109:16, 109:20, 111:17, 112:5, 113:1, 113:5, 113:18, 114:6, 114:18, 117:19, 117:21, 121:20, 121:21, 121:22, 121:23, 122:5, 123:3, 123:4, 123:10, 123:13, 123:22, 124:2, 124:4, 124:11, 124:22, 124:24, 124:25, 125:5, 125:24, 125:25, 126:9, 127:17, 129:22, 134:25, 135:3, 135:5, 135:7, 135:20, 136:1, 136:4, 136:5, 137:9
**Cruise** [38] - 5:22, 5:23, 6:1, 6:23, 7:2, 7:5, 7:21, 8:4, 9:14, 9:17, 10:4, 10:8, 10:11, 10:19, 11:3, 11:7, 11:14, 11:16, 12:5, 12:18, 13:1, 13:3, 13:14, 13:20,

14:5, 19:18, 22:10, 28:19, 103:6, 111:16, 111:18, 111:20, 111:23, 112:10, 112:13, 112:16, 113:4, 134:22
**cruise-ship-to-tender** [2] - 32:7, 64:12
**cruised** [1] - 122:7
**cruiser** [2] - 34:4, 65:15
**cruises** [6] - 17:4, 33:22, 33:23, 34:12, 34:23, 65:1
**crushed** [2] - 92:14, 92:16
**culminated** [1] - 102:25
**curb** [1] - 58:10
**currents** [2] - 31:1, 31:9
**customs** [2] - 6:4, 17:16
**cut** [1] - 17:9

## D

**Dade** [3] - 57:8, 57:13, 57:15
**daily** [1] - 103:22
**danger** [6] - 64:15, 66:9, 66:14, 67:22, 121:23, 123:11
**dangerous** [11] - 64:13, 66:5, 66:23, 66:24, 76:1, 83:20, 92:15, 117:16, 121:21, 123:3, 123:15
**dangers** [6] - 114:5, 114:16, 115:15, 115:16, 115:20, 116:9
**date** [1] - 27:9
**DATED** [1] - 142:12
**Daubert** [1] - 101:20
**daughter** [1] - 19:12
**days** [3] - 28:22, 28:25, 107:13
**de** [1] - 2:4
**DEA** [1] - 6:4
**deal** [2] - 58:20, 110:6
**dealing** [3] - 58:2, 84:18, 130:8
**dealt** [2] - 58:14, 84:15
**Dear** [1] - 144:9
**debark** [2] - 18:8, 104:3

**debarkation** [2] - 23:6, 23:11
**debarking** [3] - 18:2, 24:12, 30:8
**decades** [3] - 22:25, 47:1, 101:21
**December** [3] - 142:12, 142:12, 144:6
**decided** [1] - 19:12
**decision** [2] - 138:6, 140:17
**deck** [18] - 23:25, 36:17, 52:24, 53:2, 53:3, 53:6, 53:9, 74:5, 106:14, 108:22, 108:23, 109:2, 109:9, 110:3, 130:24, 131:2, 131:19
**decked** [1] - 12:12
**decks** [1] - 131:20
**DEFENDANT** [1] - 2:8
**Defendant** [1] - 1:9
**DEFENDANT'S** [1] - 2:22
**defense** [4] - 21:1, 21:23, 22:15, 48:24
**Defense** [4] - 20:12, 25:20, 71:20, 95:14
**defenseless** [1] - 41:12
**define** [3] - 104:23, 116:16, 117:3
**definitely** [14] - 7:20, 43:4, 44:10, 66:11, 74:13, 74:14, 80:5, 82:18, 106:23, 112:18, 124:1, 128:2, 130:16, 130:22
**degree** [2] - 56:24, 133:11
**degrees** [1] - 22:19
**Department** [4] - 9:19, 20:12, 24:11, 103:11
**department** [8] - 10:20, 20:14, 24:1, 36:18, 74:5, 106:14, 108:22, 131:16
**departments** [1] - 106:15
**depict** [1] - 43:1
**depicting** [1] - 38:8
**deponent** [1] - 144:11
**deposition** [15] - 4:3, 25:19, 26:3, 71:11, 71:25, 83:15, 95:10, 95:18, 101:7, 101:10, 141:2,

142:5, 144:17, 144:18, 145:21
**DEPOSITION** [1] - 1:17
**Deposition** [2] - 1:21, 144:12
**depositions** [3] - 4:5, 4:10, 25:8
**depth** [1] - 17:6
**descending** [1] - 39:5
**describe** [5] - 63:1, 102:13, 107:6, 108:15, 114:16
**described** [3] - 111:6, 133:6, 133:10
**designed** [1] - 105:3
**detective** [1] - 46:3
**detectives** [1] - 102:21
**determine** [1] - 25:5
**determined** [1] - 59:3
**developed** [1] - 32:21
**diagonally** [1] - 79:10
**different** [19] - 16:3, 19:3, 23:7, 28:7, 28:22, 30:21, 31:3, 43:19, 44:12, 49:17, 65:6, 80:9, 104:10, 105:8, 109:8, 113:18, 138:7, 138:18, 139:15
**differentiate** [1] - 60:22
**differentiating** [1] - 31:17
**differently** [1] - 84:2
**difficult** [3] - 29:24, 104:16, 105:13
**direct** [2] - 96:21, 120:5
**DIRECT** [1] - 3:5
**direction** [1] - 59:4
**directly** [6] - 23:19, 24:3, 30:12, 97:19, 98:2, 132:7
**director** [1] - 107:19
**disability** [9] - 21:12, 46:19, 63:16, 110:20, 131:2, 131:21, 131:25, 132:25, 138:24
**disabled** [12] - 21:5, 39:25, 63:12, 63:14, 82:10, 110:19, 115:10, 118:1, 128:10, 130:22, 130:25, 138:8
**disagree** [1] - 84:12
**discerning** [1] - 80:14
**disclose** [1] - 138:5
**disclosure** [1] -

137:24
**discovery** [11] - 25:8, 26:22, 38:5, 54:9, 55:9, 68:24, 69:7, 89:6, 95:12, 118:15
**discuss** [1] - 27:14
**discussed** [1] - 28:17
**discussion** [2] - 87:25, 130:15
**disembarking** [1] - 123:25
**Disney** [19] - 13:3, 13:6, 13:12, 13:13, 13:14, 13:20, 14:1, 14:5, 14:10, 15:18, 33:22, 34:14, 34:15, 112:6, 112:10, 112:13, 112:16, 112:20, 113:4
**disputing** [1] - 36:21
**disregard** [1] - 43:21
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 54:18
**district** [1] - 20:14
**DIVISION** [1] - 1:2
**dock** [1] - 103:24
**document** [4] - 26:2, 26:8, 95:17, 121:14
**documentation** [3] - 55:14, 56:9, 119:5
**documents** [7] - 38:7, 55:10, 99:13, 118:19, 118:20, 118:23, 119:9
**done** [30] - 4:6, 4:10, 5:8, 5:14, 9:24, 19:20, 36:17, 36:20, 41:24, 50:9, 52:3, 56:4, 67:2, 67:3, 67:11, 68:4, 70:11, 84:2, 92:16, 97:11, 108:20, 110:6, 110:9, 119:4, 126:8, 135:22, 136:8, 138:22, 138:23, 139:11
**door** [3] - 38:18, 87:10, 104:2
**dots** [1] - 129:12
**doubt** [1] - 44:13
**down** [82] - 9:2, 18:8, 25:3, 25:11, 38:22, 39:2, 39:6, 39:11, 39:18, 40:1, 40:3, 40:7, 41:16, 49:11, 50:6, 50:22, 51:4, 52:12, 52:21, 52:23, 53:24, 54:5, 54:20, 55:2, 55:5, 63:17, 68:10, 70:17, 73:4,

76:4, 76:21, 76:23, 77:5, 77:19, 78:17, 78:23, 79:3, 79:11, 79:18, 80:7, 80:8, 80:15, 80:20, 81:2, 81:9, 82:10, 85:15, 86:7, 86:9, 86:11, 87:10, 89:7, 91:10, 94:9, 95:5, 96:1, 96:8, 96:19, 97:3, 99:25, 110:1, 110:25, 117:8, 117:10, 118:6, 121:12, 122:15, 126:7, 126:15, 127:20, 127:21, 128:15, 130:6, 131:13, 131:16, 131:19, 131:20, 133:3, 137:1
**downstairs** [9] - 63:16, 75:13, 82:7, 82:11, 110:21, 115:3, 115:8, 127:14, 133:2
**dressed** [1] - 73:13
**drew** [1] - 118:19
**drills** [1] - 8:7
**driving** [1] - 59:5
**drop** [4] - 42:1, 42:2, 127:9
**dropped** [7] - 41:16, 63:23, 68:15, 81:3, 127:8, 127:9, 129:9
**dropping** [1] - 127:10
**drug** [1] - 103:2
**Dubai** [1] - 46:21
**duly** [2] - 3:3, 142:10
**duplicate** [1] - 36:12
**duplicated** [1] - 36:16
**during** [15] - 7:16, 7:21, 11:16, 12:4, 13:19, 16:18, 27:16, 27:25, 28:3, 28:18, 29:22, 31:13, 60:13, 65:18, 139:12
**duties** [3] - 16:11, 16:20, 103:22
**duty** [1] - 9:13

## E

**e)"...Any** [1] - 145:2
**earliest** [1] - 144:14
**early** [3] - 9:8, 17:15, 134:17
**easy** [3] - 9:5, 46:17, 66:20
**ECSTASY** [1] - 7:18
**education** [1] - 60:18

**educational** [1] - 22:18
**effect** [1] - 87:3
**either** [9] - 16:25, 25:11, 36:6, 37:7, 61:25, 75:11, 80:12, 84:2, 85:18
**ejected** [2] - 58:12, 59:2
**elbow** [6] - 63:3, 63:5, 78:16, 108:3, 110:11, 126:7
**elderly** [5] - 16:5, 86:6, 86:7, 118:2
**electronic** [1] - 26:13
**email** [1] - 140:22
**embarking** [1] - 24:11
**emergencies** [1] - 23:10
**emergency** [8] - 19:17, 23:7, 23:8, 24:16, 32:22, 33:6, 112:8, 133:25
**emergency-wise** [1] - 23:8
**employ** [2] - 118:11, 118:25
**employed** [4] - 6:1, 8:3, 21:3, 49:2
**employee** [13] - 33:20, 72:19, 72:20, 80:6, 85:20, 87:16, 110:3, 126:10, 129:22, 131:14, 134:1, 142:8, 142:9
**employees** [5] - 70:16, 87:11, 130:4, 130:5, 130:18
**employment** [1] - 21:14
**encased** [1] - 17:22
**end** [1] - 116:13
**engaging** [1] - 109:7
**enhance** [1] - 83:16
**enhanced** [3] - 81:14, 86:23, 99:20
**enhancement** [1] - 100:1
**ensure** [5] - 8:18, 18:5, 107:19, 116:11, 119:19
**ensuring** [1] - 6:16
**entail** [1] - 38:16
**enter** [1] - 70:4
**entered** [1] - 145:3
**entire** [6] - 4:9, 7:1, 7:12, 28:3, 28:12, 57:17
**entrance** [1] - 8:25
**environment** [1] -

127:18
**errata** [1] - 143:10
**ERRATA** [1] - 145:1
**errors** [1] - 84:13
**escort** [5] - 40:3, 108:4, 115:6, 118:4, 127:15
**escorting** [1] - 110:12
**especially** [15] - 16:4, 23:25, 38:6, 39:25, 40:23, 50:7, 58:24, 66:1, 68:4, 94:5, 106:17, 110:19, 122:23, 123:14, 137:6
**Esquire** [3] - 2:5, 2:7, 2:11
**estimate** [1] - 28:1
**event** [1] - 122:1
**everywhere** [1] - 114:21
**evidence** [6] - 51:23, 52:8, 52:13, 55:14, 63:19, 99:12
**exact** [2] - 27:9, 112:3
**exactly** [15] - 15:19, 25:5, 26:25, 29:5, 29:8, 33:1, 33:3, 37:19, 38:15, 39:12, 49:25, 57:3, 64:25, 113:3, 113:16
**examination** [4] - 120:5, 137:14, 140:5, 144:10
**EXAMINATION** [3] - 3:5, 102:7, 133:18
**examined** [1] - 3:4
**example** [1] - 125:11
**excellent** [1] - 26:5
**except** [1] - 52:20
**exclusively** [1] - 34:15
**excursions** [1] - 19:4
**excuse** [11] - 11:4, 13:12, 43:20, 49:5, 67:2, 88:24, 89:21, 99:20, 100:2, 101:12, 120:12
**Excuse** [1] - 34:10
**exercise** [3] - 69:23, 124:25, 125:25
**exhausting** [1] - 104:19
**Exhibit** [17] - 25:19, 25:20, 26:3, 47:24, 71:10, 71:20, 71:24, 88:5, 90:23, 92:18, 95:10, 95:14, 95:18, 119:24, 120:1, 121:6, 121:11
**exit** [1] - 8:25

**expect** [3] - 55:4, 122:8
**experience** [36] - 4:9, 12:5, 12:18, 14:21, 24:5, 24:19, 27:15, 30:20, 31:14, 32:2, 32:6, 41:3, 46:24, 47:7, 50:5, 50:9, 51:17, 52:4, 56:13, 56:19, 64:18, 65:15, 66:15, 67:9, 68:3, 89:4, 103:17, 106:1, 118:13, 118:19, 118:21, 119:9, 119:11, 129:3, 131:4, 137:8
**experienced** [4] - 27:20, 65:5, 65:15, 85:11
**experiencing** [1] - 67:19
**expert** [19] - 4:15, 4:20, 4:24, 5:3, 20:22, 21:25, 22:5, 22:20, 24:25, 56:15, 64:10, 67:11, 82:23, 83:19, 100:12, 101:14, 120:24, 121:11, 137:24
**Expert** [1] - 26:9
**expire** [1] - 23:18
**Expires** [1] - 142:22
**expires** [1] - 143:21
**explain** [5] - 105:1, 112:19, 125:8, 129:10, 138:21
**explained** [4] - 58:18, 96:24, 103:10, 126:4
**explaining** [1] - 37:25
**explains** [1] - 125:10
**explanation** [11] - 8:21, 30:24, 36:9, 37:16, 39:22, 43:15, 50:25, 52:2, 52:17, 60:20, 92:10
**expound** [1] - 139:12
**extend** [2] - 77:14, 77:16
**extending** [1] - 79:10
**extent** [1] - 120:4
**extremely** [4] - 31:19, 66:23, 66:24, 105:13

## F

**F.R.C.P** [1] - 145:2
**face** [2] - 114:17, 115:17
**fact** [8] - 45:22, 50:20, 52:14, 58:20, 63:22,

82:4, 82:6, 139:23
**factors** [9] - 36:12, 56:16, 56:20, 58:6, 58:16, 59:12, 60:21, 98:5
**facts** [10] - 35:16, 40:25, 48:18, 51:22, 52:7, 63:18, 63:19, 122:2, 127:5, 130:12
**failed** [6] - 89:25, 99:8, 119:17, 119:18, 127:2, 129:7
**failure** [3] - 88:13, 139:21, 140:6
**fair** [34] - 21:15, 21:16, 22:14, 29:16, 31:11, 37:10, 45:10, 45:11, 45:15, 47:10, 47:11, 50:22, 51:14, 52:1, 52:2, 52:15, 53:12, 53:13, 58:21, 60:3, 60:4, 61:18, 75:9, 77:11, 78:4, 81:22, 83:18, 84:5, 88:10, 93:7, 99:23, 105:17, 105:18, 134:23
**fall** [9] - 76:3, 81:22, 82:3, 84:9, 92:13, 97:24, 98:3, 111:2, 112:24
**fallen** [2] - 78:13, 80:20
**falling** [12] - 78:16, 78:22, 79:3, 79:11, 79:18, 81:17, 91:10, 114:20, 128:1, 128:22, 129:5, 129:15
**falls** [3] - 39:2, 80:15, 82:20
**familiar** [6] - 32:7, 32:15, 32:20, 53:3, 53:6, 66:14
**family** [2] - 54:23, 118:5
**far** [12] - 36:13, 58:7, 58:10, 59:5, 59:6, 60:23, 101:3, 109:9, 111:17, 119:15, 127:16, 132:1
**fashion** [1] - 21:4
**fed** [2] - 84:16, 126:15
**Federal** [1] - 101:19
**feed** [2] - 81:2, 117:24
**feeding** [9] - 40:5, 63:1, 63:2, 74:10, 75:23, 96:23, 110:10, 111:5, 126:4
**feet** [2] - 50:13, 116:4
**fell** [6] - 48:11, 49:11,

50:22, 62:5, 92:8, 139:24
**felt** [2] - 25:11, 130:16
**female** [4] - 75:12, 75:15, 80:7, 111:8
**few** [2] - 76:6, 102:9
**figure** [1] - 34:6
**file** [3] - 56:9, 95:13, 144:17
**filed** [2] - 1:21, 4:16
**fill** [1] - 112:8
**fill-ins** [1] - 112:8
**financially** [1] - 142:10
**fine** [2] - 47:14, 130:20
**finish** [3] - 78:2, 80:4, 135:10
**firms** [1] - 22:2
**first** [23] - 3:3, 4:2, 5:16, 5:18, 9:3, 10:7, 14:3, 41:10, 46:7, 48:15, 62:25, 64:11, 66:2, 92:20, 102:13, 107:17, 107:21, 109:18, 120:18, 121:1, 121:15, 121:19, 127:14
**firsthand** [1] - 67:12
**fit** [2] - 48:16, 51:18
**five** [7] - 13:17, 29:13, 47:13, 47:15, 50:13, 76:10, 112:25
**flight** [4] - 49:11, 51:4, 86:7, 127:21
**Floor** [1] - 2:9
**FLORIDA** [4] - 1:2, 142:4, 142:2, 143:2
**Florida** [9] - 1:20, 2:5, 2:10, 19:13, 22:9, 54:18, 57:7, 142:21, 143:20
**focusing** [1] - 7:10
**follow** [3] - 46:13, 119:17, 133:17
**following** [1] - 39:1
**follows** [1] - 3:4
**food** [1] - 63:8
**foot** [1] - 50:12
**footage** [16] - 25:7, 37:17, 38:1, 38:2, 41:17, 43:11, 44:20, 44:21, 56:11, 62:20, 71:14, 98:12, 99:14, 118:14, 119:7, 140:9
**force** [5] - 60:13, 135:1, 135:6, 135:9, 135:15
**foregoing** [3] - 142:6, 143:7, 145:20
**foreign** [1] - 13:7
**forever** [1] - 29:18

**forget** [1] - 46:16
**forklift** [1] - 58:15
**form** [34] - 14:23, 36:7, 44:4, 50:23, 61:7, 61:10, 65:8, 67:25, 75:19, 79:5, 79:19, 80:21, 99:18, 103:20, 106:12, 114:9, 114:19, 115:19, 123:5, 124:6, 124:14, 125:6, 126:2, 126:16, 128:23, 129:6, 129:16, 131:10, 133:13, 136:19, 138:10, 138:19, 139:25, 145:2
**formal** [4] - 60:17, 64:9, 64:12, 83:20
**forth** [2] - 64:10, 143:10
**forward** [2] - 54:21, 117:1
**four** [4] - 5:7, 24:9, 113:17, 133:8
**Fourteenth** [1] - 2:9
**fourth** [2] - 97:17, 132:2
**FOWLER** [1] - 2:9
**fractured** [3] - 62:6, 97:24, 98:7
**frame** [5] - 77:6, 77:20, 78:18
**friend** [1] - 9:20
**front** [8] - 27:5, 81:6, 84:24, 97:2, 97:16, 117:7, 128:5, 132:21
**fun** [3] - 67:13, 67:18, 68:13
**FURTHER** [1] - 142:8
**future** [1] - 66:1

**G**

**Gables** [3] - 22:9, 24:10, 59:20
**gait** [1] - 59:7
**gangway** [27] - 6:10, 18:8, 37:19, 38:18, 38:22, 40:2, 40:3, 62:5, 70:14, 70:17, 72:15, 80:8, 85:15, 86:9, 87:9, 103:2, 104:2, 104:4, 104:5, 110:1, 110:2, 129:23, 130:5, 131:13, 131:17, 136:14
**garbage** [1] - 3:23

**geared** [1] - 97:25
**geez** [1] - 92:3
**general** [1] - 58:4
**generally** [2] - 15:16, 107:6
**gentleman** [2] - 49:11, 128:3
**gentlemen** [1] - 47:12
**girls** [2] - 34:22, 35:7
**given** [7] - 37:6, 52:22, 131:4, 131:5, 131:8, 145:4, 145:21
**global** [1] - 12:22
**Google** [2] - 12:9, 124:8
**gosh** [1] - 11:19
**grab** [13] - 63:2, 63:3, 77:25, 78:1, 95:7, 96:22, 108:3, 114:25, 122:12, 132:24, 136:10
**grabbing** [1] - 91:22
**Grand** [6] - 5:11, 12:13, 30:23, 31:8, 31:18, 105:7
**grant** [2] - 9:18, 103:10
**GRAS** [1] - 7:19
**gray** [1] - 78:5
**great** [1] - 14:11
**Greece** [1] - 105:9
**greet** [1] - 17:16
**Grenada** [2] - 107:14
**ground** [1] - 107:24
**Guard** [5] - 22:24, 23:2, 23:3, 23:17, 106:24
**guards** [1] - 7:8
**guess** [1] - 138:6
**guesstimate** [2] - 4:13, 105:22
**guest** [2] - 34:19, 137:10
**guests** [3] - 72:23, 87:3, 99:15
**guide** [1] - 55:1
**guidelines** [1] - 69:16
**Gulf** [1] - 5:18
**gut** [1] - 74:4
**guy** [3] - 84:19, 92:4, 128:16

**H**

**hair** [2] - 85:18, 91:21
**half** [2] - 5:15, 57:20
**halfway** [1] - 18:6
**hand** [46] - 38:20, 38:24, 40:4, 40:20, 41:2, 41:4, 41:11,

42:6, 42:15, 42:20, 44:16, 45:18, 45:22, 47:5, 55:1, 63:4, 63:10, 75:17, 76:16, 76:18, 76:21, 77:14, 77:16, 79:2, 79:10, 91:18, 91:19, 95:1, 95:5, 95:6, 96:5, 96:7, 96:24, 96:25, 97:5, 107:24, 108:3, 109:2, 110:3, 110:11, 115:1, 125:13, 126:6, 136:10, 142:11
**handed** [12] - 40:13, 42:24, 43:12, 43:25, 44:1, 44:22, 45:3, 45:15, 79:14, 84:21, 125:19, 130:17
**handing** [5] - 43:1, 44:9, 46:9, 110:13
**handled** [1] - 33:7
**handling** [1] - 12:19
**handrails** [4] - 61:1, 61:5, 61:20, 61:22
**hands** [7] - 9:6, 79:2, 106:14, 107:25, 108:23, 109:9, 110:18
**hands-on** [2] - 9:6, 107:25
**happy** [2] - 35:2, 139:2
**hard** [3] - 31:2, 80:14, 85:2
**harm's** [1] - 80:24
**hat** [3] - 75:12, 78:6, 85:18
**hate** [1] - 127:7
**haul** [1] - 17:6
**Hawaii** [2] - 17:3, 116:1
**hazard** [1] - 49:18
**head** [1] - 118:7
**hear** [3] - 41:21, 42:5, 67:20
**heard** [1] - 104:22
**hearing** [1] - 118:2
**hearsay** [2] - 120:7, 121:7
**heights** [1] - 124:18
**held** [4] - 7:12, 81:16, 87:25, 125:15
**help** [9] - 18:14, 76:12, 82:7, 85:10, 107:3, 119:9, 120:25, 122:16, 127:19
**helped** [2] - 75:6, 128:5
**helping** [2] - 71:1, 107:4

**helps** [1] - 122:1
**hereby** [3] - 142:4, 143:6, 145:19
**herein** [1] - 145:23
**hereto** [1] - 143:10
**high** [1] - 60:9
**highest** [1] - 10:19
**highly** [1] - 135:10
**himself** [3] - 62:15, 79:13, 90:18
**hire** [2] - 85:12, 102:20
**history** [1] - 64:19
**hit** [2] - 9:21, 77:4
**hit-and-run** [1] - 9:21
**hold** [19] - 17:5, 22:18, 56:15, 67:15, 67:16, 75:12, 79:12, 97:2, 103:14, 105:6, 111:22, 112:12, 113:10, 116:12, 122:17, 126:6, 127:9, 135:12
**holding** [16] - 38:19, 39:5, 39:9, 63:5, 75:16, 75:21, 76:16, 79:17, 79:21, 80:11, 81:8, 81:12, 84:22, 97:4, 130:16, 131:6
**Holland** [35] - 7:25, 12:22, 12:23, 13:5, 13:10, 14:7, 14:9, 14:15, 14:21, 15:7, 15:11, 15:13, 15:24, 16:12, 16:19, 17:12, 18:20, 19:6, 19:10, 19:22, 28:19, 29:20, 30:10, 31:13, 32:18, 33:11, 33:15, 112:7, 113:6, 113:7, 113:11, 113:13, 113:21, 133:24, 134:20
**home** [6] - 3:15, 3:16, 10:17, 13:9, 14:8, 20:13
**homicide** [3] - 56:21, 57:11, 57:25
**honest** [1] - 65:23
**hope** [1] - 35:2
**horrific** [1] - 126:22
**hounds** [1] - 39:24
**hours** [4] - 17:16, 100:21, 100:25, 101:3
**housekeeping** [2] - 107:3, 131:15
**huge** [1] - 116:23
**hull** [1] - 16:1
**human** [13] - 41:11,

56:16, 56:20, 58:6, 58:16, 59:12, 60:5, 60:12, 60:21, 60:22, 135:11
**hundred** [1] - 4:13
**hundreds** [2] - 52:3, 126:8
**hurt** [1] - 115:13

**I**

**I..** [1] - 27:3
**idea** [1] - 4:6
**identification** [4] - 25:21, 71:21, 95:15, 120:2
**ill** [2] - 84:14, 85:12
**immediately** [2] - 39:1, 102:22
**immigration** [1] - 17:16
**impaired** [1] - 118:2
**important** [1] - 65:22
**importantly** [2] - 75:20, 119:6
**impression** [1] - 25:6
**IN** [2] - 144:7, 145:2
**inaction** [1] - 127:25
**inadequately** [2] - 85:4, 86:1
**incident** [29] - 35:14, 36:5, 38:1, 41:18, 44:21, 47:9, 48:10, 49:4, 50:3, 50:20, 50:21, 51:13, 51:25, 52:11, 52:14, 53:11, 53:15, 64:22, 65:2, 71:15, 72:5, 93:18, 95:25, 98:13, 99:14, 111:7, 137:17, 138:2, 140:7
**incidents** [1] - 58:20
**incinerate** [1] - 11:10
**incinerated** [1] - 11:12
**inclement** [1] - 104:6
**include** [4] - 33:4, 41:25, 106:10, 137:24
**included** [1] - 100:23
**including** [1] - 21:11
**inconclusive** [2] - 44:21, 45:14
**incredible** [1] - 81:20
**independent** [1] - 32:24
**indicate** [10] - 32:4, 49:12, 62:3, 62:12, 63:20, 90:4, 92:21, 94:19, 98:12, 98:15
**indicated** [5] - 27:16,

*Jeannie Reporting*
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

35:12, 47:3, 48:4, 55:19

**indicates** [2] - 13:25, 19:5

**indicating** [4] - 42:14, 55:14, 55:15, 137:25

**individual** [15] - 70:20, 72:13, 73:10, 74:2, 87:15, 90:22, 90:25, 91:11, 91:14, 91:25, 92:1, 92:7, 96:11, 96:12

**individuals** [3] - 70:25, 74:16, 93:10

**industry** [15] - 13:24, 32:8, 32:16, 32:20, 33:4, 39:23, 46:15, 90:5, 112:22, 112:23, 112:24, 112:25, 113:2, 114:4, 131:8

**inferred** [1] - 139:10

**information** [5] - 37:21, 51:20, 53:11, 68:19, 124:3

**informs** [1] - 40:16

**inherently** [1] - 123:15

**inhouse** [2] - 22:3, 57:20

**injure** [1] - 137:3

**injured** [8] - 39:2, 46:25, 60:24, 97:19, 97:22, 128:17, 132:8

**injuries** [1] - 59:3

**injuring** [1] - 136:24

**injury** [7] - 21:19, 22:13, 27:21, 60:10, 97:24, 98:7, 123:16

**inspect** [6] - 35:24, 36:4, 61:4, 61:19, 64:8, 118:16

**inspected** [1] - 16:1

**inspecting** [1] - 61:16

**inspection** [4] - 35:13, 35:20, 36:24, 37:7

**instance** [4] - 30:3, 52:9, 60:6, 107:14

**instead** [1] - 84:23

**Institute** [2] - 57:6, 57:14

**instruct** [4] - 93:22, 108:22, 109:2, 129:24

**instructed** [3] - 41:10, 42:6, 42:15

**instruction** [2] - 69:16, 69:18

**intend** [2] - 98:21, 99:1

**interaction** [1] - 8:23

**interdiction** [1] - 103:3

**interested** [1] - 142:10

**interpret** [2] - 43:17, 43:18

**interpretation** [19] - 39:15, 39:16, 40:15, 40:17, 40:18, 41:24, 42:9, 43:16, 44:8, 45:2, 45:6, 45:8, 45:24, 70:11, 70:15, 91:13, 91:24, 93:16

**interview** [12] - 26:23, 27:1, 38:4, 43:20, 44:13, 45:25, 47:6, 56:12, 65:19, 99:16, 118:14, 119:6

**interviewed** [1] - 35:15

**interviewing** [1] - 42:22

**intimately** [1] - 32:6

**introduce** [2] - 121:5, 121:10

**investigating** [2] - 100:21, 102:24

**investigation** [1] - 57:10

**investigator** [3] - 47:7, 48:14, 56:21

**invoices** [1] - 100:16

**involve** [2] - 59:15, 60:17

**involved** [15] - 12:6, 24:6, 28:2, 28:11, 30:12, 30:14, 36:5, 36:25, 37:9, 37:12, 57:24, 65:25, 67:22, 133:21, 133:22

**involvement** [5] - 8:5, 8:16, 11:17, 32:19, 134:21

**involves** [3] - 17:1, 21:18, 60:11

**involving** [7] - 24:24, 58:21, 60:2, 60:3, 61:1, 103:18, 140:7

**iPhone** [2] - 27:7, 121:2

**Ireland** [1] - 105:9

**irrespective** [3] - 43:3, 46:11, 46:23

**irresponsible** [1] - 131:3

**island** [2] - 107:14, 107:15

**issue** [1] - 76:11

**issues** [1] - 82:20

**IT** [1] - 75:1

**itself** [29] - 8:19, 9:1,

12:7, 36:4, 37:10, 38:7, 38:24, 42:4, 42:12, 42:19, 43:11, 44:22, 50:11, 52:15, 56:5, 57:2, 61:5, 64:4, 69:11, 70:25, 71:5, 72:15, 72:23, 87:20, 91:14, 98:7, 100:1, 106:8, 140:8

**J**

**J-A-Q-U-E-S** [1] - 3:10

**jacket** [1] - 72:14

**Jacksonville** [1] - 57:7

**Jacques** [3] - 2:17, 144:5, 144:9

**JACQUES** [5] - 1:17, 142:9, 142:5, 143:14, 145:25

**January** [1] - 144:16

**Jaques** [18] - 3:9, 20:15, 20:16, 20:20, 21:3, 21:8, 21:11, 21:15, 21:18, 26:14, 48:2, 99:6, 102:4, 102:9, 120:11, 121:10, 133:20, 140:14

**JAQUES** [1] - 3:2

**JAQUESRANDY@ hotmail.com** [2] - 140:24, 144:5

**Jennings** [1] - 3:12

**Jersey** [2] - 3:14, 3:25

**job** [6] - 6:18, 9:24, 109:11, 111:10, 112:1, 112:16

**journey** [1] - 74:17

**judging** [1] - 47:9

**July** [4] - 19:6, 19:10, 19:15, 19:22

**JURAT** [1] - 143:1

**jury** [16] - 36:9, 37:3, 39:22, 43:16, 50:25, 63:1, 80:13, 92:11, 104:22, 105:1, 107:7, 116:20, 122:1, 122:5, 129:13, 138:21

**jury's** [2] - 112:21, 116:3

**Justice** [1] - 57:14

**K**

**keep** [6] - 65:24, 74:6, 74:23, 75:25, 122:18, 130:24

**khaki** [3] - 72:14, 91:1,

96:14

**kind** [21] - 10:1, 12:12, 16:15, 18:24, 20:20, 21:13, 24:19, 41:12, 44:5, 49:10, 55:5, 58:13, 60:13, 74:16, 77:10, 77:14, 91:11, 103:12, 104:7, 111:14, 129:19

**kindly** [1] - 73:23

**kneecap** [1] - 46:22

**knowledge** [6] - 51:17, 56:13, 61:24, 89:5, 118:14, 119:12

**known** [2] - 64:14, 121:22

**knows** [2] - 41:13, 123:13

**L**

**lack** [1] - 132:18

**lady** [7] - 74:11, 81:1, 84:24, 97:16, 125:11, 128:5, 132:22

**land** [2] - 19:11, 105:16

**lane** [1] - 119:14

**Large** [2] - 1:20, 143:20

**large** [1] - 105:16

**larger** [1] - 108:10

**last** [8] - 18:16, 20:12, 22:4, 32:4, 34:8, 128:24, 133:21, 137:9

**late** [1] - 25:8

**lawsuit** [3] - 4:16, 22:1, 22:6

**lawsuits** [3] - 21:19, 22:13, 101:23

**lay** [1] - 67:21

**layman's** [2] - 117:3, 117:5

**lead** [4] - 30:18, 128:21, 129:5, 129:15

**leading** [3] - 27:21, 53:24, 54:5

**learn** [1] - 102:11

**least** [7] - 27:18, 44:19, 70:24, 73:12, 74:20, 92:19, 134:6

**leave** [2] - 88:24, 115:21

**left** [9] - 33:20, 46:21, 79:10, 96:7, 97:5, 117:2, 117:12, 126:12

**left-hand** [1] - 96:7

**legitimate** [1] - 46:5

**Lehmann** [85] - 4:16, 24:24, 25:5, 26:23, 27:1, 27:10, 35:15, 42:6, 42:22, 43:7, 43:12, 44:22, 45:22, 46:12, 47:5, 50:21, 52:20, 55:15, 62:5, 62:13, 62:23, 63:21, 65:1, 65:4, 66:13, 76:15, 76:22, 77:8, 77:21, 78:3, 78:9, 78:13, 78:15, 78:18, 79:1, 80:12, 80:15, 80:19, 81:13, 81:22, 82:22, 88:14, 90:1, 90:16, 91:10, 92:8, 92:25, 93:6, 93:13, 93:23, 94:3, 94:5, 94:9, 94:15, 94:20, 96:18, 97:9, 97:13, 97:19, 98:3, 98:17, 102:11, 111:9, 111:12, 119:16, 127:3, 128:1, 128:5, 128:6, 128:21, 129:5, 129:15, 131:6, 131:12, 132:7, 132:12, 132:20, 132:22, 132:23, 132:24, 138:17, 139:15, 139:24, 140:7, 144:7

**LEHMANN** [1] - 1:5

**Lehmann's** [16] - 4:19, 35:14, 36:5, 45:25, 47:8, 48:10, 61:1, 62:4, 64:18, 72:4, 82:3, 84:9, 93:18, 111:2, 111:7, 130:15

**Leon** [1] - 2:4

**less** [1] - 65:24

**licenses** [1] - 23:15

**lieu** [1] - 35:12

**lifeboat** [2] - 8:7, 8:8

**lifeboats** [3] - 12:6, 12:8, 18:23

**lifetime** [1] - 67:19

**likely** [1] - 126:15

**limit** [1] - 59:21

**limited** [1] - 101:19

**line** [10] - 5:20, 7:4, 14:20, 16:23, 19:16, 22:1, 22:5, 33:20, 58:25, 123:13

**Line** [39] - 5:22, 5:23, 6:1, 7:2, 7:5, 7:22, 8:4, 9:14, 9:17, 10:8, 10:11, 10:19, 11:14,

11:17, 12:5, 12:18, 12:24, 13:1, 13:3, 13:5, 13:10, 13:15, 13:20, 14:5, 14:15, 15:24, 19:18, 22:10, 28:19, 103:6, 111:17, 111:18, 111:20, 112:10, 112:13, 112:16, 113:5, 113:21, 134:22
**Lines** [5] - 6:23, 10:5, 11:3, 11:7, 111:23
**lines** [24] - 5:7, 5:17, 13:2, 20:9, 22:13, 24:4, 24:7, 24:8, 24:21, 28:4, 32:25, 33:8, 34:13, 64:14, 66:9, 111:17, 112:5, 113:1, 113:5, 113:18, 114:6, 117:20, 121:22, 136:1
**IIPCON** [1] - 2:3
**Lipcon** [1] - 2:7
**list** [2] - 75:8, 116:25
**listen** [1] - 67:14
**listing** [26] - 36:13, 36:14, 36:15, 41:13, 49:10, 50:10, 74:14, 75:10, 76:8, 82:14, 82:25, 86:11, 91:17, 95:3, 106:18, 110:15, 115:22, 117:1, 117:4, 117:6, 117:11, 117:14, 122:10, 127:16, 128:13, 130:20
**LITTLE** [4] - 11:22, 11:23, 12:9
**lives** [1] - 122:7
**living** [1] - 3:24
**LLC** [9] - 20:15, 20:17, 20:20, 21:3, 21:8, 21:11, 21:15, 21:18
**load** [1] - 106:16
**local** [1] - 30:18
**locally** [1] - 30:19
**located** [1] - 71:3
**location** [1] - 109:9
**locker** [1] - 11:9
**logical** [2] - 12:1, 54:2
**logistically** [2] - 18:7, 105:13
**logistics** [4] - 6:13, 16:8, 33:25, 115:12
**logs** [5] - 52:24, 53:2, 53:3, 53:6, 53:10
**longwinded** [3] -

48:13, 64:2, 102:15
**look** [10] - 48:14, 54:20, 55:2, 55:5, 81:4, 81:18, 82:13, 97:16, 109:16, 131:8
**looking** [8] - 54:21, 54:22, 54:23, 54:24, 54:25, 55:7, 122:13, 122:15
**looks** [8] - 72:14, 73:12, 75:8, 78:12, 78:21, 80:11, 80:16, 91:12
**Lord** [1] - 81:25
**lose** [1] - 114:14
**loses** [1] - 50:6
**lost** [2] - 16:15, 82:6
**lower** [1] - 17:24
**lowered** [2] - 6:16, 105:19
**lowering** [2] - 6:15, 18:23
**Lucas** [32] - 5:6, 5:11, 7:24, 12:19, 12:24, 15:6, 19:2, 28:6, 28:14, 28:24, 29:22, 30:12, 30:22, 31:8, 31:15, 32:1, 35:3, 36:4, 41:25, 48:12, 64:23, 66:19, 68:21, 68:22, 82:21, 83:11, 83:21, 105:7, 110:5, 110:23, 113:20, 113:23
**luckily** [1] - 76:5
**lunch** [1] - 106:7
**lying** [1] - 46:5

## M

**machine** [4] - 25:12, 52:21, 110:24, 110:25
**mailed** [1] - 3:22
**maintain** [4] - 21:7, 23:14, 114:24, 116:9
**major** [2] - 5:7, 113:1
**Maltzman** [2] - 22:7, 22:11
**MALTZMAN** [1] - 22:8
**man** [3] - 75:11, 82:7, 86:8
**management** [3] - 7:8, 23:4, 23:9
**Management** [1] - 57:6
**manager** [10] - 7:7, 9:15, 10:12, 10:13, 10:18, 13:23, 108:21, 108:22,

111:24, 111:25
**mandated** [1] - 73:25
**maneuver** [2] - 16:25, 128:9
**maneuvered** [1] - 31:22
**maneuvering** [5] - 17:18, 31:21, 104:9, 115:9, 123:15
**manifest** [1] - 46:8
**manner** [3] - 47:4, 84:4, 90:11
**manpower** [2] - 114:11
**MARDI** [1] - 7:19
**MARGULIES** [1] - 2:3
**marine** [3] - 24:9, 59:17, 59:18
**maritime** [1] - 20:24
**mark** [6] - 25:18, 71:10, 79:4, 92:6, 95:9, 119:24
**marked** [7] - 25:21, 26:3, 71:21, 71:24, 95:15, 95:18, 120:2
**markings** [1] - 54:11
**master** [1] - 10:25
**materials** [4] - 56:10, 68:17, 100:22, 101:11
**mathematic** [1] - 6:12
**matter** [33] - 4:20, 4:24, 5:4, 22:20, 25:15, 26:18, 35:20, 37:1, 37:15, 37:25, 38:12, 62:10, 64:10, 69:8, 69:19, 86:18, 88:7, 90:12, 98:21, 99:2, 100:7, 100:13, 100:18, 100:22, 101:2, 114:23, 115:25, 120:25, 121:12, 122:6, 136:7, 138:5, 144:13
**matters** [1] - 34:5
**mayhem** [1] - 23:12
**mean** [28] - 11:19, 17:3, 21:21, 25:2, 29:5, 29:8, 30:18, 31:1, 33:1, 33:23, 36:16, 39:23, 41:24, 43:3, 46:16, 46:17, 50:12, 51:2, 67:11, 81:20, 84:13, 86:5, 88:23, 89:12, 114:10, 124:7, 128:8, 131:12
**meaning** [1] - 103:23
**means** [5] - 23:2, 45:8, 104:23, 117:11,

131:1
**meant** [1] - 15:9
**measurements** [1] - 37:11
**mechanically** [1] - 59:1
**medical** [3] - 62:10, 97:23, 98:8
**meetings** [1] - 114:1
**member** [22] - 38:23, 41:6, 42:13, 63:7, 63:8, 63:9, 63:14, 70:3, 70:6, 70:7, 70:9, 70:13, 75:21, 77:13, 77:24, 79:14, 91:20, 104:25, 105:1, 109:24, 110:14, 139:22
**members** [24] - 15:25, 32:10, 54:23, 63:20, 73:17, 82:5, 84:17, 85:22, 90:17, 104:22, 106:11, 107:7, 119:13, 125:14, 125:16, 128:4, 129:13, 129:25, 134:25, 135:5, 135:15, 135:18, 136:9, 139:22
**mentality** [1] - 129:20
**mention** [1] - 28:13
**mentioned** [10] - 10:3, 18:22, 23:16, 26:21, 30:23, 33:6, 34:3, 57:24, 85:3, 138:8
**methodology** [8] - 34:2, 48:3, 49:1, 55:19, 118:10, 118:11, 133:6, 133:7
**Mexico** [1] - 29:18
**MIAMI** [1] - 1:2
**Miami** [9] - 2:5, 2:10, 9:14, 9:19, 11:21, 57:8, 57:13, 57:15, 103:11
**Miami-Dade** [3] - 57:8, 57:13, 57:15
**mid** [1] - 7:8
**mid-management** [1] - 7:8
**middle** [1] - 86:6
**middle-aged** [1] - 86:6
**military** [2] - 9:10, 9:25
**mind** [3] - 136:12, 136:16, 136:23
**minimal** [1] - 18:5
**minute** [5] - 76:14, 77:22, 79:3, 91:2,

91:9
**minutes** [4] - 47:13, 49:15, 68:8, 84:7
**misjudge** [1] - 54:2
**misjudged** [3] - 53:23, 54:15, 55:16
**mislead** [1] - 29:3
**missed** [1] - 80:20
**mistakes** [1] - 115:11
**Mister** [1] - 41:8
**mode** [1] - 95:3
**moment** [5] - 74:21, 79:3, 79:18, 81:22, 86:3
**Monday** [1] - 1:12
**monitor** [5] - 8:22, 9:6, 106:8, 123:23, 129:23
**monitoring** [2] - 130:8, 130:14
**monstrous** [1] - 116:23
**month** [1] - 40:20
**months** [4] - 4:1, 9:23, 13:17, 14:14
**moped** [1] - 58:23
**morning** [3] - 3:7, 17:16, 106:3
**most** [4] - 55:7, 58:18, 75:20, 119:6
**mostly** [2] - 21:21, 24:8
**motor** [3] - 58:3, 58:21, 58:22
**move** [8] - 9:25, 19:12, 83:2, 116:6, 117:14, 118:9, 123:18
**moved** [2] - 29:17, 109:8
**movement** [1] - 58:11
**moves** [1] - 59:1
**moving** [23] - 9:3, 9:4, 9:5, 40:23, 49:13, 51:6, 67:23, 104:17, 106:18, 110:9, 116:18, 123:7, 123:8, 126:18, 126:21, 126:22, 133:4, 135:12
**MR** [93] - 3:6, 14:23, 15:1, 25:18, 25:22, 36:7, 36:22, 44:4, 44:18, 47:14, 47:17, 47:23, 50:23, 51:10, 61:7, 61:9, 61:10, 61:12, 61:15, 61:17, 65:8, 65:10, 67:25, 68:16, 71:9, 71:13, 71:22, 75:19, 75:24, 79:5, 79:8, 79:19,



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

80:1, 80:21, 81:10, 88:2, 95:9, 95:16, 99:18, 99:22, 102:3, 102:8, 103:20, 104:20, 106:12, 106:20, 114:9, 114:15, 114:19, 115:14, 115:19, 116:15, 120:3, 120:8, 120:9, 121:7, 121:8, 121:9, 123:5, 123:9, 123:21, 124:6, 124:10, 124:14, 124:19, 126:2, 126:13, 126:16, 126:23, 128:19, 128:23, 129:1, 129:6, 129:11, 129:16, 130:11, 131:10, 131:23, 133:13, 133:15, 133:17, 133:19, 136:19, 136:21, 138:10, 138:13, 138:19, 139:1, 139:25, 140:3, 140:11, 140:14, 140:20
**must** [2] - 69:23, 124:24
**myriad** [1] - 19:2
**mystifying** [1] - 68:5

## N

**name** [3] - 3:8, 26:10, 102:10
**narrow** [1] - 109:14
**nature** [2] - 33:24, 41:11
**navigate** [1] - 49:16
**navigation** [1] - 31:23
**nearby** [3] - 94:20, 97:10, 97:13
**necessarily** [2] - 66:10, 121:25
**necessary** [2] - 118:17, 123:20
**neck** [1] - 60:10
**need** [10] - 22:17, 24:15, 109:8, 109:22, 119:25, 120:20, 122:2, 122:13, 125:25, 135:12
**needed** [3] - 94:3, 94:6, 106:16
**needs** [2] - 46:7, 82:7
**negotiate** [1] - 126:19
**Netherlands** [2] -

22:24, 23:16
**never** [3] - 30:24, 83:5, 92:3
**New** [2] - 3:14, 3:25
**new** [4] - 23:23, 82:15, 102:18, 108:23
**next** [15] - 3:17, 7:6, 9:9, 29:14, 46:18, 67:6, 82:8, 82:9, 85:1, 94:8, 96:14, 115:8, 128:9, 128:12, 138:25
**nice** [1] - 96:22
**Nicolas** [1] - 2:7
**nightmare** [1] - 12:2
**nine** [3] - 9:23, 14:14, 57:20
**nineties** [1] - 9:8
**Nlipcon@lipcon. com** [1] - 2:7
**NO** [2] - 1:3, 144:8
**no-brainer** [1] - 82:18
**nobody** [7] - 38:21, 39:17, 66:18, 126:11, 135:13, 136:12, 136:15
**none** [6] - 49:7, 52:20, 124:18, 134:6, 137:13, 137:14
**normally** [1] - 53:7
**Northwestern** [1] - 56:23
**NORWAY** [6] - 11:20, 11:22, 11:23, 11:25, 12:9
**Norwegian** [21] - 7:5, 9:14, 10:4, 10:8, 10:10, 10:14, 10:18, 10:21, 11:3, 11:6, 11:13, 11:16, 12:4, 12:17, 13:1, 15:18, 111:18, 111:19, 111:23, 111:25, 112:4
**Notary** [3] - 1:19, 142:21, 143:20
**note** [1] - 55:14
**notes** [2] - 99:5, 142:7
**nothing** [3] - 60:1, 101:17, 140:11
**notice** [3] - 74:15, 75:10, 144:18
**Notice** [1] - 1:21
**notify** [1] - 83:1
**notifying** [1] - 103:25
**November** [3] - 1:12, 144:11, 145:21
**nowhere** [5] - 83:19, 86:11, 137:12, 138:4, 138:16

**number** [10] - 3:13, 28:2, 38:19, 49:7, 82:25, 87:8, 89:22, 115:4, 115:5, 115:7

## O

**OATH** [1] - 142:2
**oath** [1] - 144:11
**object** [20] - 14:23, 36:7, 44:4, 50:23, 61:7, 61:10, 65:8, 67:25, 75:19, 79:5, 79:9, 79:19, 80:21, 99:18, 120:6, 126:2, 126:16, 138:10, 138:19, 139:25
**Objection** [1] - 123:5
**objection** [13] - 103:20, 106:12, 114:9, 114:19, 115:19, 121:7, 124:6, 124:14, 128:23, 129:6, 129:16, 131:10, 133:13
**obligations** [1] - 16:11
**observations** [1] - 53:7
**observed** [2] - 39:14, 86:2
**observing** [1] - 38:17
**obtain** [1] - 57:21
**obtained** [3] - 59:14, 59:24, 60:16
**obtaining** [2] - 57:17, 58:19
**obvious** [7] - 64:15, 94:2, 115:16, 121:23, 127:8, 139:20, 140:6
**obviously** [3] - 41:15, 84:14, 101:5
**occasionally** [1] - 75:8
**occurred** [4] - 50:21, 52:15, 102:25, 140:8
**ocean** [1] - 60:3
**OF** [12] - 1:2, 1:17, 2:3, 2:8, 142:2, 142:4, 142:5, 142:1, 142:2, 142:3, 143:2, 143:3
**offer** [8] - 25:10, 25:14, 56:19, 98:21, 98:23, 99:2, 135:18, 136:11
**offered** [11] - 20:25, 37:21, 88:8, 88:12, 98:23, 101:23, 120:5, 125:12,

137:13, 138:17, 139:15
**offering** [1] - 94:14
**office** [4] - 10:17, 101:6, 101:15, 144:14
**officer** [40] - 6:2, 6:7, 6:9, 7:3, 7:6, 7:13, 8:4, 8:17, 10:20, 13:21, 13:22, 15:15, 15:21, 15:22, 15:23, 17:10, 18:12, 18:13, 22:23, 23:15, 24:9, 47:8, 102:19, 103:15, 103:16, 104:12, 106:4, 106:5, 107:1, 107:18, 108:25, 109:1, 112:14, 112:15, 113:12, 113:13, 134:13, 134:17, 145:3
**officers** [3] - 7:7, 10:24, 102:21
**official** [1] - 142:11
**offloaded** [1] - 16:9
**offloading** [1] - 6:20
**offshore** [1] - 116:2
**often** [1] - 67:8
**oiled** [1] - 110:24
**ON** [2] - 2:3, 2:8
**onboard** [3] - 53:25, 61:22, 70:25
**once** [6] - 17:23, 19:19, 35:9, 35:10, 40:20, 98:17
**one** [41] - 5:11, 5:12, 13:4, 13:17, 13:20, 19:23, 20:12, 30:5, 30:7, 38:8, 38:19, 39:9, 45:9, 45:12, 49:7, 57:12, 74:24, 75:5, 77:22, 82:25, 84:23, 85:14, 86:8, 87:23, 90:18, 92:14, 97:4, 106:17, 112:6, 112:11, 115:4, 117:23, 117:24, 117:25, 118:8, 119:1, 125:15, 128:12, 132:21, 132:23
**ones** [1] - 23:15
**onshore** [1] - 58:25
**open** [2] - 67:24, 118:7
**operate** [2] - 33:25, 39:22
**operated** [1] - 87:13
**operating** [1] - 29:1

**operation** [18] - 4:24, 30:2, 30:5, 30:7, 31:5, 31:10, 33:1, 49:13, 54:3, 66:5, 83:9, 104:23, 104:25, 106:8, 115:12, 123:18, 130:1, 131:25
**Operation** [1] - 26:9
**operational** [1] - 105:10
**operations** [83] - 5:9, 6:10, 6:11, 6:14, 8:5, 8:6, 8:16, 11:18, 12:6, 12:19, 14:20, 15:6, 16:13, 16:21, 17:1, 17:7, 17:11, 22:21, 23:6, 24:6, 27:18, 27:25, 28:3, 28:13, 28:17, 28:22, 29:6, 29:9, 29:12, 30:1, 30:9, 30:11, 30:13, 30:22, 31:15, 31:17, 32:8, 32:9, 32:17, 32:24, 36:18, 47:1, 49:15, 49:19, 51:18, 59:7, 64:13, 82:14, 82:17, 83:1, 83:2, 83:10, 83:21, 84:3, 88:10, 103:2, 103:18, 106:2, 106:3, 106:10, 106:11, 106:22, 107:8, 107:16, 112:2, 112:17, 112:24, 113:15, 113:19, 113:23, 114:5, 114:7, 114:18, 121:21, 123:3, 123:14, 129:3, 131:5, 133:23, 134:6, 134:22
**operator** [5] - 8:24, 30:14, 46:18, 72:19, 131:18
**operators** [8] - 18:22, 58:16, 59:19, 123:11, 123:23, 124:5, 124:11, 129:4
**opine** [1] - 93:16
**opining** [2] - 66:8, 98:1
**opinion** [61] - 37:22, 38:23, 42:19, 43:6, 44:12, 48:19, 50:1, 51:15, 51:24, 52:8, 61:21, 61:25, 64:12, 66:2, 66:6, 69:19, 70:8, 74:1, 74:4,

82:15, 83:20, 89:23, 92:20, 93:11, 94:13, 96:17, 97:17, 97:23, 97:25, 98:4, 98:6, 98:8, 98:11, 99:7, 99:11, 101:25, 120:18, 121:1, 121:15, 121:19, 122:3, 124:20, 125:2, 125:24, 126:24, 127:5, 127:24, 129:15, 129:23, 130:12, 130:13, 132:2, 132:9, 132:14, 132:16, 136:15, 138:6, 138:20, 139:2, 139:9

**opinions** [32] - 5:3, 25:11, 38:3, 38:11, 55:20, 62:10, 64:10, 72:8, 86:17, 86:22, 87:1, 87:20, 88:6, 88:8, 88:12, 97:8, 98:20, 98:24, 99:1, 100:18, 101:18, 101:23, 102:12, 102:14, 118:12, 118:22, 119:10, 119:22, 120:15, 133:8, 133:10, 137:13

**opportunity** [4] - 11:21, 113:19, 140:15, 140:16

**opposed** [1] - 113:23

**ordered** [1] - 94:4

**ordinary** [1] - 6:18

**original** [1] - 144:17

**outcome** [1] - 41:16

**outside** [1] - 22:2

**oversaw** [2] - 27:25, 30:4

**oversee** [2] - 14:19, 15:5

**overseeing** [6] - 6:15, 24:5, 24:17, 27:18, 133:22, 134:21

**oversight** [1] - 134:4

**overview** [1] - 56:5

**own** [9] - 8:24, 17:19, 27:5, 45:19, 107:1, 109:5, 118:6, 119:18, 126:12

**owned** [2] - 8:1, 32:25

## P

**P.A** [2] - 2:3, 2:9

**p.m** [2] - 1:13, 141:3

**PACE** [2] - 142:20, 142:16

**Pace** [3] - 1:19, 142:4, 144:23

**PADI** [1] - 16:2

**PADI-certified** [1] - 16:2

**page** [12] - 8:14, 26:8, 26:13, 27:12, 28:17, 35:11, 62:3, 62:12, 69:20, 121:12, 143:10, 145:3

**PAGE** [3] - 2:16, 2:21, 143:1

**PAGE/LINE** [1] - 145:6

**pages** [3] - 64:11, 142:6, 143:7

**paid** [3] - 100:6, 101:6, 101:8

**PALM** [3] - 142:5, 142:3, 143:3

**Panama** [1] - 17:2

**panic** [1] - 95:3

**PANORAMA** [2] - 35:23, 53:1

**pants** [3] - 72:15, 91:1, 96:14

**paragraph** [1] - 32:4

**paramount** [1] - 16:6

**parents** [1] - 11:22

**part** [19] - 47:3, 47:4, 49:1, 54:2, 55:11, 59:15, 68:12, 68:14, 75:22, 92:20, 95:12, 103:21, 118:24, 127:25, 128:20, 129:4, 129:14, 138:23, 139:21

**PART** [1] - 145:2

**particular** [5] - 19:4, 36:10, 114:5, 119:20, 126:25

**parties** [2] - 142:9, 144:18

**parties'** [1] - 142:9

**Partners** [3] - 22:8, 22:12

**party** [16] - 5:14, 18:21, 19:1, 19:2, 30:14, 30:16, 30:17, 40:5, 70:6, 70:13, 85:13, 104:18, 105:21, 110:5, 130:5, 144:18

**passenger** [50] - 5:4, 23:6, 23:10, 24:24, 33:19, 34:1, 34:9, 34:19, 35:4, 39:25, 40:8, 42:2, 46:19, 46:25, 63:8, 63:11,

63:15, 66:13, 68:12, 68:25, 70:17, 74:19, 75:5, 75:12, 75:16, 75:22, 76:3, 80:7, 89:16, 108:10, 109:16, 111:8, 116:10, 116:12, 116:13, 119:3, 119:20, 125:5, 125:21, 126:6, 126:7, 126:11, 126:14, 130:25, 134:2, 134:5, 135:1, 135:6, 135:15, 137:10

**passengers** [91] - 6:3, 6:20, 6:21, 8:9, 8:19, 12:11, 16:5, 18:2, 18:8, 18:17, 23:11, 24:1, 24:12, 24:13, 24:18, 27:19, 30:2, 31:6, 32:11, 33:16, 36:19, 39:24, 54:20, 55:2, 56:14, 64:14, 64:15, 66:4, 66:10, 67:12, 68:6, 68:20, 69:3, 69:17, 69:24, 70:4, 70:21, 71:1, 71:6, 72:11, 73:3, 73:11, 73:14, 76:7, 76:11, 77:10, 86:15, 86:20, 87:3, 89:18, 90:6, 90:12, 92:22, 102:23, 103:19, 104:3, 104:8, 104:12, 105:3, 105:7, 105:12, 105:15, 105:20, 105:23, 106:17, 107:2, 107:9, 107:20, 108:17, 108:24, 109:25, 110:7, 114:8, 114:17, 114:25, 115:17, 117:18, 117:20, 121:22, 121:23, 122:6, 122:19, 123:4, 123:25, 124:2, 124:23, 125:1, 126:1, 130:9, 135:19

**passengers'** [1] - 69:22

**past** [2] - 4:6, 4:8

**patrol** [3] - 24:9, 59:17, 59:18

**PAULA** [2] - 142:20, 142:16

**Paula** [3] - 1:19, 142:4, 144:23

**pause** [1] - 99:25

**pay** [3] - 33:24, 127:10, 129:8

**paying** [2] - 122:9, 122:11

**payments** [1] - 21:12

**peculiar** [1] - 113:22

**pedestrian** [1] - 58:9

**Pelaez** [2] - 2:11, 2:17

**PELAEZ** [50] - 3:6, 15:1, 25:18, 25:22, 36:22, 44:18, 47:14, 47:17, 47:23, 51:10, 61:9, 61:12, 61:17, 65:10, 68:16, 71:9, 71:13, 71:22, 75:24, 79:8, 80:1, 81:10, 88:2, 95:9, 95:16, 99:22, 102:3, 103:20, 106:12, 114:9, 114:19, 115:19, 120:3, 121:7, 124:6, 124:14, 126:2, 126:16, 128:23, 129:6, 129:16, 131:10, 133:13, 133:17, 133:19, 136:21, 138:13, 139:1, 140:3, 140:11

**pending** [1] - 100:16

**pension** [1] - 21:12

**people** [26] - 17:3, 42:11, 43:18, 44:11, 46:4, 58:12, 58:15, 59:4, 67:4, 67:14, 71:4, 73:13, 74:19, 85:12, 85:13, 85:14, 87:13, 92:16, 107:2, 107:25, 109:11, 109:23, 114:12, 115:12, 116:8, 116:21

**percent** [4] - 21:22, 21:23, 67:17

**percentage** [1] - 21:17

**Perez** [4] - 2:5, 2:18, 102:10, 137:14

**PEREZ** [43] - 14:23, 36:7, 44:4, 50:23, 61:7, 61:10, 61:15, 65:8, 67:25, 75:19, 79:5, 79:19, 80:21, 99:18, 102:8, 104:20, 106:20, 114:15, 115:14, 116:15, 120:8, 120:9, 121:8, 121:9, 123:5, 123:9, 123:21, 124:10,

124:19, 126:13, 126:23, 128:19, 129:1, 129:11, 130:11, 131:23, 133:15, 136:19, 138:10, 138:19, 139:25, 140:14, 140:20

**perfect** [1] - 140:25

**perfectly** [1] - 45:11

**perform** [10] - 35:19, 37:6, 37:14, 37:24, 38:10, 55:25, 106:22, 107:8, 111:5, 113:19

**performed** [2] - 38:2, 38:15

**performing** [2] - 83:21, 114:18

**perhaps** [1] - 84:1

**period** [2] - 27:17, 28:1

**periodically** [1] - 109:7

**person** [10] - 36:25, 60:8, 67:21, 80:5, 80:12, 81:7, 81:13, 85:14, 85:17, 119:2

**personal** [4] - 21:19, 22:13, 36:24, 66:15

**personally** [5] - 31:16, 35:14, 65:5, 67:4, 133:21

**personnel** [1] - 23:24

**phone** [1] - 124:8

**photo** [4] - 2:23, 69:9, 95:21, 95:24

**photograph** [2] - 95:11, 95:19

**Photograph** [1] - 2:23

**photos** [2] - 54:8, 64:6

**physical** [3] - 37:7, 37:11, 135:2

**physically** [5] - 107:23, 110:17, 110:21, 114:25, 126:5

**picture** [2] - 118:25, 119:1

**pictures** [1] - 12:10

**pier** [2] - 17:5, 108:5

**pilot** [1] - 17:19

**piloting** [1] - 138:25

**pitch** [3] - 81:21, 116:25, 117:6

**pitching** [23] - 41:13, 49:10, 50:11, 51:6, 74:14, 80:23, 81:18, 82:1, 82:13, 82:17, 82:25, 86:11, 91:17,

95:3, 106:18, 110:15, 115:22, 117:1, 117:4, 117:5, 122:10, 128:13, 130:20

**place** [4] - 86:14, 96:25, 116:8, 131:21

**places** [1] - 19:3

**plainly** [1] - 64:5

**plaintiff** [21] - 21:1, 21:23, 27:20, 28:10, 35:25, 38:5, 38:17, 39:4, 39:17, 41:2, 42:6, 42:14, 42:20, 53:23, 54:15, 56:12, 99:17, 118:15, 125:12, 125:15, 138:7

**Plaintiff** [5] - 1:6, 4:15, 43:7, 64:17, 101:3

**PLAINTIFF** [1] - 2:3

**plaintiff's** [1] - 48:25

**Plaintiff's** [11] - 40:12, 100:6, 100:17, 100:24, 101:15, 119:24, 120:1, 121:6, 121:11, 139:20, 140:5

**plaintiffs** [2] - 21:19, 101:24

**platform** [46] - 6:16, 9:2, 9:4, 17:20, 17:21, 17:22, 17:23, 18:9, 18:19, 35:24, 36:15, 37:8, 39:6, 40:2, 42:13, 50:8, 53:24, 70:3, 70:10, 70:17, 70:21, 72:15, 72:23, 73:11, 74:3, 74:20, 76:23, 87:16, 90:11, 90:19, 91:1, 91:5, 91:13, 92:7, 92:11, 92:12, 92:13, 96:10, 96:14, 104:11, 110:8, 123:7, 126:21, 127:17

**Platinum** [2] - 33:20, 34:4

**play** [6] - 71:19, 72:10, 73:1, 73:7, 77:4, 91:6

**player** [1] - 99:24

**playing** [4] - 71:24, 74:6, 74:23, 75:25

**plus** [3] - 76:20, 110:3, 136:8

**point** [11] - 10:3, 41:14, 57:12, 77:21, 78:10, 80:12, 81:14,

91:2, 96:13, 97:10, 139:3

**police** [5] - 9:11, 19:13, 20:14, 47:7, 102:21

**Police** [4] - 9:19, 24:10, 57:6, 103:11

**policies** [9] - 25:9, 86:13, 86:19, 87:2, 87:7, 87:22, 88:9, 89:2, 108:17

**policy** [9] - 46:13, 68:23, 88:16, 88:17, 88:19, 89:11, 89:18, 118:24, 119:18

**Ponce** [1] - 2:4

**port** [21] - 5:10, 7:24, 12:1, 13:7, 16:24, 28:24, 29:21, 31:3, 31:11, 65:13, 66:20, 103:22, 103:24, 107:12, 107:15, 108:5, 108:19, 117:2, 117:11, 117:12, 123:24

**portion** [2] - 58:6, 119:16

**ports** [11] - 5:13, 8:9, 11:18, 16:14, 16:21, 17:4, 31:18, 41:25, 65:6, 68:20, 105:8

**position** [8] - 7:13, 9:18, 10:14, 49:17, 102:16, 103:10, 112:12, 113:10

**positions** [4] - 23:4, 71:2, 103:13, 111:22

**possibility** [1] - 54:15

**possible** [3] - 18:7, 56:8, 80:19

**possibly** [2] - 79:21, 85:4

**post** [1] - 21:21

**post-COVID** [1] - 21:21

**potential** [2] - 48:9, 49:3

**practice** [2] - 90:5, 92:21

**prearrival** [1] - 114:1

**preexisting** [1] - 14:16

**prefer** [1] - 3:22

**pregnant** [1] - 14:12

**preparation** [1] - 72:8

**prepare** [1] - 101:9

**prepared** [2] - 114:12, 123:17

**preparing** [1] - 100:22

**present** [3] - 32:21, 70:20, 90:10

**presented** [2] - 37:18, 38:6

**preservation** [1] - 120:6

**pretty** [6] - 19:20, 46:3, 50:15, 50:18, 68:24, 86:24

**previous** [3] - 84:24, 106:25, 107:18

**previously** [4] - 13:5, 101:18, 101:25, 137:20

**primary** [1] - 3:21

**Princess** [1] - 22:9

**problem** [1] - 47:17

**problems** [1] - 102:19

**procedure** [6] - 33:13, 46:14, 88:16, 88:19, 89:12, 99:15

**procedures** [10] - 25:9, 38:9, 86:14, 86:19, 87:2, 87:6, 87:22, 88:9, 89:2, 119:18

**proceed** [1] - 144:17

**process** [2] - 57:17, 113:3

**processed** [1] - 127:12

**produced** [6] - 54:9, 55:10, 69:7, 89:6, 95:12, 99:13

**professional** [3] - 73:24, 85:19, 133:12

**program** [1] - 102:18

**projects** [1] - 68:24

**proper** [4] - 8:25, 31:2, 46:5, 119:13

**properly** [5] - 6:17, 23:11, 109:3, 110:25, 129:25

**prosthetic** [1] - 118:3

**protecting** [1] - 104:8

**provide** [9] - 5:3, 88:13, 93:5, 93:8, 93:11, 93:12, 111:14, 125:4, 140:22

**provided** [5] - 56:10, 68:18, 68:19, 111:11, 137:14

**PROVIDES** [1] - 145:2

**provides** [1] - 69:16

**providing** [1] - 89:17

**Public** [3] - 1:19, 142:21, 143:20

**Puerto** [1] - 102:23

**pull** [1] - 121:2

**purpose** [1] - 20:19

**purposes** [5] - 23:21,

48:3, 89:16, 120:3, 120:6

**pursuant** [1] - 1:20

**pushing** [3] - 49:17, 116:23, 116:24

**put** [17] - 23:3, 80:24, 82:8, 82:9, 84:25, 95:1, 95:6, 110:20, 110:21, 115:1, 115:7, 115:8, 120:19, 125:13, 128:8, 132:25, 138:24

**puts** [1] - 63:10

### Q

**qualifications** [6] - 5:3, 56:18, 102:14, 103:5, 111:16, 118:10

**qualified** [5] - 8:24, 15:22, 23:1, 23:5, 106:24

**qualify** [1] - 22:19

**quantify** [1] - 48:19

**questioning** [1] - 133:5

**questions** [2] - 102:9, 133:16

**quit** [1] - 13:7

**quite** [2] - 7:17, 91:22

**quote** [2] - 88:17, 88:18

### R

**radio** [2] - 107:19

**railing** [17] - 63:11, 67:16, 67:17, 75:13, 75:16, 76:21, 95:2, 95:7, 96:1, 96:7, 96:25, 97:4, 115:1, 122:12, 122:17, 125:14

**railings** [10] - 62:14, 62:24, 63:22, 64:3, 94:20, 94:22, 94:23, 96:19, 97:10, 97:14

**raining** [1] - 104:6

**ran** [1] - 106:3

**RANDALL** [6] - 1:17, 3:2, 142:9, 142:5, 143:14, 145:25

**Randall** [11] - 2:17, 20:15, 20:16, 20:20, 21:3, 21:8, 21:11, 21:15, 21:18, 26:14, 144:5

**randall** [1] - 3:9

**rate** [2] - 17:14, 102:22

**RE** [1] - 144:7

**reaching** [5] - 77:25, 78:16, 78:22, 82:9, 91:11

**reacts** [2] - 60:12

**read** [8] - 25:7, 101:12, 122:1, 140:15, 140:19, 140:22, 143:6, 145:20

**reading** [3] - 38:5, 120:24, 144:16

**ready** [4] - 9:11, 104:3, 120:10, 120:13

**realized** [1] - 55:17

**really** [16] - 6:11, 13:23, 20:3, 27:2, 29:23, 32:1, 33:15, 49:8, 51:8, 59:16, 60:4, 83:23, 84:17, 86:23, 88:11, 124:7

**realm** [1] - 68:5

**rear** [2] - 117:9

**REASON** [1] - 145:6

**reason** [9] - 42:23, 43:21, 44:13, 44:14, 44:15, 46:6, 46:8, 118:17, 129:9

**reasonable** [5] - 48:5, 53:21, 55:21, 94:1, 133:11

**reasonably** [7] - 89:24, 89:25, 93:17, 98:17, 99:9, 127:3, 132:11

**reasons** [1] - 145:4

**receive** [2] - 21:13, 40:8

**received** [1] - 57:13

**receiving** [1] - 51:3

**recess** [1] - 47:20

**recognize** [1] - 72:2

**recollection** [4] - 120:21, 121:1, 121:15, 121:25

**recommend** [1] - 135:10

**reconstruction** [10] - 20:23, 36:11, 57:9, 57:11, 58:1, 58:20, 59:14, 59:25, 60:2, 60:17

**reconstructionist** [3] - 56:22, 56:25, 57:4

**record** [5] - 3:8, 47:19, 47:22, 88:1, 142:7

**Record** [1] - 144:24

**REDIRECT** [1] - 133:18



*Jeannie Reporting*
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

refer [2] - 27:5, 119:25
reference [1] - 144:10
referenced [3] - 28:18, 38:15, 69:20
referring [2] - 69:1, 69:4
refresh [4] - 120:20, 120:25, 121:14, 121:24
refuse [1] - 136:16
regarding [7] - 5:4, 22:20, 56:20, 86:14, 86:18, 87:21, 88:9
regardless [1] - 31:10
relates [5] - 107:9, 111:6, 114:17, 124:3, 132:11
relating [3] - 112:1, 112:17, 113:14
relative [2] - 142:8, 142:9
release [9] - 11:15, 39:24, 63:10, 107:23, 108:5, 109:4, 109:25, 110:16, 131:17
released [3] - 11:5, 11:6, 70:16
releases [1] - 76:2
rely [3] - 40:25, 51:23
remedy [1] - 114:7
remember [6] - 7:15, 20:3, 35:5, 35:6, 120:22, 134:2
Remote [1] - 1:11
remotely [1] - 142:9
removed [1] - 90:17
rendering [1] - 100:18
Report [2] - 2:22, 26:9
report [35] - 4:24, 13:25, 19:5, 25:15, 26:17, 27:4, 27:5, 27:12, 64:11, 69:20, 72:8, 83:8, 83:9, 83:19, 86:18, 87:20, 88:4, 88:7, 88:19, 89:3, 92:19, 100:22, 101:12, 119:23, 120:7, 120:19, 120:25, 121:11, 121:13, 137:12, 138:4, 138:16, 139:9, 139:14, 142:5
REPORTER [5] - 47:18, 47:21, 140:21, 140:25, 142:1
reporting [1] - 18:1
reports [2] - 11:12, 103:1

represent [1] - 102:10
requested [4] - 38:24, 40:12, 41:2, 142:6
required [1] - 96:18
requires [2] - 6:9, 113:2
residence [1] - 3:21
respect [11] - 16:3, 16:13, 16:21, 17:11, 48:3, 48:10, 59:24, 60:18, 65:5, 84:2, 92:19
respectful [1] - 135:22
respectfully [1] - 136:11
responded [1] - 139:19
response [3] - 60:15, 66:17, 67:3
responses [1] - 45:25
responsibilities [9] - 13:23, 15:17, 16:4, 16:12, 16:20, 23:25, 112:1, 112:17, 113:14
responsibility [6] - 8:18, 16:8, 17:14, 18:4, 130:3, 134:5
responsible [17] - 5:9, 6:3, 6:15, 11:8, 11:13, 18:1, 18:13, 23:5, 27:17, 29:13, 29:15, 69:21, 102:23, 103:1, 103:25, 104:11, 124:23
responsibly [2] - 119:19, 127:1
rest [2] - 16:3, 119:4
retained [2] - 4:19, 22:12
retired [2] - 21:5, 102:20
retracted [1] - 18:19
returned [1] - 14:8
returning [2] - 24:14, 30:8
review [21] - 25:7, 38:1, 39:3, 47:4, 52:7, 52:24, 53:9, 53:10, 55:9, 55:13, 56:9, 64:5, 68:17, 69:10, 70:19, 85:21, 85:25, 118:15, 119:7, 119:8, 142:5
reviewed [14] - 26:21, 35:13, 41:18, 41:22, 42:10, 52:13, 53:14, 69:6, 69:9, 72:7, 99:1, 99:12, 118:18,

118:21
reviewing [5] - 42:18, 44:20, 84:8, 100:21, 119:5
Rico [1] - 102:23
ridiculous [1] - 119:3
rock [1] - 116:7
rocket [1] - 131:22
rocking [2] - 51:6, 110:15
role [1] - 17:11
roll [1] - 116:7
rough [1] - 74:16
Royal [7] - 32:25, 33:21, 34:16, 34:19, 34:21, 34:23, 112:8
RPR [5] - 1:19, 142:20, 142:4, 142:16, 144:23
RULE [1] - 145:2
rule [1] - 54:14
Rule [1] - 4:23
ruled [4] - 49:4, 55:20, 56:3, 56:7
rules [1] - 136:3
run [2] - 9:21, 106:9
running [1] - 47:1

## S

safe [4] - 8:25, 18:2, 51:8, 104:1
safely [5] - 18:7, 32:9, 46:16, 56:14, 107:22
safety [25] - 6:4, 11:9, 11:12, 15:20, 15:22, 17:10, 18:13, 49:18, 69:2, 69:6, 69:15, 69:24, 88:14, 89:15, 99:14, 104:12, 106:5, 111:11, 119:19, 122:25, 124:25, 125:5, 125:20, 125:25, 127:11
sail [1] - 11:21
sailed [5] - 33:21, 33:22, 34:18, 134:2, 136:8
sailing [1] - 33:18
sailings [2] - 64:21, 64:22
sake [2] - 112:22, 116:3
San [32] - 5:5, 5:11, 7:24, 12:19, 12:24, 15:6, 19:1, 28:5, 28:14, 28:24, 29:22, 30:12, 30:22, 31:8, 31:15, 32:1, 35:3,

36:4, 41:25, 48:11, 64:23, 66:19, 68:21, 68:22, 82:21, 83:11, 83:21, 105:7, 110:5, 110:23, 113:20, 113:23
sat [4] - 11:24, 46:20, 63:17, 128:11
saw [6] - 26:22, 83:12, 86:3, 86:4, 86:23, 109:20
scanning [1] - 109:24
scary [1] - 55:5
school [1] - 20:14
science [1] - 131:22
scooter [4] - 58:15, 58:24, 58:25, 60:9
scrapped [2] - 7:18, 7:19
screen [2] - 75:2, 76:15
scroll [4] - 26:12, 27:3, 89:6, 121:12
sea [25] - 23:10, 31:9, 40:3, 49:8, 50:1, 50:8, 50:18, 51:12, 51:24, 52:10, 59:15, 60:2, 60:19, 65:13, 68:5, 104:9, 107:13, 122:9, 123:23, 124:4, 124:9, 124:16, 126:19, 137:16, 137:25
seal [1] - 142:11
seaman [1] - 23:1
seaman's [2] - 15:21, 59:18
seamen [4] - 6:18, 8:24, 23:5, 106:25
seas [1] - 18:6
seat [17] - 46:18, 46:19, 82:11, 85:1, 110:20, 110:22, 115:10, 118:5, 122:24, 128:9, 131:21, 131:25, 133:1, 138:8, 138:18, 138:24, 139:16
seated [1] - 116:13
seating [3] - 53:25, 54:5, 73:5
seats [1] - 128:10
second [10] - 9:3, 48:17, 69:19, 74:24, 79:4, 87:24, 101:16, 114:22, 124:20, 137:1
secondly [1] - 40:22
seconds [6] - 39:2,

74:21, 75:14, 77:22, 91:2, 91:9
Section [1] - 32:5
secure [2] - 104:1, 104:5
security [47] - 6:2, 6:7, 6:9, 7:3, 7:6, 7:7, 7:8, 7:13, 8:4, 8:17, 8:18, 9:15, 10:12, 10:13, 10:18, 10:20, 10:24, 13:21, 13:22, 15:15, 15:23, 17:9, 18:12, 22:23, 23:15, 88:14, 102:18, 103:15, 103:16, 104:14, 106:4, 107:1, 107:18, 108:25, 109:1, 110:1, 110:3, 111:24, 111:25, 112:14, 112:15, 113:12, 113:13, 131:16, 134:13, 134:16
see [80] - 9:25, 10:1, 12:10, 12:16, 17:21, 26:1, 26:15, 27:3, 27:22, 32:12, 39:4, 39:20, 39:25, 42:19, 42:21, 43:11, 43:12, 45:8, 45:9, 45:12, 46:8, 48:6, 54:16, 55:22, 62:7, 62:16, 64:8, 71:23, 72:11, 72:13, 73:2, 73:10, 73:15, 74:9, 74:12, 75:2, 75:15, 75:21, 76:1, 76:6, 76:10, 76:15, 76:18, 76:22, 77:1, 77:8, 77:13, 77:16, 77:20, 77:23, 78:3, 78:5, 78:8, 78:15, 78:18, 79:6, 79:9, 81:21, 82:8, 83:7, 85:9, 86:22, 91:10, 95:17, 95:21, 96:1, 96:6, 96:10, 107:4, 111:4, 114:1, 115:3, 116:19, 116:21, 118:17, 122:22, 128:14, 132:18, 137:21, 139:4
Senor [1] - 41:7
sense [1] - 131:3
sent [3] - 68:23, 102:22, 127:13
sentence [1] - 128:25
separate [3] - 3:18, 101:6, 145:3

14

**separation** [2] - 109:20, 130:2
**September** [1] - 26:14
**serious** [1] - 60:10
**served** [4] - 19:23, 20:2, 21:25, 22:4
**service** [1] - 16:7
**services** [2] - 20:25, 100:11
**set** [12] - 17:13, 17:20, 39:5, 50:22, 53:23, 54:4, 64:10, 73:4, 76:23, 96:2, 107:15, 143:9
**settle** [1] - 22:16
**seven** [5] - 5:14, 26:8, 27:17, 28:1, 28:3
**seven-page** [1] - 26:8
**seven-year** [2] - 27:17, 28:1
**several** [2] - 38:7, 111:3
**shall** [3] - 144:16, 144:17, 145:3
**share** [1] - 25:23
**shared** [1] - 26:2
**sharing** [1] - 75:2
**SHEET** [1] - 145:1
**Shield** [1] - 14:16
**ship** [99] - 5:5, 6:10, 8:9, 8:19, 8:25, 9:3, 12:7, 17:21, 17:22, 17:25, 18:3, 27:19, 29:2, 30:3, 31:6, 31:7, 32:7, 32:11, 32:16, 35:4, 35:12, 35:23, 36:13, 37:8, 37:9, 37:20, 38:18, 39:6, 53:1, 58:14, 64:12, 64:13, 66:4, 66:25, 67:7, 67:23, 69:21, 69:23, 69:24, 70:16, 73:17, 87:10, 90:13, 93:1, 104:17, 105:4, 105:11, 105:15, 105:16, 105:19, 105:24, 106:15, 107:12, 108:10, 108:12, 108:18, 108:21, 109:1, 109:17, 109:21, 109:25, 110:4, 116:6, 116:24, 116:25, 117:8, 117:9, 117:10, 117:16, 117:21, 121:20, 121:21, 122:6, 123:3, 123:4, 123:7, 123:10, 123:18,

123:22, 124:2, 124:4, 124:11, 124:22, 124:24, 124:25, 125:5, 125:24, 126:1, 126:21, 127:17, 129:22, 135:3, 135:7, 135:20, 136:5
**ship's** [1] - 108:14
**shipboard** [10] - 6:7, 6:8, 10:16, 10:24, 22:23, 23:4, 23:14, 102:25, 106:25, 134:1
**ships** [24] - 7:15, 7:23, 10:14, 10:21, 20:5, 23:8, 27:15, 28:23, 29:21, 32:10, 33:14, 33:19, 54:20, 64:19, 65:7, 86:15, 86:20, 87:4, 114:18, 126:9, 134:2, 135:6, 136:8, 137:9
**shirt** [1] - 96:13
**shore** [5] - 8:9, 19:4, 31:7, 105:3, 107:21
**short** [2] - 47:20, 65:24
**SHORTHAND** [1] - 142:1
**shoulder** [1] - 97:3
**show** [4] - 60:7, 118:25, 137:22, 139:2
**showed** [4] - 98:16, 99:21, 137:6, 137:18
**showing** [3] - 38:8, 45:14, 99:15
**shown** [1] - 69:2
**shows** [1] - 89:12
**side** [12] - 48:24, 48:25, 49:14, 75:9, 83:2, 83:4, 96:7, 117:12, 117:13, 123:19
**sideways** [2] - 80:16, 80:20
**sight** [1] - 82:6
**signature** [2] - 26:14, 144:12
**signed** [1] - 15:21
**signing** [1] - 144:17
**similar** [3] - 27:20, 28:10, 33:15
**similarly** [1] - 97:10
**simple** [8] - 46:17, 51:1, 84:6, 123:1, 123:2, 125:23, 131:11, 131:22
**simplifies** [1] - 52:16

**simply** [6] - 36:23, 53:23, 63:18, 97:7, 137:23, 139:23
**Sincerely** [1] - 144:19
**sinuses** [1] - 120:12
**sit** [10] - 29:19, 46:21, 68:10, 82:10, 83:25, 94:9, 98:25, 100:10, 118:5, 138:7
**site** [2] - 35:12, 37:7
**sitting** [2] - 54:24, 60:7
**situation** [6] - 6:12, 52:18, 92:15, 107:25, 109:10, 129:24
**six** [2] - 76:10, 116:4
**size** [1] - 117:15
**sizes** [1] - 105:6
**skilled** [2] - 84:14, 85:12
**slow** [1] - 99:25
**slowed** [1] - 77:19
**slower** [1] - 77:8
**slowing** [1] - 77:5
**small** [3] - 105:16, 117:15, 128:16
**smaller** [6] - 105:15, 105:19, 107:10, 108:11, 108:18, 109:17
**SMS** [1] - 89:21
**so..** [2] - 92:17, 100:3
**solid** [1] - 107:24
**sometimes** [2] - 22:16, 116:4
**sorry** [12] - 13:16, 17:9, 28:8, 29:24, 34:17, 65:9, 81:9, 87:23, 88:3, 99:4, 127:22, 135:4
**sort** [1] - 21:4
**sound** [1] - 29:11
**sounds** [6] - 33:12, 43:23, 50:20, 51:11, 58:17, 80:10
**South** [3] - 9:19, 19:13, 103:11
**SOUTHERN** [1] - 1:2
**Southern** [2] - 9:13, 54:18
**space** [1] - 87:9
**speaking** [1] - 73:18
**specific** [26] - 16:20, 24:23, 27:11, 28:13, 35:16, 36:23, 49:3, 52:7, 54:5, 56:18, 59:25, 63:19, 63:24, 65:24, 66:13, 68:22, 83:22, 85:21, 87:8,

87:21, 88:17, 88:18, 89:2, 97:24, 108:8, 122:2
**specifically** [27] - 7:22, 8:6, 8:8, 11:2, 12:20, 15:6, 16:11, 17:8, 17:10, 24:25, 30:14, 31:15, 33:6, 40:24, 42:5, 48:2, 48:8, 52:9, 61:21, 73:19, 93:20, 100:12, 101:22, 113:20, 134:19, 139:4, 139:14
**spectrum** [1] - 23:7
**speed** [2] - 59:3, 60:9
**spelled** [2] - 3:9, 118:23
**spent** [3] - 9:7, 100:21, 101:2
**splashing** [1] - 116:8
**spoon** [13] - 40:5, 63:1, 63:2, 63:8, 74:10, 75:23, 81:2, 96:23, 110:10, 111:5, 117:24, 126:4, 126:15
**spoon-fed** [1] - 126:15
**spoon-feed** [2] - 81:2, 117:24
**spoon-feeding** [9] - 40:5, 63:1, 63:2, 74:10, 75:23, 96:23, 110:10, 111:5, 126:4
**spoon-food** [1] - 63:8
**spot** [1] - 14:2
**SQM** [2] - 87:8, 89:19
**squared** [1] - 71:17
**SS** [3] - 11:20, 142:3, 143:2
**SSO** [2] - 6:7, 22:22
**SSOs** [1] - 10:23
**stability** [3] - 41:14, 59:10, 94:3
**stabilize** [4] - 59:9, 62:15, 63:6, 63:11
**stable** [1] - 115:2
**staff** [5] - 6:6, 6:8, 10:22, 10:24, 104:13
**staircase** [1] - 96:8
**stairs** [14] - 39:6, 49:11, 51:4, 76:23, 80:8, 81:2, 86:8, 86:12, 97:4, 118:6, 127:22, 128:16, 131:19, 131:20
**stampedes** [1] - 23:13
**stand** [2] - 68:9, 92:11
**standard** [4] - 46:15, 90:5, 92:21, 101:20

**standards** [9] - 32:8, 32:16, 32:20, 33:4, 112:22, 112:24, 112:25, 114:4, 131:8
**standing** [11] - 40:6, 72:14, 74:2, 84:22, 87:15, 91:12, 111:13, 119:2, 125:17, 130:4, 132:19
**stands** [3] - 31:20, 31:24, 31:25
**Star** [3] - 19:18, 19:23, 33:8
**starboard** [2] - 117:2, 117:13
**start** [6] - 5:21, 18:2, 20:8, 20:16, 67:15, 133:5
**started** [10] - 10:8, 14:21, 15:7, 20:15, 71:24, 74:11, 81:17, 102:18, 107:11, 131:12
**starting** [1] - 20:19
**State** [3] - 1:20, 142:21, 143:20
**STATE** [3] - 142:4, 142:2, 143:2
**state** [7] - 3:7, 44:15, 54:17, 56:3, 83:8, 93:20, 138:16
**statement** [3] - 45:19, 73:22, 145:4
**statements** [2] - 42:11, 55:15
**States** [4] - 22:24, 23:1, 23:2, 106:24
**STATES** [1] - 1:1
**stating** [2] - 50:17, 139:20
**stay** [1] - 105:11
**stayed** [1] - 13:10
**STCW-95** [1] - 23:9
**stenographic** [1] - 142:7
**stenographically** [1] - 142:5
**step** [7] - 39:18, 58:9, 76:15, 80:20, 122:16, 122:17
**stepped** [1] - 90:19
**steps** [21] - 39:11, 39:18, 50:22, 53:24, 54:4, 54:11, 54:16, 55:16, 55:17, 61:20, 61:22, 73:4, 76:21, 77:2, 80:16, 91:7, 91:10, 96:2, 96:20, 108:4, 110:7

**stick** [2] - 29:18, 136:9
**still** [9] - 21:1, 21:7, 21:22, 23:14, 34:1, 69:9, 81:8, 91:12, 134:24
**Stiltsville** [1] - 59:22
**stood** [1] - 31:16
**stop** [5] - 9:16, 19:9, 73:9, 74:7, 76:22
**stopped** [5] - 12:25, 19:21, 20:9, 32:17, 83:10
**store** [1] - 11:11
**story** [4] - 46:7, 46:9, 104:10, 116:14
**straight** [3] - 54:21, 55:8, 122:13
**stricken** [2] - 101:19, 102:1
**strike** [4] - 37:5, 60:9, 134:15, 138:15
**strikes** [1] - 39:21
**stripe** [1] - 7:7
**struck** [3] - 58:8, 58:10, 58:15
**styled** [1] - 144:11
**subject** [7] - 35:23, 36:25, 37:8, 52:25, 61:22, 71:15, 95:25
**subpart** [3] - 92:20, 94:18, 97:8
**subscribed** [1] - 143:17
**substance** [1] - 145:2
**sudden** [1] - 82:6
**suffer** [1] - 98:3
**suggest** [1] - 144:14
**suitable** [1] - 144:15
**Suite** [1] - 2:4
**summarize** [2] - 105:14, 122:3
**supervisor** [1] - 108:24
**support** [6] - 32:19, 51:24, 52:8, 52:14, 63:24, 79:13
**supporting** [1] - 80:3
**supposed** [10] - 38:9, 54:24, 68:25, 74:10, 79:23, 86:10, 108:16, 109:15, 118:25, 131:7
**surfing** [1] - 116:21
**surrounding** [1] - 48:18
**surroundings** [1] - 122:20
**suspend** [2] - 49:15, 83:1
**suspended** [4] -

82:14, 82:16, 83:10, 130:2
**suspending** [1] - 84:2
**sustained** [1] - 59:3
**swell** [3] - 116:16, 116:22, 124:17
**swells** [15] - 18:5, 31:21, 66:22, 76:9, 115:24, 116:2, 116:3, 116:17, 116:19, 126:20, 137:2, 137:6, 137:15, 138:1
**swim** [1] - 15:25
**swiping** [1] - 109:24
**switched** [1] - 90:23
**Sworn** [1] - 143:17
**sworn** [2] - 3:4, 142:10
**system** [1] - 25:12

**T**

**table** [1] - 68:3
**Tahiti** [1] - 17:2
**tanks** [1] - 16:2
**task** [1] - 9:5
**teach** [2] - 23:23, 112:22
**team** [1] - 31:23
**technique** [1] - 111:5
**Technology** [1] - 57:6
**telephone** [1] - 144:14
**temperate** [1] - 32:2
**ten** [3] - 46:3, 67:17, 84:7
**Tender** [1] - 26:9
**tender** [305] - 2:23, 4:24, 5:5, 5:9, 6:10, 6:11, 6:14, 6:17, 6:19, 8:5, 8:6, 8:16, 8:23, 9:1, 9:5, 11:17, 12:5, 12:19, 14:20, 15:5, 16:13, 16:21, 17:1, 17:6, 17:11, 17:19, 18:9, 18:17, 18:22, 22:20, 23:5, 24:6, 24:19, 27:19, 28:2, 30:3, 30:4, 30:6, 30:7, 30:14, 30:18, 30:21, 31:5, 31:7, 31:14, 31:17, 32:7, 32:17, 32:24, 33:17, 35:4, 35:24, 36:1, 36:4, 36:14, 36:25, 37:8, 37:9, 37:20, 38:24, 38:25, 39:6, 39:18, 40:2, 40:7, 40:9, 40:12, 40:13, 40:23, 41:1,

41:7, 41:12, 41:14, 42:12, 42:16, 42:21, 43:3, 43:5, 43:8, 43:25, 44:2, 44:11, 44:23, 45:23, 46:10, 46:16, 46:19, 48:11, 49:9, 49:18, 50:7, 50:10, 51:2, 51:5, 51:18, 53:24, 54:3, 54:6, 54:8, 54:25, 55:6, 59:6, 60:25, 61:5, 61:23, 62:5, 62:13, 62:14, 62:15, 62:22, 63:5, 63:20, 63:21, 64:4, 64:6, 64:12, 65:6, 65:13, 65:16, 66:5, 66:15, 66:21, 66:24, 67:6, 67:24, 68:7, 68:20, 69:17, 69:21, 69:23, 70:5, 70:10, 70:18, 70:22, 70:25, 71:1, 71:5, 72:16, 72:19, 72:24, 73:5, 73:12, 73:13, 74:12, 74:20, 75:8, 76:8, 76:23, 77:24, 78:10, 82:2, 82:21, 82:24, 83:10, 83:21, 84:3, 84:14, 85:4, 85:22, 86:15, 86:20, 87:4, 87:11, 88:10, 88:15, 89:24, 90:1, 90:5, 90:6, 90:11, 90:13, 90:16, 90:17, 90:20, 91:1, 91:15, 92:7, 92:21, 92:22, 92:24, 93:1, 93:17, 93:22, 94:2, 94:4, 94:9, 94:10, 94:14, 94:19, 95:2, 95:11, 96:1, 96:3, 96:15, 96:17, 97:9, 98:16, 98:18, 99:8, 99:16, 101:25, 103:2, 103:18, 104:23, 104:25, 105:2, 105:3, 105:5, 105:14, 105:19, 105:24, 106:2, 106:11, 106:17, 106:22, 107:8, 107:17, 107:20, 107:23, 108:4, 108:11, 108:18, 108:24, 109:17, 109:21, 110:4, 110:8, 110:12, 110:13, 110:14, 110:23, 111:4, 111:12, 112:2, 112:17, 112:24,

113:15, 113:19, 113:23, 114:5, 114:18, 115:7, 115:17, 115:22, 116:5, 116:7, 117:15, 117:21, 119:2, 121:20, 122:9, 122:21, 123:3, 123:8, 123:14, 124:22, 124:24, 125:16, 125:17, 125:22, 126:1, 126:17, 126:22, 127:1, 127:3, 127:12, 127:15, 127:16, 127:25, 128:4, 128:10, 128:21, 129:3, 129:4, 129:24, 130:6, 130:18, 130:20, 131:4, 131:7, 131:17, 131:18, 131:24, 132:10, 133:4, 133:23, 134:5, 134:21, 135:3, 135:8, 135:16, 135:20, 136:12, 136:13, 136:16, 137:5, 137:7, 138:18, 139:16, 139:22
**tender's** [1] - 92:12
**tendering** [2] - 8:8, 105:4
**tenders** [17] - 5:14, 8:8, 11:23, 12:15, 16:9, 17:24, 18:18, 29:1, 36:19, 56:14, 67:5, 104:18, 105:9, 105:10, 107:16, 119:13
**tenure** [1] - 34:23
**term** [1] - 104:24
**terminology** [1] - 100:2
**terms** [19] - 10:20, 24:17, 24:20, 24:23, 31:14, 31:16, 32:15, 33:16, 59:13, 64:18, 67:23, 69:17, 117:3, 117:5, 133:21, 134:4, 134:19, 134:21, 137:23
**tested** [1] - 55:20
**testified** [9] - 3:4, 14:6, 44:25, 45:1, 45:17, 54:19, 55:3, 61:15, 122:14
**testify** [1] - 22:19

**testifying** [2] - 3:11, 66:3
**testimony** [6] - 20:22, 21:18, 42:10, 43:19, 66:1, 139:12
**testing** [3] - 37:15, 37:24, 55:25
**that's..** [1] - 89:13
**THE** [44] - 2:3, 2:8, 14:24, 36:8, 44:5, 47:12, 47:16, 47:18, 47:21, 50:24, 61:8, 65:9, 68:1, 71:12, 75:20, 79:6, 79:20, 80:22, 99:19, 102:6, 103:21, 106:13, 114:10, 114:20, 115:20, 123:6, 124:7, 124:15, 126:3, 126:17, 128:24, 129:7, 129:17, 131:11, 133:14, 136:20, 138:11, 138:20, 140:1, 140:13, 140:18, 140:21, 140:23, 140:25
**theater** [1] - 60:7
**them..** [1] - 145:4
**themselves** [6] - 61:20, 63:12, 87:7, 124:12, 136:25
**then..** [1] - 91:4
**thereafter** [3] - 7:23, 10:4, 13:2
**therefore** [1] - 94:4
**Thereupon** [3] - 3:1, 47:20, 141:2
**thereupon** [4] - 25:20, 71:20, 95:14, 120:1
**they've** [3] - 41:9, 82:6, 122:7
**thinking** [2] - 12:21, 23:19
**third** [19] - 5:14, 9:4, 11:1, 18:21, 19:1, 19:2, 30:14, 30:16, 30:17, 40:5, 70:6, 70:13, 85:13, 89:23, 104:18, 105:21, 110:5, 126:24, 130:5
**third-party** [9] - 5:14, 18:21, 30:14, 40:5, 70:6, 85:13, 104:18, 105:21, 130:5
**thirdly** [1] - 48:21
**thousands** [3] - 24:12, 24:18, 29:11
**three** [18] - 7:7, 18:14, 50:12, 74:15, 74:18,

81:4, 82:5, 84:23, 86:9, 90:16, 111:12, 115:7, 116:4, 125:14, 125:16, 128:3, 132:19
**three-foot** [1] - 50:12
**three-stripe** [1] - 7:7
**threshold** [1] - 92:12
**throughout** [6] - 18:15, 34:23, 50:9, 59:20, 105:8, 122:7
**thrown** [1] - 58:8
**title** [4] - 7:2, 10:11, 13:19, 15:13
**titled** [1] - 26:9
**TO** [1] - 144:5
**today** [19] - 3:11, 4:14, 25:19, 26:3, 29:19, 45:6, 71:11, 83:14, 83:25, 84:8, 95:10, 95:18, 98:25, 100:10, 101:5, 101:10, 133:11, 137:7, 137:13
**together** [1] - 145:22
**tons** [1] - 117:16
**took** [8] - 9:18, 32:23, 57:11, 57:19, 59:18, 103:9, 144:18
**top** [2] - 26:10, 109:24
**total** [2] - 57:20, 101:1
**totally** [2] - 80:9, 127:19
**touch** [4] - 108:2, 126:5, 137:4
**touched** [1] - 108:1
**tour** [1] - 107:21
**tours** [1] - 6:20
**towards** [2] - 88:13, 98:1
**town** [1] - 27:3
**traffic** [3] - 56:21, 57:11, 57:24
**train** [2] - 85:13, 108:23
**trained** [13] - 15:25, 48:14, 84:15, 85:4, 86:1, 87:12, 87:13, 106:16, 106:25, 107:1, 107:18, 109:22, 119:12
**training** [20] - 23:3, 23:21, 23:23, 27:14, 32:6, 46:14, 56:19, 59:15, 60:18, 85:22, 106:10, 106:21, 107:7, 108:8, 108:15, 108:20, 108:21, 108:22, 109:14, 129:18

**transcribed** [1] - 144:12
**transcript** [7] - 140:15, 142:6, 142:6, 143:7, 144:12, 144:18, 145:20
**transfer** [24] - 5:4, 27:18, 27:25, 28:12, 28:16, 28:21, 29:5, 29:9, 29:25, 30:11, 32:7, 62:4, 64:13, 69:22, 70:4, 74:19, 107:9, 108:9, 114:7, 117:20, 121:20, 123:3, 124:24, 131:7
**transferring** [14] - 31:6, 33:16, 35:25, 66:3, 72:24, 86:19, 87:3, 99:15, 108:17, 109:16, 135:2, 135:7, 135:16, 135:19
**transfers** [2] - 115:18, 126:1
**transpired** [1] - 43:22
**travel** [3] - 58:11, 59:4, 68:8
**traveled** [2] - 16:5, 17:2
**treatment** [1] - 80:6
**trial** [1] - 120:6
**tried** [1] - 138:21
**tripping** [1] - 114:21
**TROPICALE** [1] - 7:17
**true** [6] - 66:11, 137:17, 138:9, 142:6, 143:8, 145:23
**try** [5] - 65:24, 85:13, 102:15, 109:13, 114:6
**trying** [11] - 15:4, 17:13, 29:4, 29:10, 46:4, 56:2, 58:1, 79:13, 85:10, 131:6, 136:24
**turn** [1] - 73:3
**turned** [1] - 84:21
**turns** [1] - 50:13
**twice** [1] - 122:24
**two** [35] - 4:12, 6:9, 6:24, 7:12, 7:22, 8:15, 9:7, 10:23, 11:5, 11:12, 12:12, 15:12, 19:19, 19:23, 20:2, 22:7, 22:25, 30:8, 32:23, 32:24, 33:7, 66:20, 70:24, 73:13, 101:21, 103:9, 103:13, 106:1, 111:21,

113:9, 115:5, 128:10, 132:23, 133:3, 133:24
**two-week** [2] - 19:23, 20:2
**tying** [1] - 6:19
**type** [11] - 14:20, 15:5, 21:11, 22:18, 37:6, 37:14, 38:10, 60:17, 66:14, 93:5, 133:22
**typically** [6] - 41:5, 51:5, 52:4, 116:22, 123:23, 124:2

# U

**U.S** [2] - 21:6, 23:16
**ultimate** [1] - 99:7
**unable** [1] - 100:4
**under** [10] - 23:9, 89:24, 93:17, 94:1, 99:9, 101:19, 108:16, 127:2, 132:11, 144:11
**underneath** [1] - 6:5
**undersigned** [1] - 142:8
**understood** [3] - 42:3, 43:23, 121:8
**underwater** [1] - 16:1
**unexpected** [2] - 122:8, 127:19
**unfamiliar** [1] - 55:7
**unfortunately** [1] - 40:20
**uniform** [1] - 73:24
**unique** [1] - 30:21
**UNITED** [1] - 1:1
**United** [4] - 22:24, 23:1, 23:2, 106:24
**University** [1] - 56:23
**university** [1] - 57:2
**unknown** [1] - 54:22
**unless** [4] - 14:13, 40:21, 79:13, 98:22
**unpredictable** [1] - 126:18
**unreasonable** [1] - 93:21
**unreasonably** [1] - 94:14
**up** [47] - 3:23, 5:8, 9:21, 13:16, 14:18, 17:13, 17:20, 18:18, 26:6, 27:21, 31:22, 43:16, 44:7, 45:1, 45:7, 46:6, 47:24, 59:21, 68:9, 71:9, 78:5, 79:12, 81:16, 84:22, 88:21, 91:7,

94:5, 105:6, 105:22, 105:23, 107:15, 108:4, 109:24, 110:7, 117:7, 117:9, 118:6, 119:22, 120:19, 121:2, 121:24, 130:4, 130:24, 133:3, 133:17, 136:14
**upper** [1] - 130:24
**ups** [1] - 109:6
**upset** [1] - 136:25
**urgency** [1] - 135:23
**US** [1] - 9:13
**usefulness** [1] - 68:3
**uses** [1] - 96:4

# V

**vacation** [2] - 67:13, 67:19
**vacations** [1] - 64:20
**vaguely** [1] - 78:20
**varies** [1] - 21:20
**various** [3] - 105:5, 105:8, 106:15
**vehicle** [6] - 58:2, 58:3, 58:9, 58:10, 58:12, 75:15
**vehicles** [2] - 58:21, 58:22
**version** [2] - 47:9, 71:16
**versus** [1] - 30:22
**vessel** [42] - 11:24, 12:16, 13:8, 16:1, 17:5, 17:17, 18:8, 23:24, 24:14, 24:15, 25:4, 29:18, 31:21, 35:19, 49:14, 49:16, 52:25, 61:19, 62:4, 67:24, 82:17, 83:3, 83:5, 84:20, 90:1, 90:7, 91:8, 91:14, 92:13, 92:23, 93:6, 98:18, 105:21, 108:18, 109:6, 109:17, 115:9, 116:11, 118:16, 123:19, 127:4, 131:24
**vessels** [5] - 10:19, 59:15, 60:3, 60:19, 136:8
**viable** [1] - 119:15
**Victor** [3] - 2:11, 16:15, 88:21
**video** [68] - 26:22, 37:18, 38:1, 38:14, 39:3, 39:14, 41:17,

41:22, 42:4, 42:19, 42:21, 43:1, 43:11, 43:24, 44:9, 45:2, 45:13, 45:14, 53:14, 53:18, 62:20, 69:2, 69:7, 69:10, 69:16, 70:19, 71:8, 71:10, 71:23, 72:2, 72:4, 72:7, 73:3, 74:21, 75:7, 77:21, 78:2, 79:4, 79:18, 80:18, 81:15, 83:13, 84:8, 86:2, 86:23, 89:15, 90:15, 90:23, 91:3, 92:8, 99:13, 99:14, 99:20, 99:23, 99:24, 100:1, 100:4, 109:19, 111:1, 111:5, 114:13, 119:1, 125:10, 128:14, 130:15, 132:18, 137:19, 140:8
**Video** [1] - 1:11
**view** [3] - 32:5, 48:15, 78:4
**viewing** [1] - 80:18
**vigilance** [2] - 116:10, 122:18
**vigilant** [1] - 117:18
**Viking** [3] - 19:18, 19:24, 33:8
**Villas** [1] - 3:13
**VILLAS** [1] - 3:14
**vis-à-vis** [1] - 32:10
**visible** [4] - 64:5, 64:7, 94:24, 94:25
**visit** [1] - 35:3
**Vpelaez@fowler** [1] - 2:11
**Vpelaez@fowler- white.com** [1] - 2:11

# W

**wait** [1] - 137:1
**waive** [1] - 140:16
**waived** [1] - 144:17
**walk** [12] - 38:17, 39:10, 51:2, 68:9, 70:17, 86:7, 103:12, 110:1, 110:21, 110:22, 131:16, 131:19
**walked** [1] - 37:19
**walking** [4] - 43:2, 44:10, 59:8, 131:1
**walks** [1] - 40:19
**wants** [1] - 145:3
**War** [1] - 5:18



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

**warm** [1] - 31:19
**warmer** [1] - 32:2
**warnings** [1] - 68:19
**watch** [6] - 33:23, 111:1, 122:16, 122:17, 122:23
**watching** [3] - 39:14, 60:7, 122:22
**water** [9] - 15:24, 20:25, 30:25, 31:19, 32:1, 32:2, 67:24, 105:19, 126:18
**wave** [3] - 50:12, 51:7, 124:17
**waves** [6] - 49:18, 50:11, 116:18, 116:19, 116:23, 117:10
**wearing** [2] - 73:24, 91:21
**weather** [22] - 31:1, 31:9, 50:1, 51:12, 51:24, 52:5, 52:9, 53:7, 53:10, 53:17, 84:10, 104:7, 105:11, 105:12, 114:2, 114:11, 115:23, 123:16, 123:23, 124:4, 137:15, 137:25
**week** [5] - 19:23, 20:2, 29:14, 103:1
**weekly** [1] - 5:10
**weeks** [3] - 4:12, 19:19, 57:20
**welfare** [1] - 6:4
**well-oiled** [1] - 110:24
**WESLEY** [1] - 3:2
**Wesley** [1] - 3:9
**whatsoever** [6] - 39:21, 52:22, 68:6, 68:11, 93:9, 93:13
**wheelchair** [1] - 118:1
**WHITE** [1] - 2:9
**white** [2] - 73:14, 75:11
**white.com** [1] - 2:11
**whitecaps** [2] - 116:21, 116:22
**whole** [2] - 23:7, 44:16
**wife** [3] - 14:12, 14:17, 34:21
**wind** [10] - 3:23, 31:10, 49:17, 52:10, 66:22, 83:3, 116:17, 116:18, 124:17
**WINKLEMAN** [1] - 2:3
**wise** [1] - 23:8
**witness** [10] - 3:3, 4:15, 4:20, 22:1,

22:5, 25:1, 67:11, 101:15, 145:3, 145:4
**WITNESS** [39] - 14:24, 36:8, 44:5, 47:12, 47:16, 50:24, 61:8, 65:9, 68:1, 71:12, 75:20, 79:6, 79:20, 80:22, 99:19, 102:6, 103:21, 106:13, 114:10, 114:20, 115:20, 123:6, 124:7, 124:15, 126:3, 126:17, 128:24, 129:7, 129:17, 131:11, 133:14, 136:20, 138:11, 138:20, 140:1, 140:13, 140:18, 140:23, 142:11
**witnesses** [1] - 100:12
**woman** [4] - 60:6, 75:11, 86:6, 86:7
**word** [2] - 50:16, 127:7
**words** [1] - 41:6
**works** [1] - 132:20
**world** [7] - 10:2, 16:6, 17:2, 50:10, 105:9, 113:24, 126:10
**worldwide** [1] - 29:17
**worth** [1] - 11:12
**write** [1] - 109:6

## Y

**year** [13] - 3:17, 9:22, 13:11, 13:14, 20:1, 21:20, 21:24, 27:17, 28:1, 35:5, 57:12, 57:19
**years** [31] - 4:8, 5:15, 6:25, 7:12, 7:23, 8:15, 9:7, 11:5, 15:12, 22:7, 24:10, 28:3, 34:24, 46:3, 66:20, 82:24, 84:16, 103:6, 103:9, 103:13, 106:1, 111:9, 111:21, 113:9, 113:17, 134:9, 134:23, 135:25, 136:3, 136:5, 137:9
**yellow** [1] - 54:11
**yourself** [3] - 56:15, 86:4, 117:20
**YOURSELF** [1] - 144:10

## Z

**zoom** [3] - 71:17, 88:23, 99:24
**Zoomed** [1] - 2:23
**zoomed** [2] - 71:16, 74:13
**zoomed-in** [1] - 71:16

