Randall W. Jaques
*Maritime Safety Consultant & Accident Analysis Investigator*
1601 Jennings Avenue #B
Villas, New Jersey 08251
305-498-3260

Re: Arthur Lehmann v. Carnival Corp.
Case No. 24-cv-20060-CIV-KMW

## TENDER OPERATION EXPERT REPORT

### I.    OVERVIEW

I was retained by Lipcon, Margulies, & Winkleman, P.A. on September 4, 2024 to perform a cruise ship accident analysis with respect to Plaintiff, Arthur Lehmann's July 13, 2023 tender incident.

### II.    QUALIFICATIONS

I am 65 years of age.  I have a background with the U.S. military (Ret) NCO Airborne Infantry, Military Police 31B, Honor Guard, Special Forces Operations NCO, Military Police Investigator, and Office of the Inspector General (Gulf War). As a cruise line safety officer and chief of security aboard multiple cruise ships, and lately as a private marine and cruise ship security and safety consultant, I have been investigating and testifying in maritime accidents and wrongful death all over the world.

I served as a police officer & Homicide Detective with the City of Reno & Coral Gables Police, Washoe County School Police Departments.  During that employment I functioned in part as a marine patrol officer and was required to obtain various training and certifications from the U.S. Coast Guard. I am a qualified seamen and small boat captain since 1984.

In 1990, I was activated by the Army Reserves to serve in the Gulf War (Office of the Inspector General).  Following my return from the Gulf War, I became employed by CARNIVAL CORPORATION as a Chief Security Officer and served as such on a number of vessels until approximately December 2007 with three different cruise lines.  In 2006 I obtained my certificate as Safety Officer with Holland American Line.

I was responsible for identifying hazards on board cruise ships and I was responsible for investigating accidents and incidents occurring aboard cruise ships and identifying the causes of such accidents and incidents, conducting root cause analysis, and making recommendations for corrective actions.  I was responsible for supervising tender operations in ports. "Tenders" are small commercial motor vessels which are used to transport passengers between ship and shore in ports which have no docks for cruise ships.  Such small passenger vessel operations are inherently dangerous and require the establishment, exercise, and strict enforcement of standard safety precautions to avoid mishaps and injury. Such small commercial passenger vessels require a crew



EXHIBIT    1
Witness:Randall Jacques
Date: 11-18-24
Stenographer: Paula Pace, RPR

trained and skilled in passenger management and safety. I was also a trained-On Scene Commander for emergency situations such as fire and evacuation, and a lifeboat commander.

In 2001, I was hired by Norwegian Cruise Line to work full-time as a security chief aboard various NCL vessels, where I was responsible for identifying hazards on board those cruise ships and was also responsible for investigating accidents and incidents and identifying the causes of such accidents and incidents, conducting root cause analysis, and making recommendations for corrective actions. I continued in this role with Norwegian Cruise Line until 2003, when I deployed to Afghanistan in connection with my reserve duties. After this tour, I served briefly as a security officer aboard a Disney Cruise Line vessel in the latter part of 2004, also charged with identifying shipboard hazards and investigating accidents and incidents and identifying causes and making recommendations for corrective action. Following that, I went on to work for Holland American Line.

Between March 2005 and July 2006, I worked as a security manager and safety officer, aboard vessels of Holland America Line (a subsidiary of CARNIVAL). The scope of my duties as a security manager and safety officer with Holland America Line were similar to when I was employed by Carnival, NCL, Disney, and previously with Holland America. As security officer I inspected the ships to identify hazards aboard those ships and investigated every accident or injury producing incident that occurred on the vessel, on the pier, and during shore excursions to ultimately determine the cause(s) of each accident or incident and to make recommendations for corrective actions. These accidents and incidents numbered approximately 15 to 25 per voyage. My estimated total accidents and injuries investigated surpass 2,000 cases, both at sea and on land

Accidents ranged from slip and falls, trip and falls, stairwells, falls from heights, head injuries, limb amputations, death at sea, man over board, criminal assaults, sexual assaults, tenders, gangways, ramps, engine room falls, burns, fires, food allergies, bike accidents, bus accidents, drowning, slide injuries, & scooter accidents, propeller accidents, and emergency medical evacuations at sea. During the emergency medical evacuations, it was my job as on scene commander to work directly with the Staff Captain, Doctor, nurses, safety officer and Master of the vessel to establish a logistical plan for the evacuation. Typically, I would meet with the staff captain and Doctor to determine how the debarkation will happen and where it will take place. I investigated hundreds of passenger and crew accidents at sea and in port. a number of these accidents involved death at sea or on shore excursions. investigating death at sea led me to such cases as George Smith MOB, Michael Cambell MOB, Steward Rogers MOB, Kimberly Bristal MOB and most recent Sean Klaus drowning just to name a few.

In 2008 I registered Randall W. Jaques LLC in the State of Florida, I have owned and operated my own marine/maritime security and safety consultancy since then. I have performed hundreds of investigations and evaluations of marine casualties, most often involving cruise ships. In my own marine/maritime security and safety consultancy, I conduct these investigations and evaluations of marine casualties utilizing the same methodology, described herein, as when I was employed by the cruise lines as a safety officer and security officer. I have been asked to perform such services for the cruise industry and for representatives of persons injured during cruises for both the Defense and Plaintiff firms. As the ombudsman for the United States Coast Guard, Sector Miami 2006-2018. I also had 4 CG Cutters that I represent for the command. I am extremely well

versed in the emergency operations, and capabilities of the USCG during an air/sea emergency situation or Code Oscar MOB Man Overboard. As a professional maritime consultant, I have conducted hundreds of site and vessel inspections worldwide which include the scenes of accidents and incident and have included the inspection of medical facilities where emergency treatment was conducted. My site, vessel, and medical facility inspections were conducted to perform accident reconstructions, identify hazards, determine accident or incident causes, review policies and procedures in light of SOLAS, and evaluate the safety, security, premises safety, and evaluation of professional services offered. In order to evaluate medical facility inspections aboard vessels, I would interview the facility administrator and ask questions pertaining to what care or trauma treatment can be offered.

I have upgraded my STCW certification in Crowd Management and continue my education with the Maritime Professional Training Center in Ft. Lauderdale, Florida. In May of 2015, Chief Judge Kevin Michael Moore approved and acknowledged that Randall W. Jaques is to be recognized as a maritime safety expert and crowd and crisis control management expert in the Southern District Court of Florida.

Specific to the facts of this case, I have worked over 7 years in the capacity of a safety and security officer aboard cruise ships, including those operated by Carnival, NCL, Disney, and Holland America. During that time and over a 7-year period, I was responsible for overseeing at least 50 transfer operations of cruise passengers, from cruise ship to a tender, similar to what the Plaintiff in this case experienced leading up to his injury.

In view of my work experience and training, I am intimately familiar with the cruise ship-to-tender transfer operations, industry standards for same, and how such operations are to be safely conducted on cruise ships by crewmembers vis-à-vis cruise ship passengers.

## III.   MATERIALS REVIEWED

- Defendant's Responses to Plaintiff's First Request for Production

- Defendant's Responses to Plaintiff's First Request for Admissions

- Defendant's Responses to Plaintiff's Initial Interrogatories

- CCTV video of Plaintiff's incident

- Pictures of the tender vessel

- Plaintiff's injury statement

- In lieu of a ship/site inspection I have reviewed the CCTV which captures Mr. Lehmann's incident. I also personally interviewed Arthur Lehmann further to my understanding of the specific facts of his case.

### IV.   METHODOLOGY

Review available discovery materials and evidence provided to me (outlined above).

Conduct a site investigation and/or review pictures of the site from online source(s).

Review Plaintiff's deposition transcript and interview Plaintiff for further information and clarification.

Apply training and work experience to the facts of the case.

Formulate opinions.

Consider other reasonable alternatives and/or causes.

Test opinions and/or rule out other reasonable alternatives.

Develop conclusions.

In summary, I perform an accident analysis based upon review of relevant materials and application of my training and work experience as a cruise ship safety expert, as I have done thousands of times in the past in my former roles as Safety Officer and Security Officer aboard cruise ships and thereafter as a cruise ship safety and security consultant.

### V.   ARTHUR LEHMANN'S TENDER TRANSFER INCIDENT.

I interviewed Mr. Lehmann on September 4, 2024. During my interview, I learned the following from Mr. Lehmann and these facts support my opinions outlined below.

On July 13, 2023, Mr. Lehmann was a passenger on the Carnival Panorama. On that date, and in order to access the Port of Cabo San Lucas, scheduled port stop for this cruise, Carnival required Mr. Lehmann to board a tender vessel, which would take him to the port.

On the morning of July 13, Mr. Lehmann attempted to board the tender. However, upon Mr. Lehmann's transfer from the cruise vessel gangway to the tender, Mr. Lehmann fell and fractured his ankle.

Leading up to his fall, the tender crew instructed Mr. Lehmann to give him his cane, and Mr. Lehmann complied with this order. The tender crew did not assist Mr. Lehmann to sit down on the tender. The tender crew did not advise Mr. Lehmann of the railings on the tender he could have used to stabilize himself while aboard the tender.

## VI.   EXPERT OPINIONS

1. **Cruise ship-to-tender transfer operations are dangerous for cruise ship passengers; this is well known to cruise lines, but not an obvious danger to cruise passengers**
   a. During my years working as a security officer for cruise ships, including Carnival Corp., I supervised over 50 tender operations, similar to what Plaintiff experienced.
   b. In my experience, at least one passenger a week would slip, trip or fall while doing these transfers.
   c. In my experience, these frequent incidents were due to the dangerous nature of cruise ship-to-tender transfer operations. These operations are dangerous because they are conducted while the cruise ship is moored in the open ocean, where the waves are more rough than they are when the vessel is moored closer to land at a pier, the cruise ship is moving in the sea, the tender vessel is moving in the sea, and passengers, who are usually not accustomed to sea movement, are required by the cruise line to transfer between the cruise ship and the tender under these conditions, via a narrow gangway.
   d. As such, these tender operations are dangerous, and this is a fact generally known to cruise ship operators and their tender operators/agents, such as Carnival, but not obvious to the typical cruise ship passenger who lives on land. Further, the extent of ship movement is not an obvious danger to a passenger, but it is a danger known to cruise operators, like Carnival, because cruise operators monitor the sea and wind conditions on a minute-by-minute basis.
   e. The discrepancy of knowledge between the cruise operator (like Carnival here) and their passengers (like Mr. Lehmann here) as to the dangerous nature of these tender operations is further supported by prior injury incidents experienced by cruise ship passengers. Carnival has information of prior injury incident with respect to tender transfers, similar to Mr. Lehmann's case, which put Carnival on notice of these dangerous conditions, but Mr. Lehmann did not have that information.

2. **Cruise ship crew and their tender agents responsible for assisting passengers transfer from the cruise ship to the tender must exercise caution for the safety of cruise ship passengers.**
   a. Given the point above, crew and agents of the cruise operator are required to assist cruise passengers safely transfer from the cruise ship to the tender.
   b. Cruise lines such as Carnival typically have policies and procedures applicable to their crew and agents, explaining how crew and agents are to assist passengers safely make the transfer.
   c. For example, Carnival disclosed in discovery in this case a video, which depicts its crew member assisting a passenger transfer from the cruise ship to the tender, and this supports my point that Carnival has policies and procedures to assist passengers conduct the transfer; in part because Carnival knows tender transfer operations are inherently dangerous:





3. **In this particular case, Carnival's crew and tender agents did not act reasonably under the circumstances because they failed to reasonably assist Mr. Lehmann board the tender vessel.**

   a. Within the cruise industry, it is standard practice for tender agents to assist passengers board a tender when they are coming from a cruise vessel. Such assistance includes making light physical contact with passenger by the arm or elbow, to help them stabilize during the transfer to the tender vessel, and then assisting them to a seat. These are the same practices I exercised when I assisted passengers transfer from cruise ship to tenders when I was employed by the cruise lines.

   b. Carnival's crew and tender agents did not act reasonably under the circumstances of Mr. Lehmann's incident for the following reasons:

      i. Upon Mr. Lehmann's transfer from the cruise vessel gangway to the tender, the tender crew instructed Mr. Lehmann to give him his cane, and Mr. Lehmann complied with this order. This was not reasonable under the circumstances, because it should have been obvious to the tender crew that Mr. Lehmann needed his cane for stability, and therefore, the tender crew should not have ordered Mr. Lehmann to give up his cane, especially at a time when he needed it.

      ii. The tender crew did not assist Mr. Lehmann to sit down on the tender, and the tender crew should have. The CCTV shows no crewmember came to Mr. Lehmann's aid, to assist him to safely sit down on the tender vessel. In contrast, the Carnival video excerpt provided above shows Carnival has a policy and/or expectation that its tender crew

and/or agents will assist passengers safely make the transfer to the tender. In Mr. Lehmann's case, Carnival's tender crew and agents did not do this, but they should have.

iii. The tender crew did not advise Mr. Lehmann of the nearby railings. Similar to the point above, Carnival's tender crew and agents should have done this, but they did not.

4. **The conduct of Carnival's crew and agent directly caused Mr. Lehmann to become injured.**

   a. The CCTV of Mr. Lehmann's incident shows that Carnival's tender crew and agents did not reasonably assist Mr. Lehmann once he got aboard the tender vessel.

   b. In my experience, I have witnessed passengers get injured in a similar manner to Mr. Lehmann when tender crew do not reasonably assist passengers make the transfer to the tender and assist them to safely sit down on the tender once they are aboard.

   c. In my experience and based on my review of the materials in this case and my interview of Mr. Lehmann, the conduct of Carnival's tender crew and agents – their acts and/or omissions – directly caused Mr. Lehmann to fall while aboard the tender and suffer his injuries, as I understand them to be a fractured ankle.

## VII.   CONCLUSION

My opinions contained within this report are made within a reasonable degree of certainty within the discipline of cruise ship safety and security. I reserve the right to change this report as additional information or materials become available.

I hereby declare under penalty of perjury that the facts and opinions contained herein are true and correct. Notary not required pursuant to 28 U.S.C. § 1746.

Date: September 5, 2024.

e/s *Randall W Jaques*

Randall Wesley Jaques LLC
Maritime Safety Expert
1601 Jennings Avenue #B
Villas, New Jersey 08251
305-498-3260